IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

JOHN DOE,

        Plaintiff

        v.

UNIVERSITY OF MASSACHUSETTS,
TRUSTEES OF THE UNIVERSITY OF
MASSACHUSETTS, HANNAH MONBLEAU, in
her official and individual capacities, KATE
LEGEE, in her official and individual capacities,
ESMERALDA LEVESQUE, a/k/a ESMERALDA
Mendez, in her official and individual capacities,
ADAM DUNBAR in his official and individual
capacities, BRETT SOKOLOW,

        Defendants

No. 1:23-cv-12077

**COMPLAINT**

_____

Ilya I. Feoktistov, Esq.
B.B.O. No. 704458
**LAW OFFICE OF ILYA FEOKTISTOV**
292 Newbury Street, No. 544
Boston, MA 02115
(617) 462-7938
if@ilyafeoktistov.com

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 3
PARTIES ................................................................................................................................ 4
JURISDICTION AND VENUE ............................................................................................. 9
RELEVANT FACTS ............................................................................................................ 10
   I.    UMass Lowell Maintains a Procedural Double Standard for Adjudicating Formal
        Reports of Sexual Harassment ................................................................................ 11
    A.   The UMass Lowell Title IX Process ...................................................................... 12
    B.   The Student Conduct Process .................................................................................. 13
   II.   The Process As Used Against Mr. Doe ................................................................... 15
    C.   The Notice Given to Mr. Doe .................................................................................. 15
    D.   The Investigator's Clear Bias Against Mr. Doe and All Title IX Respondents ............. 18
    E.   The Investigation of Complaints Against Mr. Doe .................................................. 20
    F.   The Shift of Mr. Doe's Process from a Title IX Process to a Student Conduct Process
        After Mr. Doe Retained Counsel .......................................................................... 31
    G.   The Hearing Panel's Findings ................................................................................ 34
   III.   Mr. Doe Has Been Extremely and Irreparably Harmed By Defendants' Actions ......... 36
COUNT I ............................................................................................................................. 37
COUNT II ............................................................................................................................ 40
COUNT III ........................................................................................................................... 48
COUNT IV ........................................................................................................................... 52
VERIFICATION .................................................................................................................. 57

## INTRODUCTION

Plaintiff, John Doe, by and through undersigned counsel, brings this Complaint against the University of Massachusetts, the Trustees of the University of Massachusetts, Hannah Monbleau, Esmeralda Levesque, Adam Dunbar, and Brett Sokolow, and alleges as follows:

1.   In The Crucible, Arthur Miller connects the crude sexual innuendo suffusing the infamous false accusations of witchcraft in 17th century Salem, Massachusetts with the McCarthyism of his own era, remarking:

> Sex, sin, and the Devil were early linked, and so they continued to be in Salem, and are today. From all accounts there are no more puritanical mores in the world than those enforced by the Communists in Russia . . . And yet, in American eyes at least, there remains the conviction that the Russian attitude toward women is lascivious. It is the Devil working again, just as he is working within the Slav who is shocked at the very idea of a woman's disrobing herself in a[n American] burlesque show. Our opposites are always robed in sexual sin. . .

2.   Mr. Doe comes from a traditional culture in a foreign country.

3.   Defendants come from the progressive culture of New England, and share a political ideology which generally teaches that traditional cultures like Mr. Doe's are tainted by what is known in this ideology as "rape culture"—generally defined as a system of cultural and legal norms that allows and encourages consequence-free sexual misconduct by males toward females.

4.   As a consequence of these beliefs, the University of Massachusetts Defendants have found Mr. Doe responsible for sexual misconduct based on nothing but innuendo, hearsay, and say-so from a group of 21st century Abigails whom Mr. Doe had the misfortune to encounter in the middle of a modern version of nighttime dancing in the woods.

5.   If this Complaint is long and complex, it is because it describes a process against Mr. Doe that has been so convoluted, arbitrary, and fundamentally unfair that there is a large number of various ways in which his rights have been violated thereby.

6.   Like God had been on the side of the Salem judges; Defendants have an entirely legitimate moral imperative on their side that is merciful, righteous, and good: a political and moral ideology whose prime desire is to support sexual assault victims. This is a laudable desire.

7.   Yet, as Miller wrote, and as is true in all ages, once a "political policy is equated with moral right, and opposition to it with diabolical malevolence," then "society becomes a congerie of plots and counterplots, and the main role of government changes from that of the arbiter to that of the scourge of God."

8.   Plaintiff pleads with this Court to sort through the various details of this Complaint, and to arbitrate the issues raised therein on the basis of current law.

## PARTIES

9.   Plaintiff John Doe (Mr. Doe) is a 37-year-old student enrolled in the Leadership in Education PhD program in at the University of Massachusetts campus in Lowell, Massachusetts (UMass Lowell), which receives federal educational funding. Mr. Doe is a heterosexual male of Indian national origin. In 2021, he sold all his possessions and came to the United States on an F1 student visa in order to enroll at UMass Lowell. Because Mr. Doe could not afford to pay for off-campus housing, and because his student visa did

not authorize him to work off-campus, he eventually began working as a residential

advisor in one of the campus dormitories.

10.    Mr. Doe was extremely well-liked by his residents and fellow resident advisors. On April

14, 2023, just three weeks before the complaints against him were made, he had received

an "RA of Distinction Award," for which he was nominated by multiple fellow resident

advisors, as

> a member of our team that exemplifies what it means to be an RA, whether they
> are helping their residents with challenging situations, supporting their fellow
> RAs in understanding a process, or simply offering to cook a delicious meal for
> anyone they meet, this RA embodies the "how can I help" attitude that every
> member of the Residence Life team should aspire to. To quote a few of the many
> nominations this RA received from the Riverview Team, "He goes out of his way
> to show care to everyone he meets and his connection with current and former
> residents encourages me to do my best."

11.    While no loin-clothed ascetic by any means, Mr. Doe practices a traditional Hindu

lifestyle as part of his modern daily life. As a member of Hinduism's Brahmin priestly

class, Mr. Doe has worn a sacred string around his torso ever since his traditional

initiation into the priesthood at 9 years old—changing it only once a year in a ritual

fashion. Mr. Doe is a strict vegetarian and could never marry someone who consumes

meat. Mr. Doe is single; and he has decided to follow his family's cultural practice to

enter into a parent-arranged marriage.

12.    In the 21st century, the logistics of such an arrangement begin with parents matching

their children on "matrimonial" smart phone apps based on horoscopes, family

background, and personal characteristics. Once the parents of a prospective couple agree

on a match, they provide their children with each other's telephone numbers, and the two

discuss by phone their plans, hobbies, how they see the future, and what they want to see in a life partner.

13. Defendant University of Massachusetts is a public institution of higher learning established by the Commonwealth in Mass. Gen. Laws ch. 75, § 1 et seq. It receives Federal funding for its education programs.

14. Defendant Trustees of the University of Massachusetts is the governing board of the University of Massachusetts, and is empowered by the Massachusetts Legislature in Mass. Gen. Laws ch. 75, § 1 to have "all authority, responsibility, rights, privileges, powers and duties customarily and traditionally exercised by governing boards of institutions of higher learning," as well as the "authority, responsibility, powers and duties specifically conferred by this chapter," including "establishing those policies necessary for the administrative management of personnel, staff services and the general business of the university."

15. The University of Massachusetts campus in Lowell, Massachusetts (UMass Lowell) is home to 2,046 international students from 94 different countries, together constituting 12% of total enrollment at the campus. The largest contingent by far is from India, with 635 Indian international students at UMass Lowell. On information and belief, there is a certain animosity and bias toward the international students at UMass Lowell, especially those from India. This animosity leads even students who are U.S. citizens of Indian origin to distance themselves from their former compatriots.

16. At UMass Lowell, personal sexuality is a topic of intense public concern and frequent discussion. The university frequently invites individuals of various sexualities to discuss

"what it's like to be LGBTQ+ and out at the workplace." The university brings in "lesbian role models to speak out on the issues facing female-identified sexual minorities." The university' Multicultural Affairs Center and the city government of Lowell offer students annual events where they can "join some queens" for burlesque shows by "some of New England's most entertaining drag performers," who go by stage names like Cherry Poppins.

17.   <u>Defendant Hannah Monbleau</u> (Monbleau) was assigned by UMass Lowell to investigate formal complaints of sexual harassment against Mr. Doe. At all times relevant hereto, Monbleau was employed by UMass Lowell as its Assistant Director of Student Life and Well-Being. Monbleau is a resident of Dracut, Massachusetts. She is sued in her official and individual capacities.

18.   <u>Defendant Kate Legee</u> (Legee) was the chair of a campus conduct process hearing panel that adjudicated formal complaints of sexual harassment against Mr. Doe. At all times relevant hereto, Legee was employed by UMass Lowell as its Director of Student Conduct and Prevention. Legee is a resident of New Ipswich, New Hampshire. She is sued in her official and individual capacities.

19.   <u>Defendant Adam Dunbar</u> (Dunbar), was a member of a campus conduct process hearing panel that adjudicated formal complaints of sexual harassment against Mr. Doe. At all times relevant hereto, Dunbar was employed by UMass Lowell as its Senior Associate Director of Student Affairs. Dunbar is a resident of Townsend, Massachusetts. He is sued in his official and individual capacities.

20.  Defendant Esmeralda Levesque (Levesque), also known as Esmeralda Mendez, was a member of a campus conduct process hearing panel that adjudicated formal complaints of sexual harassment against Mr. Doe. Levesque is a resident of Nashua, New Hampshire. At all times relevant hereto, Levesque was employed by UMass Lowell as its River Hawk Scholars Academy Coordinator.

21.  Defendant Brett Sokolow (Sokolow) is a licensed Pennsylvania attorney. He is a resident of Westlake Village, California.

22.  Sokolow operates an entity called the Association of Title IX Administrators (ATIXA).

23.  ATIXA contracts with UMass Lowell to provide the university's required annual Title IX trainings for employee investigators, hearing panelists, and other participants in the Title IX process.

24.  ATIXA bills itself as "an independent, not-for profit corporation incorporated under the laws of the Commonwealth of Pennsylvania." However, the organization instead appears to be an unincorporated membership fee project of another entity called TNG Consulting, LLC.

25.  ATIXA is not registered as a corporation with the Pennsylvania Secretary of State. The only corporate entity called TNG Consulting, LLC that is registered as having been incorporated under the laws of the Commonwealth of Pennsylvania was incorporated in 1988, when Sokolow was 16 years old. Neither ATIXA nor TNG Consulting, LLC is listed by the Internal Revenue Service as having tax exempt status.

26.  Sokolow is a prominent advocate against the use of long-established traditional legal and cultural norms like notice, hearing, and cross-examination in campus Title IX grievance

procedures. The Foundation for Individual Rights in Education has criticized Sokolow for "strongly disregard[ing] the catastrophic, lifelong consequences students face when they are found responsible for sexual misconduct."

27. Sokolow urges those involved in the campus Title IX grievance procedures to "find clever work-arounds" having to obey various U.S. Department of Education regulations interpreting Title IX, which regulations require certain due process protections for students accused of sexual harassment.

28. According to Sokolow, such protections for the accused create "significant chilling effects on the willingness of those who experience discrimination, harassment and sexual violence to report it."

29. In fundamental disagreement with Anglo-American legal norms, Sokolow claims that "no research indicates that cross-examination creates more accurate results than other ways of allowing the parties in a sexual misconduct allegation a full and fair opportunity to review and contest all evidence prior to a final determination."

30. In ATIXA's training materials for Title IX investigators, Sokolow teaches UMass Lowell employees to use the prisoner of war interrogation techniques of Nazi Germany's master interrogator Hans Scharff and the terrorist interrogation techniques of the joint U.S. Federal Bureau of Investigation, Central Intelligence Agency, and Department of Defense High-Value Detainee Interrogation Group on student respondents to formal reports of sexual harassment.

**JURISDICTION AND VENUE**

31.   This Court has original jurisdiction over Mr. Doe's claims pursuant to 28 U.S.C. §§ 1331 and 1343. Mr. Doe's claims arise under 42 U.S.C. § 1983 and the implied right of action in 20 U.S.C. § 1681.

32.   This Court has supplemental jurisdiction over Mr. Mr. Doe's state law statutory and contract claims pursuant to 28 U.S.C. § 1367.

33.   Venue in the District of Massachusetts is appropriate pursuant to 28 U.S.C. 1391 because a substantial part of the events or omissions giving rise to the claim occurred in the District of Massachusetts.

**RELEVANT FACTS**

34.   After Mr. Doe retained counsel to defend himself against formal complaints of sexual harassment that were filed against him, the University of Massachusetts Defendants denied Mr. Doe multiple procedural protections required under 20 U.S.C. § 1681 et seq., popularly known as Title IX of the Education Amendments of 1972 (Title IX), and 34 C.F.R. 106.45 in the adjudication of such complaints. As a direct consequence, the University of Massachusetts Defendants ultimately found Mr. Doe responsible for sexual misconduct under the rationales that over the space of a year:

   a.   in conversation with a female student, Mr. Doe "compare[d] unwanted sexual conduct to religious proselytism . . . and meant to do so in disagreement with both";

   b.   in conversation with another female student, Mr. Doe "stated 'I don't need to someone to have sex with'";

    c.  Mr. Doe used expressive conduct in the form of outstretched arms to ask a third

        female student for consent to give her a hug; and

    d.  Mr. Doe adjusted the third female student's "feet [on top of Mr. Doe's exercise

        machine] with his own feet" without affirmatively asking for consent to do so.

**I.    UMass Lowell Maintains a Procedural Double Standard for Adjudicating Formal Reports of Sexual Harassment**

35.    At UMass Lowell, formal reports of sexual harassment or sexual misconduct on campus

        must be reported to the UMass Lowell Title IX Coordinator in order to comply with the

        requirements of Title IX and 34 C.F.R. 106.45.

36.    Upon receipt of a sexual harassment or misconduct report, it is in the sole discretion of

        the UMass Lowell Title IX Coordinator to determine whether the report a) will be

        investigated as "sexual harassment" pursuant to the UMass Lowell Sexual Harassment

        Grievance Procedure in accordance with Title IX law and regulation (Title IX Process),

        or instead b) will be dismissed and referred to the UMass Lowell Student Conduct Office

        for investigation as "sexual misconduct" under the university's Campus Conduct Process.

37.    The definition of sexual harassment under the UMass Lowell Title IX Process is

        essentially the same as the definition of sexual misconduct under the Campus Conduct

        Code.

38.    The Title IX Process defines sexual harassment as

        conduct on the basis of sex that satisfies one or more of the following:  (i) An
        employee of the university conditioning the provision of an aid, benefit, or service
        of the university on an individual's participation in unwelcome sexual conduct;
        (ii) Unwelcome conduct determined by a reasonable person to be so severe,
        pervasive, and objectively offensive that effectively denies a person equal access
        to the university's education program or activity; or (iii) "Sexual assault" as
        defined in 20 U.S.C. 1092(f)(6)(A)(v), "dating violence" as defined in 34 U.S.C.

12291(a) (10), "domestic violence" as defined in 34 U.S.C. 1229(a)(8), or "stalking" as defined in 34 U.S.C. 12291(a) (30), as amended.

39.   The Student Conduct Code defines sexual misconduct as

unwelcomed conduct of a sexual nature when: submission to or rejection of such conduct by a person or persons is used as a basis for employment or educational decisions affecting such person or persons, or participation in University programs or activities; or such conduct unreasonably: interferes with a person or person's work or academic performance; interferes with or limits a person or person's ability to participate in or benefit from a work or academic program or activity; or creates an intimidating, hostile, or offensive working or academic environment.

40.   The UMass Lowell Title IX Process provides significantly more due process rights than does the university's Campus Conduct Process. This creates a procedural double standard for adjudicating the same conduct under two very different processes.

**A.    The UMass Lowell Title IX Process**

41.   The UMass Lowell Title IX Process incorporates some, but not all, of the due process protections required for campus Title IX investigations and adjudications by current U.S. Department of Education regulations. Cf., generally, 34 C.F.R. 106.45.

42.   In relevant part, the UMass Lowell Title IX Process provides that the respondent to a formal complaint of sexual harassment be given notice of the "identity of the parties, [and] a description of the alleged conduct constituting sexual harassment, including the date and location of the incident, if known."

43.   Both complaining and responding parties in the investigation of a complaint under the UMass Lowell Title IX Process may choose to utilize external civil or criminal processes available to them from courts or agencies outside of UMass Lowell.

44.     Under the UMass Lowell Title IX Process, the respondent is "presumed not responsible

        for the alleged conduct until a determination regarding responsibility is made at the

        conclusion of the Grievance proceeding."

45.     Pursuant to the UMass Lowell Title IX Process, there "may be restrictions on evidence

        considered by the Investigator, such as, for example, evidence related to prior sexual

        activity, and accounts of character witnesses."

46.     Under the UMass Lowell Title IX Process, "the Investigator(s) will prepare an

        Investigation Report that fairly summarizes relevant evidence, including inculpatory and

        exculpatory evidence.

47.     The UMass Lowell Title IX Process requires a live hearing to permit each party's advisor

        to ask both parties and any witnesses all relevant questions, including those questions

        challenging credibility, by direct and cross-examination.

**B.     The Student Conduct Process**

48.     In explicit contrast to the UMass Lowell Title IX Process, pursuant to the UMass Lowell

        Student Conduct Code: "Formal rules of process, procedure, and evidence, such as are

        applied in criminal or civil court, are not used in the campus conduct process."

49.     Responding students are not given the option to utilize external civil process in lieu of the

        Campus Conduct Process.

50.     Under the Campus Conduct Process, a student accused of Student Conduct Code

        violations is provided with a written "summary of what is alleged to have occurred,

        including (if known) the alleged date of occurrence, location, and details about the

origination of the report, along with the policy which the behavior purports to have violated." No description of the alleged conduct itself is required.

51.     The UMass Lowell Director of Student Conduct either personally investigates the alleged Student Conduct Code violation or appoints a "neutral investigator" to do so.

52.     Upon the conclusion of the investigation, the investigator prepares an Investigation Report containing the "investigative record" and concluding with the investigator's determination, under a preponderance of the evidence standard, of whether or not the responding student has violated the Student Code of Conduct.

53.     Because the investigator already has made a preponderance of the evidence determination that the responding student has violated the Student Code of Conduct, the final Investigation Report findings necessarily create an explicit presumption of guilt at the Hearing Panel stage of the Student Conduct Process.

54.     A responding student is allowed to have "a support person" present at the Student Conduct Process Hearing Panel, and the support person may be an attorney. However, the support person may not speak to the panel on the student's behalf.

55.     At the Student Conduct Process Hearing Panel, neither the responding student nor the responding student's support person is allowed to directly question or cross-examine the complainant and witnesses. Instead, they must present any questions "to the panel, in writing, which will then determine if the question is relevant and must be answered by the other party."

56.   According to the UMass Lowell Student Conduct Code, "All students that participate in the [Hearing P]rocess must be willing to submit to questioning by the hearing panel. This may include questions submitted by the other parties in the hearing."

57.   Students "who do not participate in the hearing are not eligible to appeal."

58.   Appeals are not as of right, and may be heard by the same Hearing Panel that made the original decision. "There is no possibility for further appeal following the outcome of the new hearing."

## II.  The Process As Used Against Mr. Doe

59.   Late evening on May 6, 2023, Mr. Doe and another Indian international student, K.G., encountered a group of their fellow resident advisors, including but not limited to J.T., and C.T., who were drinking alcohol, making loud noises and otherwise violating the UMass Lowell Student Conduct Code in the hallways of the student residence where all of them lived and worked.

60.   On the afternoon of May 7, 2023, to preempt any potential reports of misconduct against them by Mr. Doe and K.G., four of Mr. Doe's fellow resident advisors, J.T., C.T., E.Z., and E.H., made formal reports to their mutual supervisor accusing Mr. Doe and K.G. of sexually harassing them at work.

### C.     The Notice Given to Mr. Doe

61.   On May 19, 2023, Mr. Doe and K.G. received letters from both the Student Conduct Office and from a Deputy Title IX Coordinator. The Student Conduct Office letters provided Mr. Doe and K.G. with the following vaguely-worded notice of the sexual misconduct allegations against them:

Assistant Director Ricardo de la Cuesta had a concern around [sic] brought up to him on 3:40pm on Sunday, May 7th. AD de la Cuesta met with both students in his office, Riverview 107, and explained that there were concerns about the words and actions of Resident Advisors [John Doe and K.G.] around how they interacted with female RAs.

62. The Deputy Title IX Coordinator's letter did not provide any notice of the allegations against Mr. Doe and K.G., beyond stating that her "office received a report that involves you and concerns of potential sexual misconduct involving another student."

63. Immediately after receiving notice of the charges against them on May 19, 2023, and for weeks thereafter, Mr. Doe and K.G. John repeatedly requested notice of their alleged conduct from UMass Lowell's Title IX professionals.

64. Having been trained in Nazi military interrogation tactics by ATIXA, UMass Lowell's Title IX professionals refused.

65. Mr. Doe and K.G. would not receive any further written details concerning the facts and circumstances underlying the complaints against them until after the investigation against them had been completed and a determination of their culpability already had been made.

66. On the same day that UMass Lowell notified Mr. Doe and K.G. of the complaints against them, the university took punitive action against the two international students without giving them any opportunity to explain their sides of the story.

67. UMass Lowell banned Mr. Doe and K.G. from their paid campus jobs as resident advisors, and from even communicating with other residents of their residence hall.

68. Mr. Doe and K.G. were banned from using residence hall spaces outside their own rooms, and from lingering in the hall's entrance any longer than is necessary for "swiping into the building."

69.    On May 30, 2023, a UMass Lowell Deputy Title IX Coordinator wrote to Mr. Doe that

the university has assigned its Director of Administrative Services and Transportation,

Karina Cruz Winslow (Winslow), as his "advisor/support person." The Deputy Title IX

Coordinator stated: "Karina is a friend of mine and has assisted in our process for a few

years."

70.    On June 8, 2023, Mr. Doe wrote to Winslow that he wishes "to meet and discuss with

[her] and take [her] guidance on the case based on relevant facts and details once they

were received by me from the office of conduct. The same has not yet been received,

instead I received a communication from the office of conduct inviting me for an

interview to discuss the aforementioned case [with an investigator]."

71.    Winslow replied that she needs to ask some questions of the conduct office and will

follow up with Mr. Doe early next week.

72.    On June 14, 2023, Mr. Doe reached out to Winslow for a follow-up, and asked if she was

able to find out any relevant facts and details from the Student Conduct Office.

73.    Winslow replied that "[i]t is not the standard practice that respondents be given the full

Investigation Report until after the conclusion of the investigation, and that if Mr. Doe

still has "further questions regarding the process, feel free to reach out to [the Deputy

Title IX Coordinator]."

74.    Mr. Doe replied, copying the UMass Lowell Deputy Title IX Coordinator, that he does

"not seek an Investigation Report," and that "what [he] wanted to understand was what

were the actual charges." Mr. Doe wrote: "I patiently wait for some answer pertaining to

the details of the case," and "I am sure the office of conduct understands my request of

having the details of my charges in writing [because] there are lives and livelihoods of

people at stake here."

75.   Winslow ignored this and all further communications from Mr. Doe.

76.   The Deputy Title IX Coordinator replied: "If this case ends up in a hearing panel, you

will have access to all of the relevant information before that. But you do not get to

review all of the relevant information prior to the investigator's interview."

77.   UMass Lowell tasked Defendant Hannah Monbleau (Monbleau), its Assistant Director of

Student Life & Well-being, as an investigator to gather evidence to allow the university

### D.   The Investigator's Clear Bias Against Mr. Doe and All Respondents in Title IX Cases

78.   Monbleau is not an attorney or a law enforcement officer.

79.   In 2021, Monbleau became a politically-active advocate for sexual misconduct victims,

writing on her Instagram account:

> For those of you who know me, you know that I have this little sticker on my laptop. A small little message amongst other things important to me showing that I care about sexual assault awareness. For too long, I've been this shy supporter, having a little laptop message portray my beliefs and having conversations with close friends and coworkers but too scared to raise my voice too loud. If there's anything I've learned this year, it's that silent support changes nothing.

80.   As part of her on-the-job training by UMass Lowell, Monbleau has been trained as a Title

IX investigator by the Association of Title IX Administrators (ATIXA).

81.   ATIXA trained Monbleau to believe in a vague and controversial academic paradigm

often referred to as "rape culture." ATIXA training materials instruct UMass Lowell

employees to conduct "[c]ulture and/or climate investigations," and to take respondents'

"[a]ffiliations, allegiances, [and] social groups" into account.

82.     The Harvard Gazette has defined "rape culture" as "the set of social attitudes about sexual assault that leads to survivors being treated with skepticism and even hostility, while perpetrators are shown empathy and imbued with credibility not conferred on people accused of other serious crimes, like armed robbery."

83.     On information and belief, Monbleau holds certain personal biases against international male students from traditional, non-white, non-Western national origins like those of the Indian subcontinent. Such cultures and nations frequently are stereotyped by Western sexual assault awareness activists as conservative "patriarchies" where "rape culture" is endemic.

84.     On information and belief, Monbleau believes that non-white, non-Western international male students' social attitudes toward women are more lascivious; and that such international male students therefore have a greater propensity for sexual misconduct than other groups, such as American citizens, women, or non-heterosexual men.

85.     ATIXA trained Monbleau and other UMass Lowell employees who participate in the university's Title IX process to view "agitated, argumentative . . . uncooperative, [and] resistant" behaviors by respondent students as signs of guilt.

86.     Therefore, in her Investigation Report, Monbleau discounted the credibility of every witness statement which confirmed that the allegations against Mr. Doe were false, while treating the implausible claims by the complainants as credible and true.

87.     ATIXA trained Monbleau to "workaround" Mr. Doe's due process rights, and thereby to violate traditional legal and cultural norms such as notice, impartiality, and the presumption of innocence.

88.  ATIXA trained Monbleau to prioritize oral testimony over physical evidence.

89.  ATIXA trained Monbleau to take respondents' "[a]ffiliations, allegiances, [and] social groups" into account as part of her Title IX investigations.

90.  On information and belief, Monbleau's own biases against male international students from traditional or conservative national origins caused Monbleau to view Mr. Doe's defenses that "[i]n India we hug," and that "a cultural thing to hug" as manifestations of Indian patriarchy and rape culture. Mr. Doe's defenses that he was discussing religion had a similar effect.

91.  All the complainants against Mr. Doe are female American citizens, and so is Monbleau.

92.  Mr. Doe complained to UMass Lowell about Monbleau may be biased against him, but those complaints were ignored.

**E.    The Investigation of Complaints Against Mr. Doe**

93.  On or about June 5, 2023, Monbleau began her investigation to determine whether Mr. Doe and K.G. were responsible for conduct toward E.Z., E.H., C.T., and J.T. in violation of Title IX.

**1.    Interviews with Complainants**

94.  Before Monbleau began her investigation, E.Z. withdrew her complaint against Mr. Doe and did not participate in Monbleau's investigation.

95.  On June 5, 2023, Monbleau interviewed E.H., who admitted to Monbleau that, "[n]othing happened directly to [E.H.] but she heard and saw these things happen to other RAs [resident advisors]."

96.   Monbleau quietly restyled E.Z. and E.H. as a witnesses instead of complainants, without explaining why in her Investigation Report.

97.   On June 6, 2023, Monbleau interviewed the remaining two complainants C.T. and J.T.

98.   Complainant C.T. alleged that at some unstated time before she made her complaint, Mr. Doe had told another resident advisor's boyfriend, while in C.T.'s presence, that "if the food is good, I'd have sex while eating."

99.   In response to Monbleau's request to describe how this statement has impacted her job and academics, C.T. responded vaguely that it was "awkward" and that she feels "nervous."

100.   In her interview with Monbleau, complainant J.T. alleged that in February or March 2023, she tried to sit down on the floor of Mr. Doe's dormitory room near his window; and Mr. Doe then told her: "you picked the spot where I shave my pubes." C.T. also confirmed to Monbleau that she was present when Mr. Doe said this to J.T.

101.   Complainant J.T. also alleged that Mr. Doe "loved to hug," hugged fellow resident advisor A.M., and would say "in this climate, people don't want to hug me"; which "made [J.T.] feel like she should hug him" too. It is not clear from Monbleau's Investigation Report whether Mr. Doe actually ever did hug J.T herself.

102.   In response to Monbleau's request to describe how this statement has impacted her job and academics, Complainant J.T. admitted to the investigator that the statement did not have "too bad of an impact on her job."

103.   Monbleau asked the complainants if there were any other percipient witnesses to their claims.

104.   Instead of providing Monbleau with witnesses who perceived Mr. Doe's alleged sexual misconduct against themselves, the complainants provided Monbleau with the names of two of their friends, S.K. and G.D., as character witnesses against Mr. Doe.

105.   During a subsequent June 14, 2023 interview with Monbleau, S.K. alleged that while she was working with Mr. Doe over "April break," she and Mr. Doe began discussing telephone dating apps. S.K. alleged that Mr. Doe then had become upset, and stated: "I don't need someone to have sex with."

106.   According to S.K., these statements made her "[e]xtremely uncomfortable," and she still has "not fully healed."

107.   S.K. admitted to Monbleau that  she has "not witnessed this happen to anyone else, only has had her experience."

108.   On information and belief, Monbleau pressured S.K. to file her own complaint against Mr. Doe and then changed S.K.'s status in the investigation from a character witness to a complainant.

109.   After the interview with Monbleau, S.K. provided a screenshot of a text conversation between herself and her boyfriend, which S.K. alleged occurred shortly after the incident with Doe. In the conversation, S.K. repeated essentially the same allegations against Mr. Doe, except using the word "f**k" instead of "sex" and accusing Mr. Doe of "trauma dumping"—a neologism referring to the oversharing of sad emotions, traumatic past events, and stressful past situations with others.

110.   S.K's screenshot was missing the date and time stamps that usually indicate when the text message conversation took place.

111.    After interviewing S.K, Monbleau interviewed another friend of the complainants, G.D. During her June 27, 2023 interview with Monbleau, G.D. alleged that in the spring of 2022, more than a year prior to the interview, she was cooking dinner together with Mr. Doe, and they were having a conversation "on the topic of Jehovah's Witnesses."

112.    G.D. alleged that Mr. Doe told her that the religion's proselytizing practice of "shoving their beliefs in your face" is comparable to Mr. Doe trying "shoving his penis in her face."

113.    G.D. admitted to Monbleau that she did not witness Mr. Doe engaging in sexual misconduct toward any of the other complainants, and that she did "not really think about this much until she heard about what had happened with her peers."

114.    On information and belief, Monbleau pressured G.D. to file her own complaint against Mr. Doe. Monbleau noted in her Investigation Report that G.D. "wants to file formal complaint." It is unclear why the complaint was not filed.

115.    G.D. is of Indian ethnicity and Hindu religion, but she is an American citizen, was raised in the United States, and uses English as her primary language of communication. G.D.'s close social circle does not include international students from India.

116.    G.D. made various generalizations and stereotypes about international students from India in her interview with Monbleau, which Monbleau incorporated into her Investigation Report. In India, according to the Investigation Report, "talking about sex is not typical because they are very conservative so using cultural differences is not an excuse because it is tolerated even less in their own culture." Monbleau also wrote that

for Indians, "talking about sex and private topics (even with friends) is not normal

behavior and is not an excuse for [Mr. Doe's] behavior."

### 2. Interviews with Mr. Doe

117.    On June 23, 2023, Monbleau interviewed Mr. Doe, finally allowing him to explain his

side of the story.

118.    The June 23, 2023 interview also was the first time that Mr. Doe finally was able to learn

of the factual charges against him. Even then, he still was forced to speculate about what

actually happened based on the particular questions Monbleau asked him about certain

incidents.

119.    At the very beginning of the interview, Mr. Doe informed Monbleau that English is not

his first language, and that he does not understand the claims being made against him.

120.    During the June 23, 2023 interview, Monbleau made inappropriate references to Mr.

Doe's Indian national origins and asked him bizarre questions about "having large toilets

in India."

121.    Responding to Monbleau's specific questions about the conduct underlying the

complaints against him, Mr. Doe told her that he does not specifically remember making

any statement about sex and food to a male party in complainant C.T.'s presence.

According to Monbleau's Investigation Report, Mr. Doe stated that he is a "foodie." He

said that he remembers himself and the other male party "talking about food and love for

food, [that] he said food is important to him and doesn't remember specifically saying the

word sex, but doesn't deny that he may have."

122. According to Monbleau, Mr. Doe categorically denied telling complainant J.T. in complainant C.T.'s presence that J.T. should not sit on the floor of Mr. Doe's dormitory room by the window, where he allegedly shaves his pubic hair. After the interview, Mr. Doe showed Monbleau physical proof, in the form of the university's own computer-generated floor plan of his dorm room, that there would have been no floor room for anyone to sit by his window, much less to shave what they claimed he was shaving.

123. Monbleau's response to Mr. Doe's proof was: "Whether or not he said he shaved his testicles has nothing to do with there having been space to do so."

124. According to Monbleau's Investigation Report, Mr. Doe did not "remember a specific incident" of asking anyone for a hug, but he "may have asked 'are you comfortable if I hug you?'" Mr. Doe told Monbleau: "In India, they hug, so he went for a hug. It is a cultural thing to hug." Mr. Doe provided Monbleau with a Valentine's Day card that J.T. gave him earlier in the year, which featured Mr. Doe and J.T. next to each other as stick figures with outstretched arms, a hot air balloon with two figures in it, and the note: "To [Mr. Doe], You the best! [J.T.]"

125. As part of her investigation, Monbleau interviewed A.M, the female resident advisor whom J.T. alleged to have witnessed being hugged inappropriately by Mr. Doe. The resident advisor, A.M. told Monbleau that she "[d]idn't think much of [Mr. Doe] hugging her or others, some days he seemed to be having a bad day and needed a hug"; and that "[d]uring difficult times, they would hug (his uncle passing, her grandfather passing)."

126. On June 30, 2023, Monbleau wrote to Mr. Doe:

> I learned of a potential additional complainant and would like to speak to you about the allegations that person brought forth. I am still not certain if they are

going to submit a formal complaint, but would like to speak with you about it in case they do as to not prolong the process.

127.   Mr. Doe replied to Monbleau that he is "more than willing to answer all your questions and address all the concerns, since I have le[d] my role as an RA professionally and I have nothing to hide"; but that "this whole experience has been mentally and physically traumatizing, and yes, [he] hope[s] the process is not prolonged till it actually leaves an irreversible scar (already going through enough trauma through this entire episode)."

128.   Mr. Doe provided Monbleau with several due process objections to her conduct of his investigation so far. He objected to hearsay statements being used against him, with "other complainants [having] brought the allegation[s]" of his alleged conduct toward each other.

129.   Mr. Doe also objected that Monbleau appeared to be biased against him as a respondent and appeared to be "rooting from complainant(s) interest . . . by galvanizing [their] friends and others . . . to come forward with more baseless stories and incidents."

130.   Monbleau replied to confirm the additional interview for July 5, 2023, and warned Mr. Doe:

> While I appreciate you sharing your feelings about this case with me, I am solely responsible for gathering the facts (timeline, who was there, what was said, etc.). There will be plenty of time to share your feelings and how this affected you with a hearing panel if it goes to that stage. In order to respect the time we have together, I will kindly ask that we spend the hour together on Wednesday speaking solely about the facts and questions I need answered for the investigation report.

131.   According to Monbleau's Investigation Report summary of the second interview,, Mr. Doe was "adamant that he did not say" anything about sex or masturbation to complainant S.K. while they were working together during April break. Mr. Doe told

Monbleau that his one and only joint shift together with S.K. was in March; that S.K. "mentioned she has a boyfriend" during this shift, and that they then talked about future relationship plans. He explained to S.K how he did not feel compatible with Western women, and how he is not interested in the American style of romantic relationships. He described how Indian matrimonial apps and arranged marriage work.

132.    Mr. Doe told Monbleau that many female resident advisors had been very interested in Indian arranged marriages because of a popular Netflix show called Indian Matchmaking, whose season was just about to premiere in April 2023. He stated that this resulted in frequent questions about his cultural concepts of sexuality; and that discussions of each other's romantic relationships were "a common occurrence" during work among all resident advisors.

133.    According to Monbleau, Mr. Doe insisted that "[h]e's here to make his career not for a college love story," but that "it's important to talk about marriage/cultural norms, etc. because that is how a university with international students thrives so they can share these things."

134.    Mr. Doe showed Monbleau proof from his Microsoft Teams calendar that he and S.K. only worked together once in March, but never since then, including in April, as S.K. had alleged.

135.    According to Monbleau, in response to G.D.'s complaint concerning the Jehovah's Witnesses discussion, Mr. Doe told her he "does not know the word/phrase Jehovah's Witnesses," and repeated to her that English is not his first language.

136.    After Mr. Doe learned about the religious practices of Jehovah's Witnesses, he

understood the context and explained to Monbleau that he and G.D. had a heated debate

about religious proselytism in general terms, without any particular religion being

mentioned or deprecated by name. Mr. Doe explained that proselytism is condemned in

Hinduism. Indeed, in some Indian states, there are criminal laws prohibiting proselytism

in the context of interreligious sexual relationships. Therefore, the comparison of

unwanted sexual conduct with unwanted religious proselytism was provocative but quite

apt, on multiple levels, from Mr. Doe and G.D.'s shared Hindu perspective in the context

of such a discussion.

137.    Monbleau's response to Mr. Doe's argument was:

> [Mr. Doe] stated that he "has no idea what that is" when asked about Jehovah's
> witnesses during the [second] interview on July 5th and denied ever speaking
> about it. There are clear discrepancies between his interview responses and his
> response to the [investigative] report, in which he explicitly confirms speaking
> about Jehovah's witnesses and comparing them to 'sticking his penis' in [G.D.'s]
> face and stating that doing so is protected speech.

138.    During all of Mr. Doe's interviews with Monbleau and in his response to Monbleau's

Investigation Report, Mr. Doe argued that the complainants seemed to have picked

various innocent comments he had made over the span of more than a year about food,

relationships, and religion—and merely restated these comments in vague, dysphemistic,

and sexually-suggestive language to make them appear inappropriate. In this fashion, for

example, his statement to S.K. that he's not at UMass Lowell "for a college love story"

was twisted sequentially into, "I don't need someone to have sex with," and then into

"f**k." Plaintiff also noted that he "cannot see how saying that 'I don't need to someone

to have sex with,' even if I had put it so crudely, is in any sense "unwelcomed conduct of a sexual nature."

139.   Mr. Doe insisted that the complainants had an obvious motive to make a false report of sexual harassment or misconduct against him because he had caught C.T. and J.T. drinking wine, making loud noises and otherwise violating the UMass Lowell Student Conduct Code the night before they made the report.

140.   Mr. Doe provided Monbleau with a photograph of C.T. on the night in question, in which C.T. is drunkenly pushing one of the witnesses in her complaint against Mr. Doe around the residence hallways in a baggage cart.

141.   Mr. Doe also provided Monbleau with a May 4, 2023 group chat message from C.T. to the other resident advisors, in which C.T. asks if "anyone happen[s] to have a wine opener." This request for a wine opener tends to show that C.T. already may have been drinking wine for an extended period by the time Mr. Doe and K.G. encountered C.T. and the others on May 6, 2023.

142.   The other international Indian student, K.G., told Monbleau that when he and Mr. Doe encountered the resident advisors, C.T. told him: "I know you'll snitch on me."

143.   Monbleau refused to consider Mr. Doe's arguments that complainants had motives to fabricate the complaints, stating that this was merely "[Mr. Doe's] speculation."

144.   As a consequence of ATIXA training, Monbleau saw Mr. Doe's due process complaints about her investigation, his vociferous self-defense, and his attempts to impeach the complainants' credibility as "agitated, argumentative . . . uncooperative, [and] resistant" conduct—and therefore as evidence of Mr. Doe's guilt.

145.  K.G. had acted much more passively and submissively in response to Monbleau's investigation. Therefore, Monbleau cleared K.G. of responsibility for sexual misconduct based on essentially the same allegations.

146.  According to the Investigation Report, Ms. Monbleau determined that the following falsely-alleged speech by Mr. Doe constituted sexual misconduct:

    a.  "Trying to hug female staff members and making comments when they would not hug him."

    b.  "Saying 'if the food is good, I'd have sex while eating[.]'"

    c.  "[T]elling the complainant not to sit down because that is where he shaves his pubes and stating that he shaves his testicles in front of the window."

    d.  Saying "I don't need someone to have sex with, I just want someone to cuddle with," and "I'll be alone, so I'll just jerk off and go to bed."

    e.  "Comparing Jehovah's Witnesses to 'sticking his penis' in a female staff member's face without noting the comparison prior to doing so."

147.  Monbleau's Investigation Report did not state whether and how these factual conclusions constituted the preponderance of the evidence that Mr. Doe committed sexual misconduct against any one of the individual complainants.

148.  Monbleau's Investigation Report elevated what are commonplace, everyday interactions for female and LGBTQ+ U.S. citizens into serious sexual transgressions when allegedly committed by a heterosexual male international student from India.

149.    In the final version of her Investigation Report, Monbleau wrote, in response to Mr.

Doe's defenses:  "It is not up to the Respondent in a case to determine what constitutes a

policy violation."

        **F.    The Shift of Mr. Doe's Process from a Title IX Process to a Student Conduct
        Process After Mr. Doe Retained Counsel**

150.    On or about July 12, 2023, Monbleau recommended "to move this case, per the Title IX

Sexual Harassment Grievance Procedure, to a hearing panel for a charge against [Mr.

Doe] . . . [of] Sexual Misconduct."

151.    On July 12, 2023, Mr. Doe received a letter from a UMass Lowell Deputy Title IX

investigator, informing Mr. Doe that: "The investigator finished her investigation and we

will be moving to a hearing panel. It will be a Title IX hearing panel, and you will need

an advisor to conduct cross-examination. . . . If you prefer to have somebody who doesn't

work at the University, that is completely fine. Please just let me know who that is going

to be."

152.    On July 19, 2023, Mr. Doe retained licensed counsel to conduct cross-examination and

informed UMass Lowell that counsel will be his advisor at the Hearing Panel.

153.    In a letter sent July 20, 2023, a UMass Lowell Deputy Title IX Coordinator threatened

Mr. Doe with disciplinary sanctions for having shared Monbleau's Investigation Report

with counsel "to get support for [Mr. Doe's] participation in this process." According to

the Deputy Title IX Coordinator, "[d]oing so may constitute a violation of the Student

Conduct Code and may constitute retaliatory harassment."

154.    In the same July 20, 2023 letter, the Deputy Title IX Coordinator arbitrarily changed the due process standard of Mr. Doe's Hearing Panel from the UMass Lowell Title IX Process to the UMass Lowell Student Conduct Process.

155.    On information and belief, the change to the UMass Lowell Student Conduct Process was intended as an escape hatch to avoid liability for UMass Lowell's numerous violations of Mr. Doe's due process rights under Title IX—as well as to prevent counsel from cross-examining the witnesses against Mr. Doe.

156.    On information and belief, as a consequence of ATIXA training and consulting, UMass Lowell intentionally developed and maintains this arbitrary procedural double standard for adjudicating essentially the same conduct, using the double standard as a "clever workaround" the due process requirements of Title IX.

157.    As part of the workaround, UMass Lowell provides responding students with university employee advisors like Karina Cruz Winslow, who refuse to provide any advice. Consequently, the responding student gets a kangaroo trial instead of due process. If the student chooses a licensed attorney or someone else outside of the university as his advisor, the student is shunted into the Student Conduct Process Hearing Panel instead, where the advisor is prevented from directly cross-examining witnesses, and many other Title IX due process protections do not exist.

158.    UMass Lowell scheduled Mr. Doe's Student Conduct Process Hearing Panel for August 22, 2023, with the panel composed of Defendants Kate Legee, Esmeralda Levesque, and Adam Dunbar.

159.    On information and belief, Legee, Levesque, and Dunbar all have received Title IX-

related training from ATIXA as part of their on-the-job training at UMass Lowell.

160.    On August 21, 2023, counsel wrote to Mr. Doe's Deputy Title IX coordinator and to

counsel for the University of Massachusetts Defendants:

> Due to concerns about the legality of the University's Code of Student Conduct
> process against my client, Mr. [Doe], I have advised him not to attend the Hearing
> Panel that will be held on August 22, 2023. Instead, Mr. [Doe] has chosen to
> utilize external civil processes available to him from courts or agencies outside of
> the University.

161.    On September 4, 2023, counsel for Mr. Doe wrote to counsel for the University of

Massachusetts Defendants, stating that Mr. Doe has completed a federal complaint

against them. Mr. Doe's counsel also stated:

> I would like to avoid temporary restraining order practice. I imagine that you
> would like to avoid UMass Lowell's exposure to an additional violation of 34
> C.F.R. § 106.45(b)(1)(i) against Mr. [Doe] if the Hearing Panel imposes
> disciplinary sanctions on him without engaging in a grievance process that
> complies with 34 C.F.R. § 106.45. Therefore, I am hoping that we could talk on
> the telephone before I file the lawsuit, and that UMass Lowell does not impose
> any disciplinary sanctions against Mr. [Doe] before providing him with the
> required due process protections. Would some time tomorrow afternoon work?

162.    Along with requesting to speak prior to filing this litigation, Mr. Doe's counsel provided

the University of Massachusetts counsel with the following actual notice of the Title IX

violation:

> [Mr. Doe] alleges that, by proceeding against him under a 'sexual misconduct'
> provision in its Student Code of Conduct, which provision prohibits essentially
> the same conduct defined as 'sexual harassment' under its 34 C.F.R. § 106.45
> grievance process, UMass Lowell mistreated Mr. Doe in violation of Title IX and
> 34 C.F.R. § 106.45. Specifically, the UMass Lowell Title IX Coordinator
> arbitrarily decided not to dismiss the formal complaints of sexual harassment
> against Mr. Doe, but instead to process them under the Student Code of Conduct
> rather than under the campus's 34 C.F.R. § 106.45 grievance procedures for such
> complaints.

163.    Counsel for both sides agreed to discuss the matter on September 8, 2023.

**G.    The Hearing Panel's Findings**

164.    On September 7, 2023, the University of Massachusetts defendants notified Mr. Doe that the Hearing Panel found him responsible for sexual misconduct. The notice deliberately was not shared with counsel. There were several rationales for this finding.

a.    The Hearing Panel found: "[Mr. Doe]\ states that he did compare unwanted sexual conduct to religious proselytism in [his] conversation [with G.D] and meant to do so in disagreement with both. With this context of intent assumed as fact, the statement remains unwelcome by the recipient."

b.    The Hearing Panel found: "[Mr. Doe] stated that he said to Kosterman 'I don't need to someone to have sex with.' This comment was not welcome by the recipient."

c.    The Hearing Panel found that J.T. "stated that [Mr. Doe] would hug her without asking until his arms were outstretched and she felt obligated to engage."

d.    The Hearing Panel considered an additional charge that Monbleau did not conclude was sexual misconduct in the Investigation Report: The Hearing Panel found that, after Mr. Doe purchased a new exercise shaker plate, J.T. stepped onto Mr. Doe's exercise shaker plate to try it out, and Mr. Doe moved J.T.'s "feet on the shaker plate, and did so with his own feet. This touching was unwelcome and no party noted any conversation asking for consent."

165.    Like Monbleau's Investigation Report, the Hearing Panel's findings elevated what are commonplace, everyday interactions for female and LGBTQ+ U.S. citizens into serious

sexual transgressions when allegedly committed by a heterosexual male international student from India.

166.   Like Monbleau, the Hearing Panel did not challenge the complainants' credibility, which was a major issue, since Mr. Doe had caught them violating the Student Code of Conduct the night before they made the complaints against him.

167.   The Hearing Panel imposed the following sanctions on Mr. Doe:

a.     Mr. Doe was "permanently banned from University Housing," and "trespassed from all University Housing buildings." According to the Hearing Panel decision, "[the] UMass Lowell Police have been notified of this status."

b.     Mr. Doe still was charged 100% for his university housing during the fall 2023 semester, and 50 % during the spring semester, along with a $ 200 cancellation fee.

c.     Mr. Doe's meal plan was cancelled.

d.     Mr. Doe was placed on Elevated Probation until graduation, placing his status at the university "in jeopardy in the case of further violations of the Student Conduct Code."

e.     The finding of sexual misconduct will be "reported to inquiring parties when background checks are conducted" on Mr. Doe at any time in the future.

f.     Mr. Doe was ordered to "engage in research of and completion of an approved consent training required prior to registering for future classes."

**III.**    **Mr. Doe Has Been Extremely and Irreparably Harmed By Defendants' Actions**

168.   Mr. Doe's field of study is in education, and a finding of sexual misconduct therefore is a
       virtually impregnable barrier to any future job offers for Mr. Doe, all of which are nearly
       certain to require a background check. This will result in catastrophic and life-long
       consequences for Mr. Doe; who now will be consigned to an unskilled job in India in
       some other field.

169.   According to the Foundation for Individual Rights and Expression: "Students expelled
       for sexual misconduct are virtual pariahs when they seek admission to other universities,
       and those closer to graduating frequently lose job and graduate school offers as well.
       Depression, anxiety, and even suicide attempts are common."

170.   Instead of outright expelling Mr. Doe, UMass Lowell simply made Mr. Doe
       unemployable by promising to disclose his sexual misconduct determination to future
       employers, while gladly continuing to take his money in exchange for a poison-pilled
       degree.

171.   Mr. Doe is facing substantial social and personal repercussions of being stigmatized as a
       sex offender without being convicted of any crime, and without being afforded the
       procedural protections of criminal proceedings. Mr. Doe has become quite a real pariah
       on campus. He has been banished by the university from his room and board. In just a
       few short months, based on nothing by innuendo, hearsay, and say-so, he has been
       debased from an "RA of Distinction" to a sex offender who is known to UMass Lowell
       Police and trespassed from all UMass Lowell residential buildings.

172.    The prolonged and fundamentally unfair process against Mr. Doe—in which the

        University of Massachusetts Defendants used Nazi German and Central Intelligence

        Agency interrogation techniques they had learned from ATIXA training—has left an

        irreversible scar on Mr. Doe's mental health.

173.    Since mid-May 2023, Mr. Doe has experienced extreme emotional distress, and has felt

        like a zombie, with no taste in life and one overriding purpose to clear his name. He has

        gone from a highly-social person to a completely socially-nonexistent person.

174.    As a result of Mr. Doe's emotional distress, he lost fifteen pounds of weight in two

        months due to being unable to eat.

175.    During the process against Mr. Doe, he developed throat ulcers and acid reflux, and a

        doctor found traces of blood in his urine.

176.    Mr. Doe had marriage prospects in advanced stages of the parent-arranged matchmaking

        process. He has been unable to continue communicating with these women since the

        complaints against him began.

**COUNT I**
**DEPRIVATION OF FIRST AMENDMENT RIGHTS UNDER COLOR OF STATE LAW**
**IN VIOLATION OF 42 U.S.C. § 1983 AND THE FOURTEENTH AMENDMENT**

177.    Each of the preceding paragraphs 1 through 176 are hereby incorporated by reference.

178.    It is well-established that the University of Massachusetts may not impose content-based

        restrictions on unwelcome speech or prohibit the free exercise of religion.

179.    The University of Massachusetts, the Trustees of the University of Massachusetts,

        Hannah Monbleau, Kate Legee, Adam Dunbar, and Esmeralda Levesque (collectively

"the University of Massachusetts Defendants") imposed several content based restrictions

on Mr. Doe's secular and religious speech:

a.      The University of Massachusetts Defendants severely disciplined Mr. Doe for the

content of his religious pure speech statement, "I don't need to someone to have

sex with," made in the context of an expression of his spiritual beliefs about

traditional marriage.

b.      The University of Massachusetts Defendants severely disciplined Mr. Doe for the

content of his religious pure speech comparison of "unwanted sexual conduct to

religious proselytism," made in the context of an expression of his spiritual beliefs

about proselytism.

c.      The University of Massachusetts Defendants severely disciplined Mr. Doe for the

expressive conduct of outstretching his arms to communicate his request for

consent to a hug.

d.      The University of Massachusetts Defendants retaliated against Mr. Doe for his

agitated, argumentative, uncooperative, and resistant speech in support of his

innocence by interpreting this speech as evidence of guilt.

e.      The University of Massachusetts Defendants retaliated against Mr. Doe for

sharing the Investigation Report with his own counsel by threatening him with

further Student Conduct Code violations.

f.      The University of Massachusetts Defendants required Mr. Doe to participate in

compelled speech by conditioning his registration "for future classes" on his

completion of "an approved consent training required prior to registering for future classes."

180. By sanctioning and retaliating Mr. Doe for the content of his pure speech statements, for speaking to counsel, and for his expressive conduct; as well as by requiring Mr. Doe to participate in compelled speech training, the University of Massachusetts Defendants have abridged Mr. Doe's freedom of speech and prohibited Mr. Doe's free exercise of his religion, depriving Mr. Doe of his First Amendment rights under color of state law in violation of 42 U.S.C. § 1983.

181. The University of Massachusetts Defendants' violations of 42 U.S.C. § 1983 are the direct and proximate causes of Mr. Doe's exclusion from participation in, denial of the benefits of, or subjection to discrimination under his program of study at UMass Lowell. The violations subjected and are likely to subject Mr. Doe to irreparable economic loss, including, but not limited to lost wages, the loss of future earning capacity, future loss of aggregate income, and job search expenses—as well as reputational loss, emotional distress, pain, suffering, and loss of consortium from the violation of his civil rights, from humiliating mistreatment and discrimination, and from falsely being accused of being some sort of sexual deviant.

182. The University of Massachusetts defendants' conduct was so willful and wanton and in such reckless disregard of the statutory rights of Mr. Doe so as to entitle him to an award of punitive damages against them, to deter them, and others, from such conduct in the future.

WHEREFORE, Mr. Doe requests that this Court: a) enter judgment in favor of Mr. Doe and

against the University of Massachusetts Defendants, b) vacate the finding of sexual

misconduct against Mr. Doe, c) require Defendants Monbleau, Legee, Levesque, and

Dunbar to receive passive First Amendment training from the Foundation for Individual

Rights and Expression or a similar group, d) require Defendants Monbleau, Legee,

Levesque, and Dunbar to receive passive education in the history of Nazi Germany from

the Anti-Defamation League, and d) award Mr. Doe monetary damages against the

University of Massachusetts Defendants, jointly and severally, in an amount to be

determined at trial, with interest, reasonable attorney's fees and costs, and any other relief

that the Court deems proper, including but not limited to, punitive damages for malicious

deprivation of Mr. Doe's rights.

## COUNT II
## VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, (TITLE IX), 20 U.S.C. §§ 1681, et seq:

183.   Each of the preceding paragraphs 1 through 182 are hereby incorporated by reference.

184.   By adding a "sexual misconduct" provision to its Student Conduct Process that prohibits

essentially the same conduct prohibited as "sexual harassment" under its Title IX

Process, UMass Lowell, in consultation with Sokolow, developed "clever workarounds"

to the protections of the Title IX Process.

185.   20 U.S.C.S. § 1681, et seq., popularly known as Title IX of the Education Amendments

of 1972 (Title IX), provides that "[n]o person in the United States shall, on the basis of

sex, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial assistance."

186.  Under U.S. Department of Education regulations interpreting and implementing Title IX, Federal financial assistance recipients are required to provide a specific grievance process for formal complaints of sexual harassment made to them by students, employees, and others. 34 C.F.R. § 106.45 governs the grievance process for formal complaints of sexual harassment made to Federal financial assistance recipients.

187.  34 C.F.R. § 106.45(a) explicitly warns that a Federal financial assistance "recipient's treatment of a complainant or a respondent in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title IX."

188.  This Court has found that, with the exception of an inapplicable part of Section 106.45(b)(6)(i), the Department of Education adequately has considered each of the provisions in 34 C.F.R. § 106.45. Among these provisions:

a.  34 C.F.R. § 106.45(b)(1)(i) requires recipients to treat "complainants and respondents equitably" by, in relevant part, providing supporting measures to both parties and by engaging in a "grievance process that complies with this section before the imposition of any disciplinary sanctions or other actions that are not supportive measures as defined in 34 C.F.R. § 106.30, against a respondent."

b.  34 C.F.R. § 106.45(b)(1)(ii) requires that the grievance process provide "an objective evaluation of all relevant evidence . . . and provide that credibility determinations may not be based on a person's status as a . . . respondent."

c.      34 C.F.R. § 106.45(b)(1)(iii) requires that "any individual designated by a
        recipient as a Title IX Coordinator, investigator, decision-maker, or any person
        designated by a recipient to facilitate an informal resolution process, not have a
        conflict of interest or bias for or against . . . respondents generally or an individual
        . . . respondent."

d.      34 C.F.R. § 106.45(b)(1)(iii) additionally requires that "Title IX Coordinators,
        investigators, decision-makers, and any person who facilitates an informal
        resolution process, [must] receive training on . . . how to conduct an investigation
        and grievance process including hearings, appeals, and informal resolution
        processes, as applicable, and how to serve impartially, including by avoiding
        prejudgment of the facts at issue, conflicts of interest, and bias. The training must
        include "issues of relevance of questions and evidence" sufficient for the
        investigator "to create an Investigation Report that fairly summarizes relevant
        evidence, as set forth in paragraph (b)(5)(vii) of this section."

e.      Further, "any materials used to train [investigators] must not rely on sex
        stereotypes and must promote impartial investigations and adjudications of formal
        complaints of sexual harassment;

f.      34 C.F.R. § 106.45(b)(1)(iii) requires a presumption that the respondent is not
        responsible for the alleged conduct.

g.      34 C.F.R. § 106.45(b)(2)(1)(i)(B) requires notice of the allegations against the
        respondent, "including sufficient details known at the time and with sufficient

time to prepare a response before any initial interview," including "the conduct allegedly constituting sexual harassment."

h.   34 C.F.R. § 106.45(b)(2)(1)(ii) requires that, if "in the course of an investigation, the recipient decides to investigate allegations about the complainant or respondent that are not included in the notice provided pursuant to paragraph (b)(2)(i)(B) of this section, the recipient must provide notice of the additional allegations to the parties whose identities are known."

i.    34 C.F.R. § 106.45(b)(4) requires that formal complaints may be consolidated only "where the allegations of sexual harassment arise out of the same facts or circumstances."

j.    34 C.F.R. § 106.45(b)(6)(i) requires that a postsecondary institutional "recipient's grievance process must provide for a live hearing with various procedural protections. At the live hearing, the decision-maker(s) must permit each party's advisor to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility. Such cross-examination at the live hearing must be conducted directly, orally, and in real time by the party's advisor of choice and never by a party personally.

189.   By subjecting Mr. Doe to UMass Lowell's Student Conduct Code process for investigating and adjudicating E.Z, E.H, C.T., J.T., and S.K.'s formal complaints of sexual harassment against him, the University of Massachusetts and the Trustees of the University of Massachusetts have violated Mr. Doe's rights under 20 U.S.C.S. § 1681

and 34 C.F.R. 106.45 as a respondent to formal complaints of sexual harassment made to UMass Lowell.

k.      In violation of 34 C.F.R. § 106.45(b)(1)(i), prior to engaging in any process against Mr. Doe, the University of Massachusetts and the Trustees of the University of Massachusetts imposed disciplinary sanctions and other actions that are not supportive measures on Mr. Doe by banning him from working at his campus job as a resident assistant, from communicating with other residents of his residence hall, and from residence hall areas outside of Mr. Doe's room,

l.      In violation of 34 C.F.R. § 106.45(b)(2)(1)(i)(B), the University of Massachusetts and the Trustees of the University of Massachusetts failed to give Mr. Doe appropriate notice of the allegations against Mr. Doe with sufficient details of his conduct or with sufficient details and time to prepare a response before Mr. Doe's interview with Monbleau. Prior to the interview, Mr. Doe did not receive any details of his conduct beyond a vague statement that there have been "concerns about the words and actions of [Mr. Doe] around how [he] interacted with female RAs." Mr. Doe did not receive any written notice of the details of his conduct until July 20, 2023, when he received Monbleau's Investigation Report.

m.      In violation of 34 C.F.R. § 106.45(b)(2(1)(ii), the University of Massachusetts and the Trustees of the University of Massachusetts failed to give Mr. Doe notice of the additional allegations made against him by complainant S.K. and witness G.D before Monbleau confronted Mr. Doe about the allegations in her second interview with Mr. Doe on July 5, 2023.

n.      In violation of 34 C.F.R. 106.45(b)(6)(i), the University of Massachusetts and the

Trustees of the University of Massachusetts consolidated E.Z., E.H., C.T., J.T.,

and S.K.'s formal complaints into one complaint against Mr. Doe—essentially

allowing each of them and G.D. to serve as impermissible character witnesses

against Doe.

o.      In violation of 34. C.F.R. 106.45(b)(1)(iii), the University of Massachusetts and

the Trustees of the University of Massachusetts designated Monbleau, an avowed

political advocate for sexual assault victims who has a general conflict of interest

against respondents in formal complaints of sexual harassment to investigate the

complaints against Mr. Doe. Monbleau specifically had been trained by ATIXA

to have a general bias against respondents in formal complaints of sexual

harassment. Monbleau has been prejudiced against Mr. Doe in particular by this

training, due to his status as a male international student from India, and due to

his vociferous declarations of innocence, which Monbleau considered to be

evidence of guilt.

p.      In violation of 34. C.F.R. 106.45(b)(i)(3), by using ATIXA for Monbleau's on-

the-job training, and thereby training Monbleau in Nazi interrogation techniques

using materials created by an activist attorney who is explicitly critical of

impartial investigations of formal complaints of sexual harassment, the University

of Massachusetts and the Trustees of the University of Massachusetts failed

adequately to train Monbleau on basic due process protections for Mr. Doe.

Indeed, Monbleau's statement that "[i]t is not up to the Respondent in a case to

determine what constitutes a policy violation," reveals a deep-rooted ignorance of justice.

q.　　In violation of 34 C.F.R. 106.45(b)(1)(ii), and based on ATIXA consulting or training, the University of Massachusetts and the Trustees of the University of Massachusetts did not provide Mr. Doe with an objective evaluation of all relevant evidence, but rather made credibility determinations based on Mr. Doe's status as a respondent. Monbleau deprecated Mr. Doe's physical evidence showing the improbability of the accusations against him, and discounted the credibility of all of Mr. Doe's witnesses, while refusing to consider Mr. Doe's evidence impeaching the credibility of the complainants against him. In her Investigation Report, Monbleau entirely failed to mention that she determined Mr. Doe committed sexual misconduct "by a preponderance of the evidence."

r.　　In violation of 34 C.F.R. 106.45(b)(1)(ii), the University of Massachusetts and the Trustees of the University of Massachusetts violated the presumption that Mr. Doe is not responsible for the alleged conduct by providing Mr. Doe's Hearing Panel with Monbleau's determination that Mr. Doe committed sexual misconduct.

s.　　 In violation of 34 C.F.R. 106.45(b)(6)(i), the University of Massachusetts and the Trustees of the University of Massachusetts failed to provide Mr. Doe with a live hearing at which Mr. Doe's advisor could cross-examine the complainants and witnesses against Mr. Doe directly, orally, and in real time, including on questions of credibility. Instead, Mr. Doe's advisor would have been allowed only to submit

written questions to the Hearing Panel members in writing, and have the Hearing

Panel members read the questions.

190.   The entire process and findings against Mr. Doe were colored by Defendants' prejudicial

beliefs that male international students from India subscribe to a patriarchal "rape

culture." Therefore, Mr. Doe was found responsible for sexual misconduct and excluded

from participation in, and denied the benefits of his education program at UMass Lowell

only because he was male.

191.   The University of Massachusetts received actual notice of the Title IX violations against

Mr. Doe on September 4, 2023.

192.   After receiving actual notice thereof, the University of Massachusetts and the Trustees of

the University of Massachusetts committed further Title IX violations by preemptively

finding Mr. Doe responsible for sexual misconduct before litigation can be filed. The

university's counsel entirely refused to address the Title IX violations against Mr. Doe;

and was deliberately indifferent to Mr. Doe's pleas to pause the unlawful campus process

against him.

193.   The University of Massachusetts and the Trustees of the University of Massachusetts

violations of Title IX and the Department of Education regulations implementing the

statute are the direct and proximate causes of Mr. Doe's exclusion from participation in,

denial of the benefits of, or subjection to discrimination under his program of study at

UMass Lowell. The violations subjected and are likely to subject Mr. Doe to irreparable

economic loss, including, but not limited to lost wages, the loss of future earning

capacity, future loss of aggregate income, and job search expenses—as well as

reputational loss, emotional distress, pain, suffering, and loss of consortium from the violation of his civil rights, from humiliating mistreatment and discrimination, and from falsely being accused of being some sort of sexual deviant.

194.    The University of Massachusetts and the Trustees of the University of Massachusetts conduct was so willful and wanton and in such reckless disregard of the statutory rights of Mr. Doe so as to entitle him to an award of punitive damages against them, to deter them, and others, from such conduct in the future.

WHEREFORE, Mr. Doe requests that this Court enter judgment in favor of Mr. Doe and against the University of Massachusetts and the Trustees of the University of Massachusetts, and award Mr. Doe monetary damages against them, jointly and severally, in an amount to be determined at trial, with interest, reasonable attorney's fees and costs, and any other relief that the Court deems proper, including but not limited to, punitive damages for malicious deprivation of Mr. Doe's rights under Title IX.

**COUNT III**
**VIOLATION OF MASSACHUSETTS CIVIL RIGHTS ACT, M.G.L. c. 12, §§ 11H-11J: COERCIVE INTERFERENCE WITH FIRST AMENDMENT AND MASS. CONST. ART. 16 RIGHTS, AS WELL AS WITH DUE PROCESS RIGHTS PROVIDED BY 20 U.S.C. § 1681**

195.   Each of the preceding paragraphs 1 through 194 are hereby incorporated by reference.

196.   The MCRA, G.L. c. 12, § 11I, provides a right of action to "any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with . . . by threats, intimidation or coercion."

197.   Denial of the benefits and privileges of a program of education, denial of rights due under a contract, and denial of access to university buildings by threat of police force have been considered sufficiently intimidating and coercive to violate G.L. c. 12, § 11I, as long as these actions occur with a general intent interfere with a student's exercise of his statutory and well-established constitutional rights.

198.   It is well-established that the University of Massachusetts Defendants may not interfere with students' First Amendment rights by imposing content-based restrictions on unwelcome speech or by abridging their free exercise of religion.

199.   As a consequence of Sokolow's training, all Defendants violated G.L. c. 12, § 11I by imposing content-based restrictions on Mr. Doe's unwelcome speech and by abridging his free exercise of his foreign religion.

     a.   In violation of G.L. c. 12, § 11I, all Defendants threatened, coerced, or attempted to threaten or coerce Mr. Doe, by denying him the benefits and privileges of his program of education, of rights due under his contract with UMass Lowell, and of entry into UMass Lowell buildings, from freely stating as part of his discussion with S.K. about Hindu arranged marriages: "I don't need to someone to have sex with."

b.  In violation of G.L. c. 12, § 11I, all Defendants threatened, coerced, or attempted to threaten or coerce Mr. Doe, by denying him the benefits and privileges of his program of education, of rights due under his contract with UMass Lowell, and of entry into UMass Lowell buildings, from freely exercising his right to compare "unwanted sexual conduct to religious proselytism."

c.  In violation of G.L. c. 12, § 11I, all Defendants threatened, intimidated, and or coerced or attempted to threaten, intimidate, and or coerce Mr. Doe, by denying him the benefits and privileges of his program of education, of rights due under his contract with UMass Lowell, and of entry into UMass Lowell buildings, from exercising his right to engage in the expressive conduct of outstretching his arms to communicate his request for consent to a hug.

d.  In violation of G.L. c. 12, § 11I, all Defendants coercively retaliated against Mr. Doe, by denying him the benefits and privileges of his program of education, of rights due under his contract with UMass Lowell, and of entry into UMass Lowell buildings, for his verbal and written complaints about due process, for his statements challenging the credibility of the witnesses against him, and for his vociferous defense of his innocence.

e.  In violation of G.L. c. 12, § 11I, all Defendants threatened Mr. Doe not to exercise his right to share the Investigation Report with his own counsel by stating that doing so could result in further Student Conduct Code violations.

f.  In violation of G.L. c. 12, § 11I, all Defendants are coercing Mr. Doe to participate in compelled speech by requiring that he "must engage in research of

and completion of an approved consent training required prior to registering for future classes," thereby threatening entirely to deny him access to his program of education if he does not comply.

g.  In violation of G.L. c. 12, § 11I, Sokolow trained the University of Massachusetts Defendants to interfere with Mr. Doe's attempts to invoke long-established traditional legal and cultural norms like notice, hearing, and cross-examination in their own defense during campus Title IX grievance procedures. As part of this training, Sokolow trained the University of Massachusetts Defendants to use Nazi interrogation techniques, and to use threats, coercion and intimidation against any respondents who attempt to invoke the protections of such procedures.

h.  In violation of G.L. c. 12, § 11I, the University of Massachusetts Defendants did work around the requirements of notice, hearing, and examination by repeatedly intimidating Mr. Doe from further inquiring about the facts and circumstances of the complaints against him, by attempting to intimidate Mr. Doe from sharing information with counsel, and by attempting to coerce Mr. Doe into participating in a process that denied him the right to cross-examination by counsel.

200.  The Defendants' threatening coercive interference with Mr. Doe's statutory and constitutional rights in violation of G.L. c. 12, § 11I is the direct and proximate cause of Mr. Doe's exclusion from participation in, denial of the benefits of, or subjection to discrimination under his education by UMass Lowell. The violations subjected and are likely to subject Mr. Doe to irreparable economic loss, including, but not limited to lost wages, the loss of future earning capacity, future loss of aggregate income, and job search

expenses—as well as reputational loss, emotional distress, pain, suffering, and loss of consortium from the violation of his civil rights, from humiliating mistreatment and discrimination, and from falsely being accused of being some sort of sexual deviant.

WHEREFORE, Mr. Doe requests that this Court enter judgment of violation of G.L. c. 12, § 11I in favor of Mr. Doe and against all Defendants, and award Mr. Doe monetary damages against all Defendants, jointly and severally, in an amount to be determined at trial, with interest, reasonable attorney's fees and costs, and any other relief that the Court deems proper.

### COUNT IV
### BREACH OF CONTRACT

201.   Each of the preceding paragraphs 1 through 200 are hereby incorporated by reference.

202.   It is well-established that the student-university relationship in Massachusetts is contractual in nature, and is governed by two standards: reasonable expectation and basic fairness.

203.   The reasonableness of expectations under a student-university contract is based on student handbooks and other quasi-contractual university policies, with any uncertainty in the meaning of the documents' terms construed against the drafter.

204.   The obligation to provide basic fairness in disciplinary proceedings is separate from and in addition to the provisions of student handbooks and other quasi-contractual university policies.

205.   There are two principal threads to the "basic fairness" inquiry. The first is procedural fairness concerning whether process used to adjudicate the matter was sufficient to provide the accused student a fair and reasonable opportunity to defend himself. The

second is substantive fairness, which can be violated even if the procedure was fair, by a decision was unduly arbitrary or irrational, or tainted by bias or other unfairness.

206.    The University of Massachusetts and its Trustees breached its contractual obligation to provide a student in the position of Mr. Doe with the Title IX Process, instead of the Student Conduct Process. The uncertainty in UMass Lowell policies concerning which process will be used is intentionally designed as a "clever workaround" to allow UMass Lowell to breach its contractual obligations to provide the Title IX process.

207.    The University of Massachusetts failed to provide Mr. Doe with basic procedural fairness by:

    a.    Denying Mr. Doe notice of the details of the charges against him.

    b.    Denying Mr. Doe the right to see the relevant evidence.

    c.    Denying Mr. Doe the right to counsel by threatening Mr. Doe with disciplinary sanctions for sharing information with counsel "to get support for your participation in this process."

    d.    Denying Mr. Doe the right to confront his accusers and test the credibility of the witnesses against him through cross-examination by counsel.

    e.    Combining several complaints and character witness accusations based on entirely separate facts and circumstances into a single process.

    f.    Denying Mr. Doe the right to effective appeal.

208.    Substantively, the decision to find Mr. Doe responsible for sexual misconduct was unduly arbitrary or irrational, and tainted by bias or other unfairness.

a.   As a consequence of prejudice against male international students and of

consulting and training provided by Sokolow, the University of Massachusetts

Defendants based their findings of sexual misconduct by Mr. Doe on novel

notions of consent, due process, and what constitutes conduct of sexual nature,

which notions are at odds with traditional legal and cultural norms and

definitions.

b.   The University of Massachusetts Defendants' refusal to consider the critical issue

of complainants' credibility raised by the timing of their complaints on the day

after Mr. Doe caught both initial complainants drinking had a very substantial

effect on the fairness of the Student Conduct Process against Mr. Doe, which has

turned entirely on the credibility of the accuser and the accused. This effect was

compounded greatly by the University of Massachusetts Defendants' refusal to

permit any oral cross-examination of complainants and complaining witnesses by

Mr. Doe's counsel.

c.   It was arbitrary and irrational for the University of Massachusetts to determine

that Mr. Doe is responsible for sexual misconduct based on Mr. Doe's alleged

statement, "I don't need someone to have sex with" in the context of a discussion

about arranged marriage; Mr. Doe's request of consent for a hug; and the act of

using one's foot to guide another's foot in order to prevent exercise equipment

injury are not. These are commonplace, everyday interactions for normal persons,

gay or straight, male or female, at UMass Lowell and across this nation.

Defendants solely these statements and conduct to be serious sexual

transgressions solely because female U.S. citizens accused a male international student from India, who is tainted by what Defendants consider to be "rape culture," of having some sort of strange foreign sexual motive in having made them.

209. The University of Massachusetts promised and Mr. Doe expected that he would be able to use his PhD degree to work in the United States as an assistant director or director in higher education. Mr. Doe expected that he would earn about $ 100,000 per year, with additional benefits of $ 50,000 per year, until he retired at sixty-five. As the direct consequence of the University of Massachusetts's breach of its contractual relationship with Mr. Doe, his background record contains a false determination of his guilt for sexual misconduct, marking him for life as a sexual predator. Consequently, Mr. Doe will be blocked entirely from any job in the field of education and will have to find an unskilled job in India earning him $ 20,000 in benefits.  This as Defendants' threatening coercive interference with Mr. Doe's statutory and constitutional rights in violation of G.L. c. 12, § 11I is the direct and proximate cause of Mr. Doe's exclusion from participation in, denial of the benefits of, or subjection to discrimination under his education by UMass Lowell. The violations subjected and are likely to subject Mr. Doe to irreparable economic loss, including, but not limited to lost wages, the loss of future earning capacity, future loss of aggregate income, and job search expenses—as well as reputational loss, emotional distress, pain, suffering, and loss of consortium from the violation of his civil rights, from humiliating mistreatment and discrimination, and from falsely being accused of being some sort of sexual deviant.

WHEREFORE, Mr. Doe requests that this Court enter judgment of breach of contract in favor of Mr. Doe and against the University of Massachusetts and the Trustees of the University of Massachusetts, and award Mr. Doe expectancy damages of $ 2,240,000, with interest, and any other relief that the Court deems proper.

DATED: September 10, 2023

> Respectfully submitted,
> John Doe,
> By his Attorney,
>
> Ilya I. Feoktistov, Esq.
> B.B.O. No. 704458
> LAW OFFICE OF ILYA FEOKTISTOV
> 292 Newbury Street, No. 544
> Boston, MA 02115
> (617) 462-7938
> if@ilyafeoktistov.com

**VERIFICATION**

I, John Doe, hereby verify, under the pains and penalties of perjury, that I have read this complaint being made by my duly authorized representative on my behalf, and that the allegations contained herein are true and accurate to the best of my knowledge. Those facts alleged on the basis of information and belief, I believe to be true.

_____                    _____

          John Doe                                                                        Date