IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE,<br><br>　　　　Plaintiff<br><br>　　v.<br><br>UNIVERSITY OF MASSACHUSETTS, TRUSTEES OF THE UNIVERSITY OF MASSACHUSETTS, HANNAH MONBLEAU, in her official and individual capacities, KATE LEGEE, in her official and individual capacities, ESMERALDA LEVESQUE, a/k/a ESMERALDA Mendez, in her official and individual capacities, ADAM DUNBAR in his official and individual capacities, BRETT SOKOLOW,<br><br>　　　　Defendants | No. 1:23-cv-12077-WGY |

**MEMORANDUM IN SUPPORT OF PLAINTIFF JOHN DOE'S MOTION FOR A PRELIMINARY INJUNCTION AGAINST UNIVERSITY OF MASSACHUSETTS AND TRUSTEES**

Plaintiff, John Doe, by and through undersigned counsel, respectfully moves this Court pursuant to Fed. R. Civ. P. Rule 65 for preliminary relief under Count I[1] of his Complaint, ordering Defendants University of Massachusetts and Trustees of the University of Massachusetts to remove Plaintiff from elevated probationary student conduct status, and to reinstate his room and board at the University of Massachusetts campus in Lowell, Massachusetts (UMass Lowell) until the Court rules on the merits in this instant matter. Plaintiff

---

[1] Count I of the Complaint alleges deprivation of First Amendment rights under color of state law in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment.

further moves this Court to preliminarily enjoin the University of Massachusetts from reporting its finding of sexual misconduct by Plaintiff to any inquiring parties when background checks are conducted, and from requiring Plaintiff to complete "consent training" prior to registering for future classes.

## INTRODUCTION

In a September 7, 2023 letter informing Plaintiff of the outcome of his August 22, 2023 disciplinary hearing, annexed hereto as Exhibit A, the University of Massachusetts stated that it had found Plaintiff responsible for sexual misconduct under its Student Conduct Code based on three instances of pure speech and two instances of expressive conduct over the span of a year. *See* Ex. B at 6. Plaintiff denies various factual aspects of the findings, but will accept them as entirely true solely for the purposes of the instant motion for preliminary relief. According to the University of Massachusetts:

1. Plaintiff said to female student S.K.: "I don't need someone to have sex with."

2. Plaintiff was "saying the word sex while talking about food" with female student C.T.

3. Plaintiff said to female student G.D, in order to "compare unwanted sexual conduct to religious proselytism in conversation and mean[ing] to do so in disagreement with both" practices: "what if I stuck my penis in your face?"

4. Plaintiff approached female student J.T. to "hug her without asking until his arms were outstretched and she felt obligated to engage."

5. While female student J.T. was on Plaintiff's "shaker plate" exercise equipment, Plaintiff "moved her feet on the shaker plate, and did so with his own feet" without "any conversation asking for consent."

On the basis of this speech and expressive conduct, the University of Massachusetts terminated Plaintiff from his job as a residential advisor and trespassed Plaintiff from living in or entering university housing, for the stated purpose that "further comments of this nature can be prevented from impacting other students in the residential community." The University of Massachusetts also required Plaintiff to demonstrate through an approved research and training course that he "has learned appropriate ways to interact with others in conversations related to sex" before Plaintiff is allowed to sign up for his spring semester classes.

Judicial intervention to restore Plaintiff's disciplinary status to the status quo ante is necessary. Well-settled principles of First Amendment law prohibit state universities from taking adverse action to prevent their adult students from having non-obscene conversations related to sex in informal settings. It is also well-settled that the First Amendment protects universally-understood communicative conduct, such as the "open arms" gesture or the use of physical guidance to demonstrate the proper use of a tool. Therefore, Plaintiff is reasonably likely to show on the merits that he engaged in constitutionally protected conversations related to sex and made every day human gestures; that the University of Massachusetts took adverse action against Plaintiff for these conversations and gestures; and that Plaintiff's protected conversations and gestures were substantial or motivating factors in the adverse action.

Plaintiff will suffer irreparable harm without relief from the University's adverse action and the restoration of the status quo ante: The loss of First Amendment freedoms unquestionably constitutes irreparable constitutional injury, while Plaintiff's sudden loss of campus residential resources as an international student constitutes ongoing and irreparable economic, academic, and reputational injury. Plaintiff also is suffering tremendous psychological injury due to his sudden fall from award-winning residential advisor to campus pariah. The balance of equities

favors Plaintiff because the University's own legitimate responsibility to prescribe and control overt sexual conduct on its campuses does not encompass disciplinary action that would expose the University to a constitutional claim. The public has an interest in knowing that Plaintiff and other university students can discuss their thoughts and feelings about a vital problem of human interest and public concern, like love or sex, without the fear of punishment for daring to speak about such topics. Therefore, as stated more fully below, Plaintiff respectfully requests the Court grant his Motion and issue a preliminary injunction pending a decision on the merits of Plaintiff's claims in this matter.

## FACTS

On May 6, 2023, Plaintiff John Doe, a UMass Lowell graduate student and resident advisor, encountered several of his coworkers and their friends drinking and making noise in his residence hall in violation of the UMass Lowell Student Conduct Code. *See* Exhibit (Ex.) B at 5; Verified Complaint (Comp.) at ¶ 59. On May 7, 2023, several female coworkers accused Plaintiff of sexual misconduct. *See* Comp. at ¶ 60.

UMass Lowell's Student Conduct Code, annexed hereto as Exhibit A, defines "sexual misconduct" as:

> unwelcomed conduct of a sexual nature when: submission to or rejection of such conduct by a person or persons is used as a basis for employment or educational decisions affecting such person or persons, or participation in University programs or activities; or such conduct unreasonably: interferes with a person or person's work or academic performance; interferes with or limits a person or person's ability to participate in or benefit from a work or academic program or activity; or creates an intimidating, hostile, or offensive working or academic environment.

One of the complaining students later admitted to the University of Massachusetts "that she and other students were, in fact, drinking on the night of May 6, 2023." See Ex. B at 5. Nevertheless, the University investigated the complaints against Plaintiff and disciplined him

under the Student Conduct Code in a process that is described at length in the Complaint (Comp.). *See* Comp. at ¶¶ 59-167. On August 22, 2023, a Student Conduct Hearing Panel of three University administrators acting on behalf of the University (Doe Hearing Panel) found Plaintiff responsible for sexual misconduct as a result of five separate incidents alleged by four individual female coworker resident advisors, J.T., C.T., S.K., and G.D. *See* Ex. B; Comp. at ¶ 164. According to a September 7, 2023 letter informing Plaintiff of the Doe Hearing Panel results, which is annexed hereto as Exhibit B, the rationale for the decision was:

> In the hearing on August 22, 2023, [J.T.], [C.T.], [S.K.], and [G.D.] all stated that the conduct by [Doe] was not welcome.
>
> As noted above [in the material findings of facts], related to the comment "what if I stuck my penis in your face" in conversation with [G.D.], [Doe] states that he did compare unwanted sexual conduct to religious proselytism in this conversation and meant to do so in disagreement with both. With this context of intent assumed as fact, the statement remains unwelcome by the recipient.
>
> Related to the comment in conversation with [C.T.], [Doe] stated that he does not remember saying the word sex while talking about food, but that he may have done so. In his response to the investigation report, [Doe] stated that [C.T.] may have misunderstood what he was saying in regard to food, and that he may have been speaking similar to the popular hashtag #foodporn. With this context of intent assumed as fact, the statement remains unwelcome by the recipient.
>
> Related to moving [J.T.'s] feet without her consent, [Doe] stated that he did so to move her feet on the shaker plate[2], and did so with his own feet. This touching was unwelcome and no party noted any conversation asking for consent.
>
> [J.T.] stated that [Doe] would hug her without asking until his arms were outstretched and she felt obligated to engage. [Doe] stated that his hugs with [J.T.] were not unwelcome. With this context of intent assumed as fact, the hugs were not welcome by the recipient.
>
> [S.K.] stated that the comments that [Doe] made about sex were not welcome. [Doe] stated that he said to [S.K.] "I don't need to someone to have sex with." This comment was not welcome by the recipient.

---

[2] A "shaker plate" is a type of exercise machine. An image of Plaintiff's shaker plate model is annexed hereto as Exhibit C.

> The comments to [S.K.], [C.T.], and [G.D.], as well as hugs and touching of [J.T.]'s feet constitute a pervasive pattern of unwelcome conduct related to sex directed to female students.

Ex. B at 6.

As a consequence of the sexual misconduct finding against Plaintiff, the University of Massachusetts severely disciplined, retaliated, and otherwise took adverse action against him. Plaintiff was placed on Elevated Probation status until graduation, with any further misconduct resulting in "suspension, or expulsion from the University." *See id.* at 7; Comp. at ¶ 167(d). This status will remain part of Plaintiff's "disciplinary record for seven years after completion of all sanctions, and is reported to inquiring parties when background checks are conducted." *See* Ex. B at 7; Comp. at ¶ 167(e).

Plaintiff was terminated from his job as a resident advisor and evicted from his dormitory housing. *See* Ex. B at 1.; Comp. at ¶ 167(a). He was trespassed "from entering any UMass Lowell Residence Halls, with the exception of" two dining areas. *See* Exhibit B at 2; Comp. at ¶ 167(a). Plaintiff was told that "UMass Lowell Police have been notified of this status, and any attempt to enter the residence halls will result in future action through the University Conduct Process." *See id.* According to the Doe Hearing Panel, Plaintiff was restricted from residence halls because "[b]y separating [Plaintiff] from university housing, further comments of this nature can be prevented from impacting other students in the residential community." *See* Ex. B. at 7. Lastly, Plaintiff was required to "engage in research of and completion of an approved consent training required prior to registering for future classes." *See id.* According to the Doe Hearing Panel, "[t]he panel believes completion of a self-researched and approved consent training that can show that the respondent has learned appropriate ways to interact with others in conversations related to sex." *Id.*

Plaintiff is an international student, with limited economic means at his disposal, and without immigration authorization to work off campus. *See* Comp. at ¶ 9. After the University of Massachusetts terminated Plaintiff from his job as a resident advisor, evicted him from his campus residence, and trespassed him from all residence halls, Doe has been unable to pay for off-campus housing. *See id.* Plaintiff has been rendered homeless, is sleeping off-campus on the couches of friends and family, and has been commuting long-distance to class. As a primary human need, stable shelter is indisputably a positive factor in academic success. Plaintiff therefore is suffering serious and irreparable harm to the academic and professional value of his doctoral degree. Along with shelter, as time ticks toward his graduation, Plaintiff is irretrievably losing the unique benefits of a traditional higher education residential campus model, like networking and cultural exchange opportunities, proximity to professors, and various extracurricular enrichment. If the instant matter remains unresolved until well before Plaintiff graduates, the scarlet letter of sexual misconduct branding Plaintiff's University references will require Plaintiff to delay his post-graduate job search until the matter is resolved. *See* Ex. B at 2; Comp. at ¶ 167(e).

## ARGUMENT

**I.**   **Preliminary Injunction Standard**

"When assessing a request for a preliminary injunction, a district court must consider '(1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest.'" *Norris v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020) (*quoting Shurtleff v. City of Bos.*, 928 F.3d 166, 171 (1st Cir. 2019).).

## II.     Likelihood of Success on the Merits

"The showing of a likelihood of success on the merits is the most important of the four preliminary injunction factors." *Doe v. Trs. of Boston College*, 942 F.3d 527, 533 (1st Cir. 2019). In order to succeed on the merits of a First Amendment retaliation claim, a plaintiff must "prove that (1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." *See D.B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012).

### A.     Non-Obscene Comments and Conversations About and Related to Sex Are Protected as Speech on a Matter of Public Concern

A state university's ability lawfully to restrict the content of speech on campus extends only to its authority, "consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *See Healy v. James*, 408 U.S. 169, 180 (1972) (*citing Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 507 (1969) (quotation marks omitted).). Those constitutional safeguards, nevertheless, may not apply with "less force on college campuses than in the community at large." *Healy*, 408 U.S. 1at 180. "With respect to persons entitled to be there," Supreme Court cases "leave no doubt that the First Amendment rights of speech and association extend to the campuses of state universities." *Widmar v. Vincent*, 454 U.S. 263, 268-269 (1981). *See also Healy*, 408 U.S. at 180-81 ("[T]he college classroom with its surrounding environs is peculiarly the marketplace of ideas."); *Gay Students Org. of Univ. of N.H. v. Bonner*, 509 F.2d 652, 658 (1st Cir. 1974) ("[T]he First Amendment applies with full vigor on the campuses of state universities.").

The Puritan sexual norms of Massachusetts remain in the State's past for now; and across all the United States, "[t]he First Amendment guarantees wide freedom in matters of adult public discourse." *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 682 (1986). While "obscenity is not

protected by the freedoms of speech and press[,] . . . sex and obscenity are not synonymous." *Roth v. United States*, 354 U.S. 476, 481, 487 (1957). *See also Erznoznik v. Jacksonville*, 422 U.S. 205, 213 (1975) ("Clearly all nudity cannot be deemed obscene. . ."). "Sex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; it is one of the vital problems of human interest and public concern." *Roth*, 354 U.S. at 481, 487 (1957). While sexual obscenity may be unprotected by the First Amendment, non-obscene comments and conversations among adults about or related to sex are entitled to the heightened protections of the First Amendment for speech related to "matters of public concern." *Id.* at 487 n.20, 488 (1957) (defining sexual obscenity as expression "having a tendency to excite lustful thoughts").

It is well-established in the First Circuit, that public universities may not prohibit or take adverse action against students for expressing personal "thoughts and feelings concerning sexuality and sexual roles" to other students "in an informal atmosphere" outside of the classroom. *See Gay Students Org. of Univ. of N.H. v. Bonner*, 509 F.2d 652, 661, 654 n.1 (1st Cir. 1974) (protecting expressive activity that "educate[s] the public about bisexuality and homosexuality"). This is true even if the expressed "sexual values [are] in direct conflict with the deeply imbued moral standards of much of the community whose taxes support the university." *Id.* at 658. Even the profane four-letter epithet for sex may not be banned from "the public vocabulary," merely because it may be extremely offensive or unwelcome to some. *Cohen v. California*, 403 U.S. 15, 15 (1971). "Whatever else may be necessary to give rise to the States' broader power to prohibit obscene expression, such expression must be, in some significant way, erotic." *Id.* at 20.

None of the three statements related to sex that Plaintiff allegedly made to three separate female students was obscene or had "a tendency to excite lustful thoughts." *Cf. Roth*, *357 U.S.* at 487 n.20. *See also Fraser*, 478 U.S. at 682; *Cohen* 403 U.S. at 20. Indeed, Plaintiff's statement, "I don't need to someone to have sex with," to female student S.K. would seem to be precisely the opposite. *Cf.* Ex. B at 6; Comp. at ¶ 164(b). As an expression of Plaintiff's "thoughts and feelings concerning sexuality and sexual roles" to another student "in an informal atmosphere," it is well-established that such a statement is protected. *Cf. Bonner*, 509 F.2d 652, 661, 654 n.1 (1st Cir. 1974). Using the anodyne "word sex while talking about food," *cf.* Ex. B at 6; Comp. at 146, is also protected speech, Cf. *Cohen*, 403 U.S. at 20 (1971) Indeed, the University of Massachusetts may not take adverse action against Plaintiff for using any particular word in "the public vocabulary" while talking about any "one of the vital problems of human interest and public concern." *Cf. id.* at 22-23.

Like sex, religion is indisputably one of the vital problems of public concern. *See, e.g.*, *Shurtleff v. City of Boston*, 596 U.S. 243 (2022) (finding that religious viewpoint discrimination abridged freedom of speech). The Doe Hearing Panel found that Plaintiff was having a discussion about religion with female student G.D., in which he "compare[d] unwanted sexual conduct to religious proselytism in conversation and meant to do so in disagreement with both" by making the statement: "what if I stuck my penis in your face?" *See* Ex. B at 6; Comp. at ¶ 146(e).

In the context of a true unwanted sexual advance, such a statement indeed may seem to be an obscene sexual advance intended to excite lustful thoughts in the recipient. *Cf. Fraser*, 478 U.S. at 682; *Cohen* 403 U.S. at 20; *Roth*, 357 U.S. at 487 n.20. However, in the context of a college dorm room debate about religious proselytism, the statement was a rhetorical question in

an appeal to pathos. *See* Ex. B at 6; Comp. at ¶ 136. Like the "f**k the draft" statement in Cohen, 403 U.S. at 15, "[i]t cannot plausibly be maintained that this vulgar allusion to [religious proselytism] would conjure up such psychic stimulation in" G.D. as to make the allusion obscene. *Cf. Cohen*, 403 U.S. at 20. Merely "shocking and offensive" statements, even those related to sex, are protected. *See Bonner*, 509 F.2d at 661. *See also Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (protecting "outrageous" speech about homosexuality); *Cohen*, 403 U.S. at 21. "Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949) "[T]he Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer." *Erznoznik*, 422 U.S. at 210-211. The University of Massachusetts may not take adverse action against Plaintiff for posing provocative rhetorical questions in a college dorm room bull session about religion. *Cf. Erznoznik*, 422 U.S. at 210-211; *Terminiello*, 337 U.S. at 4.

  **B.**  **Communicative Conduct**

The First Amendment protects conduct "sufficiently imbued with elements of communication." *See Texas v. Johnson*, 491 U.S. 397, 404 (1989). "In deciding whether conduct deserves First Amendment protection, [courts] ask both whether it was 'intended to be communicative' and whether it, 'in context, would reasonably be understood by the viewer to be communicative.'" *Hernández-Gotay v. United States*, 985 F.3d 71, 80 (1st Cir. 2021) (*quoting Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984).). "It is the duty of the party seeking to engage in allegedly expressive conduct to demonstrate that the First Amendment applies to that conduct." *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 49 (1st Cir. 2005).

As defined in Merriam-Webster Dictionary, the human gesture of "open arms" is universally understood to communicate "an eager or warm welcome," instead of an obscene request to engage in erotic conduct. Plaintiff's greeting of J.T. with his "arms . . . outstretched," *cf.* Ex. B at 6; Comp. at ¶ 164(c)—as distinct from the accomplished physical contact of an actual unconsented-to hug—is a purely communicative act. *Cf.* Cohen, 403 U.S. at 18 ("The only 'conduct' which the State sought to punish is the fact of communication."). *See also* Donna M. Goldstein & Kira Hall, *Darwin's hug: Ideologies of gesture in the science of human exceptionalism*, 11 HAU: Journal of Ethnographic Theory 693, 694 (2021) ("[T]he movement made to request a hug would be classified as a gesture but not the movement that realizes this request.").

To the extent that J.T. was offended by Plaintiff's open arms gesture, the University of Massachusetts may not take adverse action against Plaintiff to shield J.T. from such purely communicative acts. *Cf. Phelps*, 562 U.S. at 459; *Erznoznik*, 422 U.S. at 210-211; *Cohen*, 403 U.S. at 18. Whatever she may have "felt," J.T. was not, as she complained, "obligated to engage" in a hug with Plaintiff by any explicit or implicit quid pro quo. *Cf.* Ex. B. at 6; Comp. at 164(c). She could have informed Plaintiff that a hug would be unwelcome or simply given him the cold shoulder. Lastly, hugs themselves are not inherently sexual activity. *Cf. Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 610 (D. Mass. 2016) (finding that it is a broad generalization to characterize "kissing [a]s sexual activity").

Plaintiff's conduct of "moving [J.T.'s] feet . . . with his own feet" in order to "move her feet on [Plaintiff's] shaker plate" exercise equipment also was intended to be non-sexually communicative, and had been understood by J.T. as such. *See* Ex. B. at 6; Comp. at 164(d). *Cf. Hernández-Gotay*, 985 F.3d at 80. J.T. "stated in her interview with the investigator as well as in

the hearing panel" during Plaintiff's disciplinary process that she understood Plaintiff's intent in making foot-to-foot contact with her was "to place her feet on the shaker plate." *See* Ex. B at 5; *Hernández-Gotay, supra.*

Of course, "a physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment." *See Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993). At the same time, in Massachusetts, like in many other states, "[p]layers, when they engage in sport, agree to undergo some physical contacts which could amount to assault and battery absent the players' consent." *See Gauvin v. Clark*, 404 Mass. 450, 454 (1989) (*citing* Restatement (Second) of Torts § 50 comment b (1965).).This is true of contact or non-contact sports. *See Gray v. Giroux*, 49 Mass. App. Ct. 436, 439 (2000). *See also Johnson v. Verizon New Eng., Inc.*, 23 Mass. L. Rep. 40, 2007 Mass. Super. LEXIS 333 at *12 (Mass. Worcester Cty. Super. Ct. 2007) (and cases cited) ("The standard of care in recreational activities is willful, wanton, or reckless even when those activities do not have definable rules or customs recognized by the greater community."). Plaintiff's communicative conduct of making foot-to-foot contact with J.T. in order to "to place her feet on the shaker plate" was neither sexual nor reckless. *See* Ex. B at 6. *Cf. Gray*, 49 Mass. App. Ct. at 439. There was no "conversation asking for consent" to do so, *see* Ex. B at 6; Comp. at ¶ 164(d), because, in the recreational activity context, J.T. agreed to potential physical contact by participating in using Plaintiff's exercise machine. *Cf. Gauvin*, 404 Mass. at 454.

Because Plaintiff's non-obscene comments related to sex are constitutionally protected speech; because his "open arm" gestures are constitutionally protected communicative conduct; and because his communicative foot-to-foot contact with J.T. was in the context of recreational activity; Plaintiff is likely to prove that he engaged in constitutionally protected conduct. *Cf.*

*Esposito*, 675 F.3d at 43. Because the University of Massachusetts put Plaintiff on elevated probation status in retaliation for this conduct, and separated Plaintiff from university housing to prevent this conduct "from impacting other students in the residential community," *see* Ex. B. at 7, Plaintiff is likely to prove that he was subjected to an adverse action by the University of Massachusetts, and that the protected conduct was a substantial or motivating factor in the adverse action." *Cf. Esposito*, 675 F.3d at 43.

### III. Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" or harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "As a result, the First Circuit has held that 'irreparable injury is presumed upon a determination that the movants are likely to prevail on their First Amendment claim.'" *Norris v. Cape Elizabeth Sch. Dist. (In re A.M.)*, 422 F. Supp. 3d 353, 367 (D. Me. 2019) (*quoting Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10-11 (1st Cir. 2012).). In addition to his loss of Plaintiff's First Amendment freedoms, Plaintiff is suffering serious and irreparable harm to the academic and professional value of his doctoral degree due to homelessness and lack of access to campus opportunities caused by being trespassed from university housing. *See* Ex. B. at 6; Comp. at ¶ 167(a).

### IV. Balance of Equities

To obtain preliminary injunctive relief, a Plaintiff must also show "a balance of equities in his favor." *Arborjet, Inc. v. Rainbow Treecare Scientific Advancements*, 794 F.3d 168, 171 (1st Cir. 2015). This involves weighing "the balance of relevant hardships as between the parties." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 482 (1st Cir. 2009). As described above, Plaintiff's loss of First Amendment freedoms and his being trespassed from the

UMass Lowell residential community, as well as the serious and irreparable harm to the academic and professional value of his degree are on Plaintiff's side of the balance of hardships.

On the other side of the balance is the University of Massachusetts's legitimate and important disciplinary interest in prohibiting "actions which 'materially and substantially disrupt the work and the discipline of the school.'" *Bonner*, 509 F.2d at 663. If a "university chose to do so, it might well be able to regulate overt sexual behavior," such as sexual harassment, public displays of affection, or campus burlesque drag shows. *See id.* However, "the curtailing of expression which [its administrators] find abhorrent or offensive cannot provide the important governmental interest upon which impairment of First Amendment freedoms must be predicated." *See id.* at 662 (1st Cir. 1974).

The University of Massachusetts also has the responsibility to prevent student-on-student sexual harassment under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 et seq., and/or coworker sexual harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. In addition to the loss of federal education funding, "Title IX creates an implied private right of action against federal funding recipients for money damages . . . when a Title IX funding recipient is deliberately indifferent to known acts of sexual harassment of a student by a teacher" or by another student. *See Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1, 7 (1st Cir. 2020) (citations omitted). *See also Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 636 (1999).

"[T]he Supreme Court has endorsed two different, although related, theories as to how such harassment can constitute sex discrimination either in the workplace (Title VII) or school context (Title IX)"—quid pro quo sexual harassment and hostile environment sexual harassment. *See Wills v. Brown Univ.*, 184 F.3d 20, 25 (1st Cir. 1999). Title IX quid pro quo harassment

occurs when "(1) [a student] was subject to unwelcome sexual advances by a supervisor or teacher and (2) [the student's] reaction to these advances affected tangible aspects of his or her compensation, terms, conditions, or privileges of [student] employment or educational training." *Lipsett v. University of P.R.*, 864 F.2d 881, 898 (1st Cir. 1988). Title IX hostile environment harassment occurs when a student is (1) "subjected to harassment" (2) on the basis of sex; (3) "the harassment was sufficiently severe and pervasive to create an abusive educational environment;" and (4) "a school official authorized to take corrective action . . . exhibited deliberate indifference to the harassment." *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65 (1st Cir. 2002). *See also Grace v. Board of Trustees*, No. 22-1742, 2023 U.S. App. LEXIS 27843, at *21 (1st Cir. Oct. 19, 2023).

By dismissing the complaints against Plaintiff from the University's Title IX process and instead "refer[ring the complaints] to the UMass Lowell Student Conduct Office for investigation as 'sexual misconduct' under the university's Campus Conduct Process," the University's Title IX Coordinator already implicitly has acknowledged that Plaintiff's conduct did not expose the University to Title IX liability.[3] *See* Comp. at ¶ 36, 154. Indeed, Plaintiff's conduct does not meet essential elements of both the quid pro quo and the hostile environment theories of sexual harassment. *Cf. Lipsett*, 864 F.2d at 898. In all of the five instances of alleged sexual misconduct with all four female students, Plaintiff was not the complainants' "supervisor or teacher;" his conduct did not constitute "sexual advances;" and there was no quid pro quo. *Cf. Lipsett v. University of P.R.*, 864 F.2d 881, 898 (1st Cir. 1988).

---

[3] The university also did not seek to discipline Plaintiff in his role as a resident advisor under its Title VII process for employees.

Plaintiff's conduct also "flunks" the hostile environment sexual harassment test. *Cf. Frazier*, 276 F.3d at 66. There is no indication that Plaintiff's conduct was based on the sex of the complaining students, or that Plaintiff directed such conduct only at females. *Cf. id.* (*citing Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 258 (1st Cir. 1999).). Moreover, to qualify as hostile on the basis of sex, the educational environment must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive environment." *Brown v. Hot, Sexy & Safer Prods.*, 68 F.3d 525, 540 (1st Cir. 1995) (quotation marks omitted) (*quoting Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).). In a totality of the circumstances, the conduct should be objectively and subjectively frequent, severe, and "physically threatening or humiliating rather than a mere offensive utterance," to the extent that the conduct "unreasonably interferes with [academic] performance." *Hot, Sexy & Safer Prods.*, 68 F.3d at 540.

In *Hot, Sexy & Safer Prods.*, 68 F.3d at 529, two fifteen-year-old high school students—a boy and a girl—alleged that an adult AIDS awareness educator at their school:

> 1) told the students that they were going to have a 'group sexual experience, with audience participation'; 2) used profane, lewd, and lascivious language to describe body parts and excretory functions; 3) advocated and approved oral sex, masturbation, homosexual sexual activity, and condom use during promiscuous premarital sex; 4) simulated masturbation; 5) characterized the loose pants worn by one minor as 'erection wear'; 6) referred to being in "deep sh--" after anal sex; 7) had a male minor lick an oversized condom with her, after which she had a female minor pull it over the male minor's entire head and blow it up; 8) encouraged a male minor to display his 'orgasm face' with her for the camera; 9) informed a male minor that he was not having enough orgasms; 10) closely inspected a minor and told him he had a 'nice butt'; and 11) made eighteen references to orgasms, six references to male genitals, and eight references to female genitals.

The First Circuit refused to find that these "comments were so severe as to create an objectively hostile environment," noting also that there was only a "one-time exposure to the comments." *See id.* at 541 (1st Cir. 1995).

In the instant matter, Plaintiff told one adult female university student "I don't need someone to have sex with;" 2) said "the word sex while talking about food" with a different adult female university student; 3) said "what if I stuck my penis in your face?" in a religious debate about proselytism with a third adult female university student; and 4) had two interactions with yet a fourth adult female university student, in which a) their feet touched during recreational activity and b) he used the open arm gesture to communicate a request for consent to a hug. *See* Ex. B. at 6; Comp. at ¶¶ 34, 164. Even in a high school environment, Plaintiff's conduct would not have been "so severe as to create an objectively hostile environment" to minors. *See Hot, Sexy & Safer Prods.*, 68 F.3d at 529. Under the Title IX hostile environment theory, the University of Massachusetts has no duty to grown men and women living in its residential community to prevent further conduct of such nature. *Cf. id.* Under the First Amendment, the University does not have the constitutional authority to do so.

With Plaintiff's conduct constituting neither quid pro quo nor hostile environment sexual harassment, Plaintiff's First Amendment rights and the value of his doctoral degree far outweigh the University's right to regulate its students' non-erotic comments and conversations related to sex, to prohibit students from greeting each other with open arms, or to require conversations asking for consent prior to bodily contact during athletic activity. "[I]t would be entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims." *Davis*, *supra*. Therefore, the balance of equities in this matter is in Plaintiff's favor. *Cf. Arborjet, Inc.*, 794 F.3d at 171; *Irizarry*, 587 F.3d at 482.

V.   **The Public Interest**

"A party who seeks a preliminary injunction must show . . . that the granting of prompt injunctive relief will promote (or, at least, not denigrate) the public interest." *McGuire v. Reilly*, 260 F.3d 36, 42 (1st Cir. 2001) "Protecting rights to free speech is ipso facto in the interest of the general public." *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 128 (D. Mass. 2003). *See also Worthley v. School Comm. of Gloucester*, No. 22-cv-12060-DJC, 2023 U.S. Dist. LEXIS 11508, at *23 (D. Mass. Jan. 24, 2023). The public indisputably has an interest in frank non-obscene discussion of love and sex, some "of the vital problems of human interest and public concern," without fear of punishment for daring to speak about such topics. *Cf. Roth*, 354 U.S. at 487 (1957). The public also has an interest in knowing that neither Plaintiff nor any other student who has similar conversations related to sex will be denied access to school simply because anatomical words like "sex" and "penis" offend the sensibilities of some university students and administrators. *Cf. Norris (In re A.M.)*, 422 F. Supp. 3d at 369. Lastly, it is in the public interest in Massachusetts and many other states with similar common law rules that participants in recreational activity must agree to non-reckless bodily contact during such activity, so that "vigorous and active participation in sporting events should not be chilled by the threat of litigation." *Kavanagh*, 440 Mass. at 205.

## CONCLUSION

Because Plaintiff is likely to succeed on the merits of his First Amendment claim; because he will suffer irreparable harm if preliminary relief is not granted; because the balance of equities is in his favor, and because preliminary relief is in the public interest; preliminary relief should be granted in this case.

WHEREFORE, Plaintiff respectfully requests the Court grant his Motion and issue a preliminary injunction pending a decision on the merits of Plaintiff's claims in this matter.

DATED: November 6, 2023

        Respectfully submitted,
        John Doe,
        By his Attorney,

        Ilya I. Feoktistov, Esq.
        B.B.O. No. 704458
        LAW OFFICE OF ILYA FEOKTISTOV
        292 Newbury Street, No. 544
        Boston, MA 02115
        (617) 462-7938
        if@ilyafeoktistov.com

## SERVICE CERTIFICATE

I, Ilya Feoktistov, counsel for Plaintiff John Doe in the above-captioned matter, hereby certify that on November 8, 2023, I served a true and accurate copy of the foregoing document on the parties of record by filing electronically and by email on counsel for the University of Massachusetts, the Trustees of the University of Massachusetts, Hannah Monbleau, Kate Legee, Esmeralda Levesque, and Adam Dunbar at:

Michael Hoven, MHoven@umassp.edu

Maria Sheehy, MSheehy@umassp.edu

Ilya I. Feoktistov, Esq.