UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
JOHN DOE,                                                )
        Plaintiff,                                    )
                                                                    )
v.                                                                )   Case No. 1:23-cv-12077-WGY
                                                                    )
UNIVERSITY OF MASSACHUSETTS,       )
TRUSTEES OF THE UNIVERSITY OF      )
MASSACHUSETTS, HANNAH MONBLEAU, )
in her official and individual capacities,    )
KATE LEGEE, in her official and individual )
capacities, ESMERALDA LEVESQUE, a/k/a )
ESMERALDA MENDEZ, in her official and  )
individual capacities, ADAM DUNBAR, in his )
official and individual capacities,              )
BRETT SOKOLOW,                                  )
        Defendants.                                 )
_____)

**JOINT PRETRIAL MEMORANDUM**

Plaintiff John Doe ("Doe") and Defendants the University of Massachusetts, the Trustees of the University of Massachusetts (with the University of Massachusetts, the "University"), Hannah Monbleau, Kate Legee, Esmeralda Levesque, and Adam Dunbar (Monbleau, Legee, Levesque, Dunbar, and the University, collectively, the "University Defendants") submit the following joint pretrial memorandum.

**(1)**     **Concise Summary of the Evidence**

     **A. Plaintiff**

This matter concerns adverse action taken by the University of Massachusetts Defendants against John Doe (Doe) in retaliation for statements and gestures made by

Doe to his fellow Resident Advisors ("RAs") at the University of Massachusetts Lowell, MA campus (UMass Lowell).

The evidence will show that on the night of May 6, 2023, Doe encountered a fellow RA, C.T., drinking alcohol with several other students in his residence hallway and outside of the privacy of her own room in violation of the UMass Lowell Student Alcohol Policy. On May 7, 2023, C.T. and three other female students at UMass Lowell who act as RAs reported to their supervisor that some of Doe's words or actions over the previous several months made them "uncomfortable." After an investigation by Defendant Hannah Monbleau, a hearing panel composed of Defendants Kate Legee, Adam Dunbar, and Esmeralda Levesque found Doe responsible for violating the UMass Student Conduct Code's prohibition against "sexual misconduct" on the basis of three instances of pure speech and two instances of communicative conduct directed toward four separate female RAs: 1) Doe was "saying the word sex while talking about food" with C.T; 2) Doe said to S.K., "I don't need someone to have sex with"; 3) Doe said to G.D, "what if I stuck my penis in your face?" during an argument about religion; 4) Doe approached J.T. to "hug her without asking until his arms were outstretched and she felt obligated to engage"; and 5) Doe "moved [J.T.'s] feet on [an exercise] shaker plate, and did so with his own feet" without "any conversation asking for consent."

UMass Lowell has a Student Conduct Process (Student Conduct Process) that governs the conduct of its students and is superintended by the Office of Student

Joint Pretrial Memorandum

Conduct. Separately, UMass Lowell has a Title IX Sexual Harassment Grievance Procedure (Title IX Procedure), which also governs the conduct of its students, and which is superintended by the Title IX Coordinator's office. The Student Conduct Code and the Title IX Procedure use two separate terms, 2) "Title IX Sexual Harassment," and 2) "Non-Title IX Sexual Misconduct," to define identical conduct:

| Sexual Harassment under the Title IX regulations means conduct on the basis of sex that satisfies one or more of the following: | [Non-Title IX] Sexual Misconduct: unwelcomed conduct of a sexual nature when: |
|---|---|
| (i) An employee of the university conditioning the provision of an aid, benefit, or service of the university on an individual's participation in unwelcome sexual conduct; | 1. submission to or rejection of such conduct by a person or persons is used as a basis for employment or educational decisions affecting such person or persons, or participation in University programs or activities; or |
| (ii) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that effectively denies a person equal access to the university's education program or activity; or . . . | 2. such conduct unreasonably: interferes with a person or person's work or academic performance; interferes with or limits a person or person's ability to participate in or benefit from a work or academic program or activity; or creates an intimidating, hostile, or offensive working or academic environment. |

On May 19, 2023, Doe received separate letters from the Office of Student Conduct and from a Deputy Title IX Coordinator. The former informed Doe that it will use the Student Conduct Process to investigate his alleged conduct as sexual misconduct. The latter informed Doe that her office will use the Title IX Procedure to

Joint Pretrial Memorandum

investigate the same conduct as sexual harassment. Neither letter gave Doe any notice of his alleged conduct. During the investigation, the University Defendants denied Doe's repeated requests to see the relevant evidence against him.

On July 11, 2023, Michael Coughlin, UMass Lowell's Associate Director of Student Rights & Responsibilities, emailed Doe that the investigation has concluded and will be reviewed by a hearing panel pursuant to the Student Conduct Process. On July 12, 2023 Coughlin, now identifying himself as a Deputy Title IX Coordinator, emailed Doe that the investigation instead will be moving to a "Title IX hearing panel, and you will need an advisor to conduct cross-examination." On July 13, Coughlin, reverting to his role as Associate Director of Student Rights & Responsibilities, emailed Doe that the hearing panel will be held pursuant to the Student Conduct Process after all. Under the Student Conduct Process, Doe had no right to confront his accusers and test the credibility of the witnesses against him through cross-examination by counsel. Doe also had no right to an effective appeal. Therefore, Doe retained counsel, refused to appear before the hearing panel, and filed a federal lawsuit instead. During Defendants' process against Doe, he developed throat ulcers and acid reflux, and a doctor found traces of blood in his urine as physical manifestations of the emotional distress caused by Defendants' actions.

**The University Defendants Violated Doe's First Amendment Rights**

The evidence will show that the University Defendants took adverse employment and academic action against Doe in substantial or motivating part due to Doe's three non-obscene comments related to sex and two nonsexual communicative acts that caused offense to four female RAs during informal interactions with Doe. The University's adverse actions were intended to prevent Doe from causing such offense to female RAs in the future. The University Defendants may not regulate Doe's non-obscene comments related to sex and Doe's protected communicative acts in order to protect unwilling listeners or viewers in an informal campus setting from taking offense. Therefore, their regulation of Doe's speech and communicative acts violates the First Amendment.

**The University Defendants Breached the Terms of Their Contract with Doe**

Two separate UMass Lowell policy manuals describing the Student Conduct Process and the Title IX Procedure both formed the basis of Doe's contractual relationship with the University. The same conduct that is defined as "Non-Title IX Sexual Misconduct" under the former is defined as "Title IX Sexual Harassment" under the latter. The former provides significantly fewer due process protections than the latter.

The University drafted the definitional ambiguity into its relevant policy manuals. The University maintained this ambiguity during the process it used against

Doe by repeatedly referring to both the Student Conduct Process and the Title IX Procedure in its notices to Doe. Thus there is an uncertainty of which definition and process should have been applied to Doe's conduct. As interpreted in Doe's favor, the uncertainty means that Doe had a reasonable expectation to have been provided the greater procedural protections of the Title IX Procedure.

The University breached the terms of its contract with Doe when it denied Doe several procedural protections available under the Title IX Procedure by imposing punitive measures, by failing to give advance notice of the conduct allegedly constituting sexual harassment, by using a biased investigator, by consolidating complaints arising out different facts or circumstances, by denying the right to cross-examination, and by denying the right to an effective appeal.

Even if the ambiguity between the Student Conduct Process and the Title IX Procedure allows an interpretation that the University appropriately provided the former to Doe (which it does not), the University still breached the terms of its contract with Doe. In finding Doe responsible for "Non-Title IX Sexual Misconduct," the university switched the definition of this term from the contractual "unwelcomed conduct of a sexual nature" to "unwelcomed conduct related to sex." The University further breached by misapplying this already corrupted definition to Doe's pure speech (as opposed to conduct) related to sex, and to Doe's entirely non-sexual conduct.

Joint Pretrial Memorandum

The University also breached its basic obligation to provide procedural fairness in disciplinary proceedings by denying Mr. Doe notice of the details of the charges against him, the right to see the relevant evidence, the right to cross-examination by counsel, and the right to an effective appeal. Lastly, the University breached its basic substantive fairness obligation by steadfastly refusing to consider the critical issue of the complainants' credibility created by the timing of their complaints on the day after Doe caught complainant C.T. and several other students violating the UMass Lowell Alcohol Policy.

### The University Defendants Violated the Massachusetts Civil Rights Act

In order to interfere with Doe's First Amendment right to express his non-obscecne personal thoughts and feelings concerning sexuality and sexual roles to other students in the informal atmosphere of a university residential community, the university refused to provide Plaintiff with the Title IX Procedure he expected under his contract with UMass Lowell and trespassed Doe from living in or entering university housing, thereby using the threat of police force against Doe and denying Doe his contractual rights, as well as the privileges and benefits of his educational program. The denial of entry into university buildings under the threat of police force, of rights due under a contract, of the benefits and privileges of an educational program, all constitute threats, intimidation, and coercion under the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §§ 11H-I. Therefore, the University Defendants violated the

Massachusetts Civil Rights Act by interfering with Doe's First Amendment rights by threats, intimidation, or coercion.

### B. University Defendants

This case concerns the disciplinary process used to respond to complaints against Doe by his fellow Resident Advisors ("RAs") at the University of Massachusetts Lowell and the sanctions imposed upon him as a result of that process.

### Complaints and Investigation

The evidence will show that on May 7, 2023, several students at UMass Lowell who act as RAs (J.T., C.T.Z., E.Z., and E.H.) reported to their supervisor that they had concerns with how two of their fellow RAs—John Doe and K.G.—interacted with female RAs.

The University initiated an investigation of the complaints against Doe and K.G. under the Student Code of Conduct ("Code"). The Code prohibits various forms of "Non-Title IX Sexual Misconduct," including "sexual misconduct" defined as "unwelcomed conduct of a sexual nature when . . . such conduct unreasonably: interferes with a person or person's work or academic performance; interferes with or limits a person or person's ability to participate in or benefit from a work or academic program or activity; or creates an intimidating, hostile, or offensive working or academic environment."

The University followed its process under the Code. The University assigned an investigator, Hannah Monbleau, to investigate the formal complaints made. Monbleau interviewed the complainants, respondents Doe and K.G., and witnesses. Monbleau solicited potential witnesses and documentary evidence from Doe and K.G. Monbleau completed an Investigative Report and recommended that the case against Doe move forward to a hearing panel. In contrast, Monbleau determined that there was not evidence of policy violations by K.G., and the charge against K.G. of sexual misconduct was dropped.

The University provided the Investigative Report to Doe and Doe's counsel, and Doe provided a written response to the Investigative Report on June 30, 2023.

**Hearing Panel**

The University convened a hearing panel on August 22, 2023 to determine whether Doe engaged in sexual misconduct in violation of the Student Conduct Code. At the hearing, the panel heard from four separate women who found Doe's sexual comments and non-consensual physical contact unwelcome. While Doe did not attend the hearing, the Hearing Panel took into account his written response to the Investigative Report and his prior statements to the investigator. The Hearing Panel noted that Doe disputed certain behavior, but his written response "agree[d] that many of the comments did occur with the complainants and witness." In particular, he did not deny saying, "What if I stuck my penis in your face?," "I don't need someone to

have sex with," or discussing sex and food. He also did not deny touching J.T.'s legs or hugging her.

The Hearing Panel reasonably found that Doe's behavior "constituted a pervasive pattern of unwelcome conduct related to sex directed to female students." One of the complainants had asked not to be on RA duty with Doe anymore, and two others told the Hearing Panel they were likewise uncomfortable interacting with Doe any longer and it had impaired their ability to act as RAs. Accordingly, the Hearing Panel found that Doe had violated "the sexual misconduct standard in the Student Conduct Code."

In determining the appropriate sanction, the panel noted that Doe's behavior "impacted multiple members of the student community" and "[a]ll incidents occurred between female residents and the respondent while in university housing." Only "[b]y separating [Doe] from university housing" could the University "remediate the effects" of Doe's actions. The panel also placed Doe on elevated probation status and required Doe to take a consent training course prior to registering for future classes. Doe's probationary status would not be reflected on his transcript, but would be disclosed to parties conducting background checks for seven years. Other sanctions, such as suspension or expulsion from the University, were available but were not imposed on Doe.

**There Was No Violation of Doe's First Amendment Rights**

Joint Pretrial Memorandum

The evidence will show that the University reasonably concluded that Doe's pattern of comments substantially interfered with the University's work and had specifically impaired three RAs' ability to perform their responsibilities as RAs. Based on this behavior, the University could also reasonably foresee other disruptive behavior in the absence of sanctions. Because the University's determination that Doe's offensive behavior caused a substantial disruption is reasonable, its regulation of Doe's speech does not violate the First Amendment.

### There Was No Violation of the Massachusetts Civil Rights Act

Even if Doe could show a violation of his civil rights (which he cannot), the evidence will show that no such violation was done through threats, intimidation, or coercion. If there were a violation, it was done directly by following the procedures in the Code and imposing sanctions on Doe. In the absence of threats, intimidation, or coercion, there can be no violation of the MCRA.

### There Was No Breach of Contract by the University

Doe will not be able to prove the University breached a contract with Doe by using the disciplinary process under the Code rather than its Title IX grievance process. As a preliminary matter, a student at a public university with due process rights under the Fourteenth Amendment does not have an additional contractual relationship with the University regarding adherence to disciplinary codes. Even if there were a contract,

the evidence will show that the University appropriately followed its process under the Code for charges of sexual misconduct.

The Code prohibits various forms of "Non-Title IX Sexual Misconduct," including "sexual misconduct" defined as "unwelcomed conduct of a sexual nature when . . . such conduct unreasonably: interferes with a person or person's work or academic performance; interferes with or limits a person or person's ability to participate in or benefit from a work or academic program or activity; or creates an intimidating, hostile, or offensive working or academic environment." In contrast, complaints of sexual harassment, as defined in Title IX regulations set forth in Part 106 of title 34 of the Code of Federal Regulations, are investigated by the University pursuant to its Sexual Harassment Grievance Procedure rather than its process under the Code.

The University may investigate and sanction conduct that does not meet the definition of sexual harassment as defined in Title IX regulations, and for such conduct is not required to use the process prescribed in Title IX regulations. The University did so here, and its notices to Doe repeatedly refer to the Code and its prohibition of "sexual misconduct" (rather than sexual harassment).

**(2)     Stipulated Facts**

Stipulated Facts are attached as Exhibit A.

**(3)     Contested Issues of Fact**

The parties agree there are no significant contested issues of fact. Accordingly, the parties agree to proceed on a case-stated basis.

**(4)    Jurisdictional Questions**

   **A. Plaintiff**

Plaintiff submits the following jurisdictional question:

1.    Does the Ex Parte Young exception to Eleventh Amendment sovereign immunity grant the Court subject matter jurisdiction over Count I (as to the University and as to Monbleau, Legee, Levesque, and Dunbar in their official capacities for prospective relief) and Count III (as to the University and as to Monbleau, Legee, Levesque, Dunbar in their official capacities for prospective relief)?

   **B. University Defendants**

University Defendants submit the following jurisdictional question:

1.    Does sovereign immunity deprive the Court of subject matter jurisdiction over Count I (as to the University and as to Monbleau, Legee, Levesque, and Dunbar in their official capacities for damages) and Count III (as to the University and as to Monbleau, Legee, Levesque, Dunbar in their official capacities)?

**(5)    Questions Raised by Pending Motions**

There are no pending motions.

Joint Pretrial Memorandum

**(6) Issues of Law, Including Evidentiary Questions, Together with Supporting Authority**

    **A. Plaintiff**

    1.    Does the Ex Parte Young exception to Eleventh Amendment sovereign immunity grant the Court subject matter jurisdiction to grant the prospective injunctive relief in Count I as to the University and as to Monbleau, Legee, Levesque, and Dunbar in their official capacities? See Green v. Mansour, 474 U.S. 64 (1985); Ex parte Young, 209 U.S. 123 (1908); Doe v. Shibinette, 16 F.4th 894, 903 (1st Cir. 2021).

    2.    In their individual capacity, do Monbleau, Legee, Levesque, and Dunbar have qualified immunity from Count I? See Papish v. Board of Curators, 410 U.S. 667, (1973); Healy v. James, 408 U.S. 169 (1972); Cohen v. California, 403 U.S. 15 (1971); Roth v. United States, 354 U.S. 476 (1957); Norris v. Cape Elizabeth Sch. Dist., 969 F.3d 12, 22 (1st Cir. 2020)  Diaz-Bigio v. Santini, 652 F.3d 45 (1st Cir. 2011); Gay Students Org. of Univ. of N.H. v. Bonner, 509 F.2d 652 (1st Cir. 1974); Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 607 (D. Mass. 2016).

    3.    Does the Ex Parte Young exception to Eleventh Amendment sovereign immunity grant the Court subject matter jurisdiction to grant the prospective injunctive relief in Count III as to the University and as to Monbleau, Legee, Levesque, Dunbar in their official capacities? See Howcroft v. City of Peabody, 51 Mass. App. Ct. 573, 747 N.E.2d 729 (2001); Commonwealth v. ELM Med. Lab'ys, Inc., 33 Mass. App. Ct. 71, 596 N.E.2d 376 (1992).

Joint Pretrial Memorandum

    4.    In their individual capacity, do Monbleau, Legee, Levesque, and Dunbar have qualified immunity from Count III? See <u>Diaz-Bigio v. Santini</u>, <u>652 F.3d 45</u> (1st Ci<u>r. 2011</u>); <u>Gay Students Org. of Univ. of N.H. v. Bonner</u>, <u>509 F.2d 652</u> (1st Ci<u>r. 1974</u>); <u>Reproductive Rights Network v. President of Univ. of Mass.</u>, <u>45 Mass. App. Ct. 495</u>, <u>699 N.E.2d 829</u> (1998).

    5.    Under the First Amendment, may a public university regulate its students' non-obscene expression of personal thoughts and feelings concerning sexuality and sexual roles to other students in the informal atmosphere of a university residential community? <u>See</u> Bethel Sch. Dist. v. Fraser, <u>478 U.S. 675, 682</u> (1986); <u>Erznoznik v. Jacksonville</u>, <u>422 U.S. 205, 213</u> (1975); <u>Papish v. Board of Curators</u>, <u>410 U.S. 667</u>, (1973); <u>Healy v. James</u>, <u>408 U.S. 169</u> (1972); <u>Cohen v. California</u>, <u>403 U.S. 15</u> (1971); <u>Roth v. United States</u>, <u>354 U.S. 476</u> (1957); <u>Norris v. Cape Elizabeth Sch. Dist.</u>, <u>969 F.3d 12, 22</u> (1st Ci<u>r. 2020</u>); <u>Diaz-Bigio v. Santini</u>, <u>652 F.3d 45</u> (1st Ci<u>r. 2011</u>); <u>Gay Students Org. of Univ. of N.H. v. Bonner</u>, <u>509 F.2d 652</u> (1st Ci<u>r. 1974</u>).

    6.    Under the First Amendment, may a public university regulate non-sexually communicative conduct that was intended to be communicative and, in context, would reasonably be understood by the viewer to be communicative, such as the "open arms" gesture widely understood to communicate an offer of a hug, or the use of one's foot to move another person's foot during recreational activity. <u>See</u> <u>Texas v. Johnson</u>, <u>491 U.S. 397</u> (1989); <u>Clark v. Cmty. for Creative Non-Violence</u>,

468 U.S. 288 (1984); Cohen v. California, 403 U.S. 15 (1971); Hernández-Gotay v. United States, 985 F.3d 71, 80 (1st Cir. 2021); Doe v. Brandeis Univ., 177 F. Supp. 3d 561 (D. Mass. 2016).

7. Does Massachusetts law permit physical contacts during recreational activity which could amount to assault and battery absent the participants consent? See Gauvin v. Clark, 404 Mass. 450, 454 (1989); Gray v. Giroux, 49 Mass. App. Ct. 436, 439 (2000).

8. Did the uncertainty whether the definition and process of the Student Conduct Process should have been applied to Doe's conduct, or whether those of the Title IX Procedure should have been applied instead, create a reasonable expectation in Doe that he would be provided with the greater procedural protections of the Title IX Procedure? See Nadherny v. Roseland Prop. Co., Inc., 390 F.3d 44, 49 (1st Cir. 2004); Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 595 (D. Mass. 2016); New Bedford Gas & Edison Light Co. v. Maritime Terminal, Inc., 380 Mass. 734, 735-36, 405 N.E.2d 653 (1980).

9. Did the University breach its basic obligation to provide procedural and substantive fairness in university disciplinary proceedings? See Cloud v. Trustees of Boston Univ., 720 F.2d 721, 724 (1st Cir. 1983); Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 607 (D. Mass. 2016); Coveny v. President & Trs. of the Coll. of the Holy Cross, 388 Mass. 16, 20, 445 N.E.2d 136 (1983).

10. Is the University liable to Doe for breach of contract if the breach does not violate Doe's procedural or substantive due process rights under the Fourteenth Amendment? See Bishop v. Wood, 426 U.S. 341 (1976); Bleeker v. Dukakis, 665 F.2d 401 (1st Cir. 1981); Jimenez v. Almodovar, 650 F.2d 363 (1st Cir. 1981).

11. Has Doe proved that the University Defendants interfered with his First Amendment Rights through threats, intimidation, or coercion? See DeWeese-Boyd v. Gordon College, 487 Mass. 31, 163 N.E.3d 1000 (2021); Bally v. Northeastern Univ., 403 Mass. 713, 719 532 N.E.2d 49 (1989); Batchelder v. Allied Stores Corp., 393 Mass. 819 473 N.E.2d 1128 (1985).

   B. **University Defendants**

University Defendants submit the following as issues of law:

1. Does sovereign immunity deprive the Court of subject matter jurisdiction over Count I as to the University and Monbleau, Legee, Levesque, Dunbar in their official capacities? See Will v. Mich. Dept. of State Police, 491 U.S. 58 (1989); U.S. v. Univ. of Mass., Worcester, 812 F.3d 35 (1st Cir. 2016); O'Neill v. Baker, 210 F.3d 41 (1st Cir. 2000); Brown v. Newberger, 291 F.3d 89 (1st Cir. 2002).

2. In their individual capacity, do Monbleau, Legee, Levesque, and Dunbar have qualified immunity from Count I? See Diaz-Bigio v. Santini, 652 F.3d 45 (1st Cir. 2011).

Joint Pretrial Memorandum

    3.    Does sovereign immunity deprive the Court of subject matter jurisdiction over Count III as to the University and Monbleau, Legee, Levesque, Dunbar in their official capacities? See Commonwealth v. ELM Med. Lab'ys, Inc., 33 Mass. App. Ct. 71, 596 N.E.2d 376 (1992); Howcroft v. City of Peabody, 51 Mass. App. Ct. 573, 747 N.E.2d 729 (2001).

    4.    In their individual capacity, do Monbleau, Legee, Levesque, and Dunbar have qualified immunity from Count III? See Howcroft v. City of Peabody, 51 Mass. App. Ct. 573, 747 N.E.2d 729 (2001); Duarte v. Healy, 405 Mass. 43, 537 N.E.2d 1230 (1989).

    5.    Has Doe proved University Defendants did not reasonably believe Doe's conduct materially disrupted the work of the University? Morse v. Frederick, 551 U.S. 393 (2007); Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675 (1986); Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503 (1969); Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist., 969 F.3d 12 (1st Cir. 2020).

    6.    Has Doe proved that University Defendants interfered with his constitutional rights through threats, intimidation, or coercion? Longval v. Commissioner of Correction, 404 Mass. 325, 333, 535 N.E.2d 588 (1989).

    7.    Does Doe, a student at a public university who is entitled to due process rights under the Fourteenth Amendment, also have a contractual relationship with the University regarding adherence to the Student Code of Conduct or Sexual Harassment

Grievance Procedure? Gorman v. Univ. of Rhode Island, 837 F.2d 7 (1st Cir. 1988); Lyons v. Salve Regina Coll., 565 F.2d 200 (1st Cir. 1977); Coveney v. President & Trustees of Coll. of Holy Cross, 388 Mass. 16, 445 N.E.2d 136 (1983).

8. Has Doe proved that the University should have reasonably expected Doe to believe the Student Code of Conduct or the Sexual Harassment Grievance Procedure required the University to adjudicate charges of sexual misconduct under its Sexual Harassment Grievance Procedure? Schaer v. Brandeis Univ., 432 Mass. 474, 478 (2000)

9. Did the University provide basic fairness to Doe in investigating and hearing the complaints against him? Haidak v. Univ. of Massachusetts-Amherst, 933 F.3d 56 (1st Cir. 2019); Doe v. Trustees of Bos. Coll., 942 F.3d 527 (1st Cir. 2019).

10. Is the investigation and disciplinary process used regarding K.G., the other RA besides Doe accused of sexual misconduct, relevant to this case? Fed. R. Civ. P. 26(c); Doe v. Harvard Univ., 462 F. Supp. 3d 51 (D. Mass. 2020).

**(7)    Any Requested Amendments to the Pleadings**

None.

**(8)    Any Additional Matters to Aid in the Disposition of the Action**

None.

**(9)    The Probable Length of the Trial**

The parties agree to a non-jury trial on a case stated basis. The parties request one hour for argument.

Joint Pretrial Memorandum

**(10) Witness List**

Not applicable.

**(11) Proposed Exhibits**

The exhibit list is attached as Exhibit B.

**(12) Positions on any Remaining Objections to the Evidence Identified in the Pretrial Disclosure Required by <u>Fed. R. Civ. P. 26(a)(3)</u>.**

None.

Dated: December 15, 2023

| JOHN DOE | UNIVERSITY DEFENDANTS |
|---|---|
| By his attorney, | By its attorney, |
| /s/ | /s/ |
| Ilya I. Feoktistov, BBO No. 704458 | Michael Hoven, BBO No. 688593 |
| LAW OFFICE OF ILYA FEOKTISTOV | Associate Counsel |
| 292 Newbury Street, No. 544 | University of Massachusetts |
| Boston, MA 02115 | Office of the General Counsel |
| (617) 462-7938 | 50 Washington Street, Suite 3000 |
| if@ilyafeoktistov.com | Westborough, MA 01581 |
| | (774) 528-0205 |
| | mhoven@umassp.edu |