## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE,                          )<br>              Plaintiff,            )<br>                                    )<br>v.                                  )<br>                                    )<br>UNIVERSITY OF MASSACHUSETTS,        )<br>TRUSTEES OF THE UNIVERSITY OF       )<br>MASSACHUSETTS, HANNAH MONBLEAU,     )<br>in her official and individual capacities, )<br>KATE LEGEE, in her official and individual )<br>capacities, ESMERALDA LEVESQUE, a/k/a )<br>ESMERALDA MENDEZ, in her official and )<br>individual capacities, ADAM DUNBAR, in his )<br>official and individual capacities,  )<br>BRETT SOKOLOW,                      )<br>              Defendants.           )<br>                                    ) | Case No. 1:23-cv-12077-WGY |

## UNIVERSITY DEFENDANTS' TRIAL BRIEF

The University Defendants[1] did not violate John Doe's rights when they investigated complaints of sexual misconduct against him, found him responsible for a violation of the Student Conduct Code, and imposed sanctions on him for his violation. Following the process set forth in the Student Conduct Code for the University's Lowell campus ("UMass Lowell"), the University investigated complaints made by several female student Resident Advisors ("RAs") against two of their fellow RAs, Doe and

---

[1] The University of Massachusetts, the Trustees of the University of Massachusetts, Hannah Monbleau, Kate Legee, Esmeralda Levesque, and Adam Dunbar will be referred to collectively as the "University Defendants." The University of Massachusetts and the Trustees of the University of Massachusetts will be referred to collectively as the "University."

K.G.[2] After the investigation, a Hearing Panel heard from four women about Doe's unwelcome sexual conduct towards them. While Doe opted not to attend the Hearing Panel, he had addressed the allegations against him in interviews with the investigator and in a written response to the Investigative Report, and the Hearing Panel took his statements into account. Because Doe does not have the right to repeatedly make unwelcome sexual comments to and unwelcome physical contact with his fellow RAs, and because the University followed the procedure in its Student Conduct Code, judgment should enter for the University Defendants on all remaining counts.

Specifically, Doe continues to press Counts I, III, and IV in his Complaint. Count I asserts that all University Defendants infringed on Doe's First Amendment rights in violation of 42 U.S.C. § 1983. This claim is largely barred by sovereign immunity and qualified immunity. The only exception is that Doe may, under the Ex Parte Young doctrine, request prospective injunctive relief with respect to Monbleau, Legee, Levesque, or Dunbar. Yet judgment should enter for University Defendants on this ground for relief as well because there was no violation of Doe's First Amendment rights. The members of the University's Hearing Panel reasonably concluded that Doe's conduct was offensive, disruptive, and likely to be disruptive in the future, and in the school setting they were authorized to discipline him for his conduct.

---

[2] Students will be referred to by their initials.

Count III asserts that University Defendants violated the Massachusetts Civil Rights Act ("MCRA"). As against the University or Monbleau, Legee, Levesque, or Dunbar in their official capacities, it is barred by sovereign immunity. As against Monbleau, Legee, Levesque, or Dunbar in their individual capacities, the claim fails because Monbleau, Legee, Levesque, and Dunbar did violate Doe's speech rights. Even if there were a violation of Doe's rights, it was not done through threats, intimidation, or coercion, as required under the MCRA. In addition, Monbleau, Legee, Levesque, or Dunbar are entitled to qualified immunity because it was, at a minimum, not clearly established that their actions would be in violation of law.

Count IV asserts that the University breached its contract with Doe. As a threshold matter, this claim, too, is barred by sovereign immunity. Further, while courts have applied a loose contractual framework to claims brought by students against private colleges and universities to provide students some legal recourse, students at public institutions are entitled to the protections of due process and do not have additional contractual rights to ensure fairness in disciplinary proceedings. Even if there were a contract, there would be no breach because the University followed its procedures under the Student Conduct Code.

## I.  <u>FACTS</u>

On May 7, 2023, several students at UMass Lowell who act as RAs (J.T., C.T.Z., E.Z., and E.H.) reported to their supervisor that they had concerns with how two of

their fellow RAs—John Doe, a Ph.D. student, and K.G.—interacted with female RAs.

See Stipulated Facts, Dkt. No. 31-1 (hereafter "Stip. Facts"), ¶¶ 1, 11, 12; Ex.[3] 11 at 2 &

Appendix A. The University initiated an investigation of the complaints against Doe

and K.G. under the Student Conduct Code. Stip. Facts, ¶¶ 13, 16; Exs. 4, 5, 11, B, D.  The

Student Conduct Code prohibits various forms of "Non-Title IX Sexual Misconduct,"

including "sexual misconduct" defined as "unwelcomed conduct of a sexual nature

when . . . such conduct unreasonably: interferes with a person or person's work or

academic performance; interferes with or limits a person or person's ability to

participate in or benefit from a work or academic program or activity; or creates an

intimidating, hostile, or offensive working or academic environment." Ex. 2 at 5-7.

The University has a separate Sexual Harassment Grievance Procedure that

addresses complaints that meet the definition of sexual harassment under Title IX

regulations. Ex. 3 at 4. The Sexual Harassment Grievance Procedure expressly states

that sexual misconduct complaints are addressed through other University policies,

including the Student Conduct Code. Id.

The University followed its process under the Student Conduct Code. The

University assigned an investigator, Hannah Monbleau, to investigate the formal

complaints made. Stip. Facts, ¶ 16; Ex. 11. Monbleau interviewed the complainants,

---

[3] "Ex." Refers to the exhibits identified on the Joint Exhibit List submitted with the Joint
Pretrial Memorandum, see Dkt. 31-2, copies of which will be delivered to the Court at
the Case Stated Hearing.

respondents Doe and K.G., and witnesses. Stip. Facts, ¶¶ 18, 21, 25, 28, 33, 36; Ex. 11. Monbleau solicited potential witnesses and documentary evidence from Doe and K.G. Stip. Facts, ¶¶ 29, 31; Ex. 11 at 16; Ex. L. Monbleau completed an Investigative Report and recommended that the case against Doe move forward to a Hearing Panel. Ex. 11 at 27. In contrast, Monbleau did not find sufficient evidence of a violation of the Student Conduct Code by K.G., and the charge against him was dropped. Ex. 11 at 27; Ex. O.

The University provided the Investigative Report to Doe and Doe's counsel, and Doe provided a written response to the Investigative Report on June 30, 2023. Stip. Facts, ¶¶ 37, 42, 45; Exs. 7, 10, 12, T. In his response, Doe did not dispute much of the behavior that Monbleau relied on to make her recommendation, but instead tried to minimize its significance. He admitted to requesting hugs, but contended his requests were never refused. Ex. 12 at 4. He did not deny making a comment about sex and food, but said such "[s]exual metaphors for nonsexual pleasure from food are common in modern English." Ex. 12 at 5. He did not deny making a comment about shaving his testicles, but provided a diagram he contended showed it would be "physically impossible" for him to shave his testicles in front of his window. Ex. 12 at 5. He admitted stating he was not interested in sex and that he may have said "I don't need someone to have sex with." Ex. 12 at 6. He admitted making a comment about sticking his penis in a female staff member's face. Ex. 12 at 6.

The University convened a Hearing Panel on August 22, 2023 to determine whether Doe engaged in sexual misconduct in violation of the Student Conduct Code. Stip. Facts, ¶ 49; Ex. 1. Doe did not attend the hearing. Stip. Facts, ¶¶ 48, 50.

At the hearing, the Hearing Panel heard from four separate women who found Doe's sexual comments and non-consensual physical contact unwelcome. Ex. 1 at 4-7.

- G.D. told the Hearing Panel she felt "fear and confusion about [Doe's] intent" when Doe said to her, "What if I stuck my penis in your face?" Ex. 1 at 4-5.

- C.T.Z. told the Hearing Panel that Doe made the unwelcome comment to her that "If the food is good, I'd have sex while eating." Ex. 1 at 5.

- J.T. told the Hearing Panel that Doe made a comment to her about "shaving his pubes" and repeatedly touched her without her consent: Doe touched her legs without her consent to place her feet on a shaker plate, touched her thigh without her consent to show her a video on his phone, and hugged her without her consent by keeping his arms outstretched until she "felt obligated to engage." Ex. 1 at 5, 6.

- S.K. told the Hearing Panel that Doe said to her, "I don't need someone to have sex with, I just want someone to cuddle with," and "I'll be alone, so I'll just jerk off and go to bed." Ex. 1 at 6.

While Doe did not attend the hearing, the Hearing Panel took into account his written response to the Investigative Report and his prior statements to the investigator. Ex. 1 at 4. The panel noted that Doe disputed certain behavior, but his written response "agree[d] that many of the comments did occur with the complainants and witness." Ex. 1 at 4. In particular, he did not deny saying, "What if I stuck my penis in your face?," "I don't need someone to have sex with," or discussing sex and food, or that he touched J.T.'s legs or hugged her. Ex. 1 at 6.

Based on Doe's admissions and what they heard at the hearing, the Hearing Panel found that Doe's behavior "constituted a pervasive pattern of unwelcome conduct related to sex directed to female students." Ex. 1 at 6. S.K. had asked not to be on RA duty with Doe any more. Ex. 1 at 6. J.T. and C.T.Z. told the Hearing Panel they were likewise uncomfortable interacting with Doe any longer and that his behavior had impaired their ability to act as RAs. Ex. 1 at 7. Accordingly, the panel found that Doe had violated "the sexual misconduct standard in the Student Conduct Code." Ex. 1 at 7.

In determining the appropriate sanction, the Hearing Panel noted that Doe's behavior "impacted multiple members of the student community" and "[a]ll incidents occurred between female residents and the respondent while in university housing." Ex. 1 at 7. Only "[b]y separating [Doe] from university housing" could the University "remediate the effects" of Doe's actions. Ex. 1 at 7. The Hearing Panel also placed Doe on elevated probation status and required Doe to take a consent training course prior to registering for future classes. Ex. 1 at 7. Other sanctions, such as suspension or expulsion from the University, were available but were not imposed on Doe. Ex. 1 at 7.

## II. ARGUMENT

### A. COUNT I: PLAINTIFF'S FIRST AMENDMENT CLAIM

#### 1. THE UNIVERSITY HAS SOVEREIGN IMMUNITY FROM PLAINTIFF'S FIRST AMENDMENT CLAIM.

The University, as an arm of the Commonwealth of Massachusetts, has Eleventh Amendment immunity from federal suits. "[T]he Eleventh Amendment bars federal

suits by citizens against the state or state agencies and . . . this 'jurisdictional bar applies regardless of the nature of the relief sought.'" O'Neill v. Baker, 210 F.3d 41, 47 (1st Cir. 2000) (quoting Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100 (1984)). The First Circuit, in a suit naming the University's medical school as a defendant, held that the medical school was an arm of the state, reasoning that "[e]very feature of the statutory framework is conducive to a finding that both the University and UMMS are arms of the state." U.S. v. Univ. of Mass., Worcester, 812 F.3d 35, 40 (1st Cir. 2016). The First Circuit also relied on the fact that the "Massachusetts Supreme Judicial Court (SJC) has stated in no uncertain terms that 'the University of Massachusetts and the Commonwealth are one and the same party, namely the Commonwealth of Massachusetts.'" Id. at 42 (quoting Wong v. Univ. of Mass., 438 Mass. 29, 777 N.E.2d 161, 163 n. 3 (2002)).

Moreover, Section 1983 authorizes suits only against any "person" acting under color of state law, and it is well settled that "a state and its agencies are not 'persons'" under 42 U.S.C. § 1983. Brown v. Newberger, 291 F.3d 89, 92 (1st Cir. 2002) (citing Will v. Mich. Dept. of State Police, 491 U.S. 58, 71 (1989)). "Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." Will, 491 U.S. at 66.

Because the Commonwealth's immunity has been neither waived nor abrogated by Congress, the Eleventh Amendment bars Doe's First Amendment claim against the University.

**2.** **Monbleau, Legee, Levesque, and Dunbar Have Are Not Subject to Suit in Their Official Capacities under Section 1983 for Money Damages.**

For the same reasons the University may not be sued under Section 1983, neither may its employees be sued in their official capacity. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," and "[a]s such, it is no different from a suit against the State itself." Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). Section 1983 authorizes suits only against any "person" acting under color of state law, and "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." Will, 491 U.S. at 71. The claims against Monbleau, Legee, Levesque, and Dunbar in their official capacities must be dismissed.

**3.** **Prospective Injunctive Relief Is Not Warranted Because Defendants Reasonably Concluded Doe's Actions Substantially Disrupted or Materially Interfered With School Activities.**

Doe's claim for prospective injunctive relief under the Ex Parte Young doctrine fails because the University reasonably concluded that Doe's lewd behavior substantially disrupted University activities, interfered with the rights of other students, and was offensive.

The Supreme Court, in a case involving student speech at a public law school, has reaffirmed that "First Amendment rights . . . must be analyzed in light of the special characteristics of the school environment." Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez, 561 U.S. 661, 685–86 (2010) (quoting Widmar v. Vincent, 454 U.S. 263, 268 n. 5 (1981)). In particular, the University may regulate speech when:

- "[S]chool officials reasonably conclude that it will 'materially and substantially disrupt the work and discipline of the school.'" Morse v. Frederick, 551 U.S. 393, 403 (2007) (quoting Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 513 (1969)).

- The speech interferes "with the rights of other students to be secure and to be let alone." Tinker, 393 U.S. at 508.

- The speech is "offensively lewd and indecent." Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 685 (1986).

When evaluating a school's actions, "[t]he Supreme Court has repeatedly emphasized the necessary discretion school officials must exercise and the attendant deference owed to many of their decisions." Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist., 969 F.3d 12, 29 (1st Cir. 2020) (collecting cases). Accordingly, "[c]ourts generally defer to school administrators' decisions regarding student speech so long as their judgment is reasonable." Id. at 30 (collecting cases).

The Hearing Panel reasonably concluded that Doe's "pattern of sexually inappropriate comments with females who live in university housing" substantially interfered with the "academic living and working environment" of the dormitory in

which the complainants and Doe worked, and had specifically impaired three RAs "ability to work their student employment positions at UMass Lowell." Ex. 1 at 6-7. Based on this pattern of behavior, the University could also reasonably foresee "further comments" that would "impact[] other students in the residential community" in the absence of sanctions. Ex. 1 at 7. Because the Hearing Panel's determination that Doe's offensive behavior caused a substantial disruption is reasonable, its regulation of Doe's speech does not violate the First Amendment.

The regulation of Doe's speech was permissible for the further reason that it interfered "with the rights of other students to be secure and to be let alone." Tinker, 393 U.S. at 508; see Healy v. James, 408 U.S. 169, 189 (1972) (First Amendment did not require state college to "tolerate[]" "activities . . . [that] infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education"). Interfering with the rights of even one student can be sufficient to regulate student speech. Koeppel v. Romano, 252 F. Supp. 3d 1310, 1324 (M.D. Fla. 2017), aff'd sub nom. Doe v. Valencia Coll., 903 F.3d 1220 (11th Cir. 2018). In Koeppel, the court held that the college could discipline a student for his repeated text messages because it "disrupt[ed] another student's ability to pursue her education in a safe environment." Id. Here, Doe's behavior disrupted not just one but three RAs' ability to do their work because they did not feel comfortable being around Doe or on duty with him. Ex. 1 at 6-7. His comment about sticking his penis in someone's face

caused that person "fear and confusion" about Doe's intent. Ex. 1 at 4-5. Doe's

interference with these students' "rights . . . to be secure and to be let alone" in the

living and working environment of the campus dormitory is a permissible basis, under

Tinker, to discipline him for his speech. Tinker, 393 U.S. at 508.

Finally, the Hearing Panel could discipline Doe for his speech because it was

"offensively lewd and indecent." Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 685

(1986). Even a single offensive comment may be the basis for a university to discipline a

student. Sasser v. Bd. of Regents of Univ. Sys. of Georgia, No. 1:20-CV-4022-SDG, 2021

WL 4478743 (N.D. Ga. Sept. 30, 2021), aff'd, No. 21-14433, 2023 WL 2446720 (11th Cir.

Mar. 10, 2023). In Sasser, a student spectator at a football game "used a racial slur to

refer to one of the student football players." Id. at *1. The student was told the slur was

offensive, stopped using it, and apologized. Id. The court held that school officials

"were well within their authority as educators to discipline Sasser for this speech"

regardless of whether the speech was "harassing or threatening." Id. at *6.

Here, Doe made comments about sticking his penis in someone's face, about sex

and food, and that he didn't need someone to have sex with. The Hearing Panel

concluded that "[a] reasonable person would find comments of a sexual nature in the

academic living and working environment to be offensive." Ex. 1 at 7. Because public

schools may regulate "offensively lewd and indecent speech," the Hearing Panel could

discipline Doe for his offensive comments. Fraser, 478 U.S. at 685.

**4.  Doe Has Failed to State a Damages Claim against Monbleau, Legee, Levesque, and Dunbar in Their Individual Capacities that Would Overcome Their Qualified Immunity.**

Doe has failed to plausibly allege that Monbleau, Legee, Levesque, or Dunbar violated Doe's clearly established constitutional rights, as he is required to do to overcome their qualified immunity. The doctrine of "qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'" Diaz-Bigio v. Santini, 652 F.3d 45, 50 (1st Cir. 2011) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011)). There is a two-prong analysis to determine whether defendants are entitled to qualified immunity. First, courts ask "whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right." Id. Second, courts ask "whether the right was 'clearly established' at the time of the defendant's alleged violation." Id. (quoting Pearson v. Callahan, 555 U.S. 223, 269 (2009)). The second question itself has two sub-parts: "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable official would have understood that what he was doing violated that right, and (b) whether the particular factual violation in question would have been clear to a reasonable official." Id.

As set forth above, there was no violation of Doe's constitutional rights. Yet even if there were, Doe's rights were not clearly established such that any reasonable official would have understood that the sanctions the Hearing Panel imposed on Doe would violate the First Amendment.

13

**B.** <u>COUNT III: VIOLATION OF MCRA.</u>

**1.** <u>The University Has Sovereign Immunity From Plaintiff's MCRA Claim.</u>

The MCRA claim against the University must be dismissed because the

Commonwealth has not waived sovereign immunity and consented to suit under the

MCRA. <u>Commonwealth v. ELM Med. Lab's, Inc.</u>, 33 Mass. App. Ct. 71, 77, 596 N.E.2d

376, 380 (1992). The Supreme Judicial Court has held that "there is no reason to believe

that the Legislature intended, by the enactment of G.L. c. 12, §§ 11H and 11I, to waive

sovereign immunity" and the Commonwealth is not a "person" subject to suit under

the MCRA. <u>Id.</u>

**2.** <u>In Their Official Capacities, Monbleau, Legee, Levesque, and Dunbar Have
Sovereign Immunity From a Claim for Money Damages.</u>

Because the University is not subject to suit under the MCRA, neither are its

employees in their official capacities. <u>See, e.g.</u>, <u>Howcroft v. City of Peabody</u>, 51 Mass.

App. Ct. 573, 593, 747 N.E.2d 729, 745 (2001) (affirming summary judgment in favor of

individual defendants sued in their official capacity); <u>Anderson v. Heffernan</u>, No.

CIV.A. 12-12173-FDS, 2013 WL 1629122, at *3 (D. Mass. Apr. 9, 2013) (claims against

employee in their official capacity "are not available, at least not pursuant to the

Massachusetts Civil Rights Act, [and] the Court lacks subject-matter jurisdiction over them").

    **3.  Monbleau, Legee, Levesque, and Dunbar Did Not Violate the MCRA.**

There is no evidence that Monbleau, Legee, Levesque, and Dunbar interfered with Doe's rights under the constitution or laws of the United States or Massachusetts through "threats, intimidation or coercion." M.G.L. c. 12, §§ 11H, 11I. "A direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the [MCRA]." Longval v. Comm'r of Correction, 404 Mass. 325, 333 (1989).

As set forth above, there was no violation of Doe's speech rights. Even if there were a violation of Doe's speech rights, it was done directly by the Hearing Panel's imposition of sanctions on Doe and not through threats, intimidation, or coercion. In Longval, the Supreme Judicial Court ruled that when prison officials "[s]hackl[ed] and handcuff[ed]" plaintiff to transfer him to an administrative segregation unit they did not act coercively, even if the transfer was ultimately held to be unlawful, because it would "take [plaintiff's] rights away directly." Id. at 333. Like the officials in Longval, the Hearing Panel did not have "some further purpose" but was instead directly addressing the violation of the Student Code of Conduct. Id. at 333.

**4.   Monbleau, Legee, Levesque, and Dunbar Are Entitled to Qualified Immunity from Doe's Damages Claim Under the MCRA.**

If there were a violation of the MCRA, Monbleau, Legee, Levesque, and Dunbar would be entitled to qualified immunity from any claim for damages under the MCRA. Howcroft, 51 Mass. App. Ct. at 595. "The qualified immunity principles developed under § 1983 apply equally to claims under the MCRA." Id. (citing Duarte v. Healy, 405 Mass. 43, 46–48, 537 N.E.2d 1230 (1989)). "[P]ublic officials are not liable under the Civil Rights Act for their discretionary acts, unless they have violated a right under Federal or State constitutional or statutory law that was 'clearly established' at the time." Duarte, 405 Mass. at 47.

For the reasons stated above, it was not clearly established that Doe had a First Amendment right to make the unwelcome comments and unwelcome touches identified by Monbleau and the Hearing Panel. Monbleau, Legee, Levesque, and Dunbar are therefore entitled to qualified immunity from Doe's damages claim under the MCRA.

**C.   COUNT IV: BREACH OF CONTRACT**

**1.   The University Has Sovereign Immunity from Breach of Contract Claims in Federal Court.**

While the Commonwealth has consented to breach of contract claims in state court, that waiver does not "extend so far as to permit lawsuits against the Commonwealth in federal court." McGuigan v. Conte, 629 F. Supp. 2d 76, 83 (D. Mass.

2009) (emphasis in original). Federal courts have applied this principle expressly to contract claims against the University and dismiss those claims based on Eleventh Amendment immunity. <u>Kamayou v. Univ. of Massachusetts Lowell</u>, No. 16-CV-10098-IT, 2018 WL 4088074, at *5 (D. Mass. July 26, 2018), <u>report and recommendation adopted</u>, No. 16-CV-10098-IT, 2018 WL 4088931 (D. Mass. Aug. 27, 2018) ("the University does enjoy immunity from suit in this federal court for breach of contract"); <u>BT INS, Inc. v. Univ. of Massachusetts</u>, No. 10-11068-DPW, 2010 WL 4179678, at *4 (D. Mass. Oct. 19, 2010) ("there is no evidence that Massachusetts's general waiver of immunity for contract claims extends to the Eleventh Amendment's protections against suit in federal court").

Eleventh Amendment immunity therefore bars Doe's breach of contract claim.

**2.   <u>Doe Does Not Have Contractual Rights Beyond the Protections of Due Process.</u>**

Students at private colleges and universities may have some contractual recourse to challenge disciplinary proceedings, but for students at public institutions the analysis is subsumed in the due process analysis. It is well established that "a student facing expulsion or suspension from a public educational institution is entitled to the protections of due process." <u>Gorman v. Univ. of Rhode Island</u>, 837 F.2d 7, 12 (1st Cir. 1988). It is equally clear that "the rights of a private college" to regulate student conduct "are more expansive . . . than are those of a public institution." <u>Dinu v. President & Fellows of Harvard Coll.</u>, 56 F. Supp. 2d 129, 133 (D. Mass. 1999). For example, students

at "private institution[s]" have "no constitutional right to a hearing" even prior to receiving a sanction as severe as expulsion. Coveney v. President and Trustees of the College of the Holy Cross, 388 Mass. 16, 21 (1983). Courts therefore may apply "some elements of the law of contracts" to academic and disciplinary disputes between a student and a private university simply "to provide some framework into which to put the problem." Lyons v. Salve Regina College, 565 F.2d 200, 202 (1st Cir. 1977) (quoting Slaughter v. Brigham Young University, 514 F.2d 622 (10th Cir. 1975)) (applying contract law principles to student's challenge to university's decision in Grade Appeal Process); see Note, Bryce Freeman, The Title IX Contract Quagmire, 118 Mich. L. Rev. 909 (2020) ("Finding that plaintiffs can state breach of contract claims against their private universities has the effect of creating a path to judicial review where none would otherwise exist.").

Specifically, courts have imposed an obligation on private colleges and universities, arising out of the implied covenant of good faith and fair dealing, to conduct any disciplinary hearing with "basic fairness." Doe v. Trustees of Bos. Coll., 892 F.3d 67, 87–88 (1st Cir. 2018). This obligation exists even if the college or university was not obligated to conduct a hearing at all. Id. Basic fairness can be met without complying with due process. Trustees of Bos. Coll., 942 F.3d 527, 533–34 (1st Cir. 2019) (citing Schaer, 735 N.E.2d at 381; Coveney, 445 N.E.2d at 138-40). Accordingly, finding a contractual relationship between a student and a university regarding disciplinary

proceedings is "only appropriate in cases where the student plaintiffs attend private educational institutions." Kuntz v. Univ. of Mass. at Amherst, No. HSCV2013-00094A, at 11 (Hampshire Super. Ct. April 1, 2014) ("Because [plaintiff] attended a publicly funded university, the Court concludes that no contractual relationship existed between [plaintiff] and the University for purposes of ensuring adherence to the Student Code").[4]

Because the University of Massachusetts is a public university, no contractual relationship existed between Doe and the University for purposes of ensuring adherence to the Student Conduct Code. If the University were held to be obligated to provide Doe with "basic fairness," it satisfied that obligation by providing him the opportunity to address the evidence against him in two interviews with an investigator, the opportunity to suggest witnesses and provide evidence, the opportunity to provide a written response to the investigator's report, and the opportunity to attend the Hearing Panel and suggest questions for the Hearing Panel to ask.

### 3. There Is No Breach Because the University Followed Its Written Procedures.

If the Student Conduct Code and Sexual Harassment Grievance Procedure did create a contract between the University and Doe, there is still no breach because the University followed the terms of its policies.

---

[4] A copy of the opinion in Kuntz is attached here as Attachment A.

In construing a contract between a university and a student, courts apply "the standard of reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." Schaer v. Brandeis Univ., 432 Mass. 474, 478 (2000) (quoting Cloud v. Trustees of Boston Univ., 720 F.2d 721, 724 (1st Cir. 1983)). In analyzing the contractual relationship, courts show deference to universities' "academic and disciplinary decisions." Id., 432 Mass. at 482.

The University should reasonably expect students such as Doe to recognize that the Student Conduct Code and the Sexual Harassment Grievance Procedure are two different policies that provide different procedures to address distinct categories of conduct. Not only are they two separate policies, the Sexual Harassment Grievance Procedure expressly states that sexual misconduct is addressed by other University policies, including the Student Conduct Code. Ex. 3.

Doe's contention that "sexual harassment" as defined in the Sexual Harassment Grievance Procedure and "sexual misconduct" as defined in the Student Conduct Code address the same behavior is unpersuasive. The definition of sexual harassment in the Sexual Harassment Grievance Procedure derives from Title IX regulations and applies, in pertinent part, to "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that [it] effectively denies a person equal access to the university's education program or activity." Ex. 3 at 4. Sexual misconduct, as defined in the Student Conduct Code, does not require the conduct to be "severe,

pervasive, <u>and</u> objectively offensive." The Department of Education, in the preamble to 2020 amendments to Title IX regulations, contemplated that there would be additional processes, apart from what Title IX required, to address misconduct that did not meet Title IX strictures. The Department stated that "Title IX is not the exclusive remedy for sexual misconduct" and "nothing in the final [Title IX] regulations precludes recipients from vigorously addressing misconduct (sexual or otherwise) that occurs outside the scope of Title IX." "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," 85 Fed. Reg. 30,026, 30,199 (May 19, 2020).

As the Department of Education contemplated, the University has policies and procedures to address misconduct "that occurs outside the scope of Title IX." <u>Id.</u> As relevant here, the Student Conduct Code applies to sexual misconduct that does not meet Title IX's definition of sexual harassment.

Because the Student Conduct Code and the Sexual Harassment Grievance Procedure plainly describe different procedures for different conduct, and the University followed its Student Conduct Code, judgment should enter for the University. two different policies that provide different procedures to address distinct categories of conduct.

### III. <u>CONCLUSION</u>

For the foregoing reasons, the University Defendants respectfully request that

the Court enter judgment in their favor on Counts I, III, and IV.

Dated: January 25, 2024

UNIVERSITY OF
MASSACHUSETTS, TRUSTEES OF
THE UNIVERSITY OF
MASSACHUSETTS, HANNAH
MONBLEAU, KATE LEGEE,
ESMERALDA LEVESQUE, a/k/a
ESMERALDA MENDEZ, ADAM
DUNBAR,

By their attorney,

<u>/s/ Michael Hoven</u>
Michael Hoven, BBO No. 688593
Associate Counsel
University of Massachusetts
Office of the General Counsel
50 Washington Street, Suite 3000
Westborough, MA 01581
(774) 528-0205
mhoven@umassp.edu

A TRUE COPY
ATTEST

*[signature]* CLERK MAGISTRATE

# COMMONWEALTH OF MASSACHUSETTS
## TRIAL COURT

HAMPSHIRE, ss.

SUPERIOR COURT
CIVIL ACTION 13-00094

## BRENDAN KUNTZ

### vs.

## UNIVERSITY OF MASSACHUSETTS AT AMHERST & others[1]

## MEMORANDUM OF DECISION ON THE DEFENDANTS' MOTION TO DISMISS

This civil action arises out of the plaintiff Brendan Kuntz ("Kuntz")'s expulsion from the University of Massachusetts at Amherst ("University") after a disciplinary hearing and appeal. The expulsion resulted in Kuntz's failure to graduate from the University.  The complaint, filed pursuant to 42 U.S.C. § 1983, Article 12 of the Massachusetts Declaration of Rights, G. L. c. 12, § 11I, and common law principles of contract, alleges that the defendants, the University and certain of its administrators, violated Kuntz's constitutionally protected right to due process in failing to provide a fair disciplinary hearing (Counts I and II) and that the University breached its contract with Kuntz (Count III).

Pursuant to Mass. R. Civ. P. 12 (b)(6), the defendants have now filed a motion to dismiss, arguing that (1) Kuntz fails to sufficiently allege a due process violation; (2) the individual defendants, if sued in their individual capacities, are entitled to qualified immunity; and (3) Kuntz fails to sufficiently allege that a contract exists between the two parties. For the reasons stated below, the defendants' motion is **ALLOWED**.

---

[1] Enku Gelaye, David Vaillancourt, and Jean Kim.

## BACKGROUND

The relevant facts, as alleged in the complaint, are as follows.[2]  Though the Court reserves certain facts for the discussion below.

On February 6, 2012, at around 12:30 a.m., Kuntz entered an off-campus bar in downtown Amherst in order to use the restroom. While Kuntz was in the restroom, a person pounded on the door and startled Kuntz.  In response, Kuntz opened the restroom door and "moved" the person against the opposite wall and told the person to "chill the 'F' out." Kuntz then returned to the bathroom. At the time of the altercation, Kuntz was a twenty-four year old senior in good standing at the University.

The police were contacted and the other person involved ("victim") filed a report based on Kuntz's conduct.  The victim also alleged that Kuntz put a utility razor blade to his throat and threatened to kill him.  Kuntz denied this allegation.  After the altercation and while still at the bar, Kuntz voluntarily emptied his pockets, which did not reveal any razor blade in his possession.  Kuntz then left the bar and walked home.  Later, an employee of the bar emptied the contents of a garbage can from the bar and discovered a razor blade.  Kuntz was arrested and initially charged with assault with a dangerous weapon.  He was eventually charged with misdemeanor assault, which was continued with probationary conditions for less than one year, to be dismissed at that time.

---

[2]  The Court accepts, as it must, the facts alleged in the complaint as true and draws every reasonable inference therefrom in favor of the plaintiff.  Courts may also consider documents referenced in a complaint without turning the motion to dismiss into a motion for summary judgment.  See *Marram* v. *Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 45 n.4 (2004) ("Where, as here, the plaintiff had notice of these documents and relied on them in framing the complaint, the attachment of such documents to [the defendant's] motion to dismiss does not convert the motion to one for summary judgment").  Because Kuntz refers and cites the 2011-2012 Student Code in his complaint without it having been attached and the defendants have included it as Exhibit 1 to their motion, the Court will consider this pertinent document at this stage without converting the motion into one for summary judgment.  The Court will not consider the remaining exhibits submitted by the defendants.

On February 7, 2012, Kuntz received a notice from defendant Gelaye informing him that he was being charged with violating five sections of the 2011-2012 Code of Student Conduct ("Student Code" or "Code").[3] As a result, the letter advised Kuntz that the University was imposing an interim sanction of immediate expulsion. The letter also advised Kuntz to schedule an appointment to conduct a disciplinary conference with the Dean of Students about the charges.[4] According to the complaint, the letter further stated that Kuntz's "behavior represent[ed] a direct and imminent threat to [his] safety and the safety of the University community." As such, he was immediately expelled per the interim sanction.

The University had received a copy of the police report from the Amherst Police Department, giving rise to the disciplinary charges. The University did not conduct any further investigation into the incident and received no further information from the police.

Kuntz participated in a conference with defendant Vaillancourt and explained that much of the allegations were false; no weapon was involved in the incident; the victim wished him no further repercussions; and the matter warranted more investigation by the University before removing him from classes prior to conducting a hearing on the merits of the allegations. Kuntz did not receive written documentation as to why the interim sanction would remain in effect.

On February 27, 2012, the victim wrote a letter to the Commonwealth, expressing concern for Kuntz: "Although [Kuntz's] actions were violent and uncalled for I also see him as my peer and someone who could have simply made a mistake. I don't like the fact that he is

---

[3] Specifically, he was alleged to have violated the following provisions: section II.B.1 "Physical assault"; section II.B.2 "Harassment"; section II.B.8 "Possession or use of . . . hazardous or dangerous weapons"; section II.B.11a "Endangering behavior to persons or property; and section II.B.14 "Violations of University policies and regulations."

[4] "Upon the filing of charges, the charged student(s) will receive a Notice of Charge and will have at least forty-eight hours to request a Disciplinary Conference, at which time the nature of and the responsibility for an alleged offense is discussed. The student will also be advised of his or her option to resolve the matter." Code, § IV.B. For repeated violations and/or more serious infractions, various outcomes are listed in the Code. If an agreement is not signed at the time of conference and the facts are not agreed upon, the case will be referred to the disciplinary hearing board. § IV.B.2.

getting in trouble with the [University] . . . [and] hope that no serious criminal charges are successful . . . ." The University did not receive a copy of the victim's letter.

On April 20, 2012, Kuntz received notice from the Dean of Students that the University disciplinary hearing board had scheduled a sanction hearing on his pending charges for April 26, 2012.[5] The date was later changed to May 2, 2012. The notice listed the five sections of the Code that Kuntz allegedly violated and included an excerpt from the police report. Kuntz was advised to review the Student Code regarding his procedural and substantive rights in preparation for the hearing.

On April 26, 2012, Kuntz received a handout detailing the hearing procedures.

On May 2, 2012, the hearing was held.[6] Kutnz was advised of procedural safeguards at the beginning of the hearing. In support of the University's case, a staff member from the Office of the Dean of Students read aloud the portion of the police report that formed the basis of the charges. The University did not present any witnesses. It is unclear from the complaint whether Kuntz presented any witnesses. During the hearing, Kuntz requested that the hearing committee members "receive additional information from either actual witnesses or at least documents that contradicted the original allegation made against him." His objections were ignored and the hearing was not postponed or continued. In May 2012, Kuntz was enrolled in two courses in order to complete his final six credits for graduation.

After the hearing closed, the hearing board deliberated and determined that Kuntz had committed four of the five charged violations. The board recommended expulsion.[7]

---

[5] The hearing board is composed of University employees and students and shall not have fewer than three and not more than five members. Code, § III.A. The Dean of Students or the Dean's designee may conduct sanction hearings. § III.B.
[6] "Where the student denies the charge(s), the University shall bear the burden of proving the charge(s) by a preponderance of the evidence. § IV.D.3.
[7] "Any recommendation of a Hearing Board shall be based only upon evidence and testimony at the hearing." § IV.E.9.

Defendant Gelaye, in her capacity as Dean of Students, upheld the recommendation and imposed a permanent expulsion.[8]

Subsequently, Kuntz filed an appeal in accordance with the procedures outlined in the Student Code. Defendant Kim, acting in her capacity as Vice Chancellor of Student Affairs, denied the appeal and upheld the permanent expulsion.

## DISCUSSION

A motion to dismiss pursuant to Mass. R. Civ. P. 12 (b)(6) permits "prompt resolution of a case where the allegations in the complaint clearly demonstrate that the plaintiff's claim is legally insufficient." *Harvard Crimson, Inc.* v. *President & Fellows of Harvard Coll.*, 445 Mass. 745, 748 (2006). When evaluating the sufficiency of a complaint, the Court must accept as true the well-pled factual allegations of the complaint and draw all reasonable inferences in favor of the plaintiff. *Iannacchino* v. *Ford Motor Co.*, 451 Mass. 623, 635-636 (2008). To survive a motion to dismiss, labels and conclusions will not suffice; a complaint must allege facts "plausibly suggesting (not merely consistent with) an entitlement to relief." *Id.* at 636. (citations omitted).

The complaint is captioned as against the administrators both in their individual and official capacities. However, "the real party in interest in an official-capacity suit is the governmental entity and not the named official." *Hafer* v. *Melo*, 502 U.S. 21, 25 (1991). When sued in his or her official capacity for other than injunctive relief, a state official is not a person within the meaning of section 1983. *Will* v. *Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Thus, in this case, any claims for damages asserted against the individual defendants in their official capacity is without merit and must be dismissed.

---

[8] "In determining a sanction, a designated University official may consider the student's present demeanor and past disciplinary record, the nature of the offense, the severity of any damage, injury, or harm resulting therefrom, and other factors." § V.

A.      **Due Process Violation (Count I)**

"[A] student facing expulsion or suspension from a public educational institution is entitled to the protection of due process."[9] *Gorman* v. *University of Rhode Island*, 837 F.2d 7, 12 (1st Cir. 1988). Due process requires that student disciplinary action must comport with general notions of fundamental fairness, including notice and an opportunity to be heard. *Id*. at 12-13. Although "some kind of notice" and "some kind of hearing" is required, "[d]ue process which may be said to mean fair procedure, is not a fixed or rigid concept, but, rather, is a flexible standard which varies depending upon the nature of the interests affected, and the circumstances of the deprivation." *Id*. at 12,13. Thus, generally, "the procedures due to a student include notice, an explanation of the case against the student, and an opportunity to present his [or her] side of the story." *Id*. at 14 (internal quotation marks omitted).

Here, the complaint plainly admits that Kuntz received notice of and an opportunity to be heard on the charges leveled against him. Specifically, on February 7, 2006, Kuntz received a letter informing him that the University was imposing an interim sanction of expulsion based on five alleged violations of the Student Code and that he should make an appointment with the Dean of Students to conduct a disciplinary conference. Kuntz attended the conference and explained his side of the story to the Dean. On April 20, 2006, Kuntz received notice of a scheduled hearing on the charges, which was later changed to May 2, 2006. Prior to the hearing, he received copies of hearing procedure and was advised to review the Student Code regarding his procedural and substantive rights. At the hearing, Kuntz had the opportunity to tell his side of the story, including presenting witnesses and information.

---

[9] "The *fourteenth amendment to the United States Constitution* provides that no state shall deprive any person of life, liberty, or property without due process of law. . . . [A] student's interest in pursuing an education is included within the *fourteenth amendment's* protection of liberty and property." *Gorman*, 837 F.2d at 12, citing *Goss* v. *Lopez*, 419 U.S. 565, 574-575 (1975) (emphasis in original).

Nevertheless, Kuntz maintains that the University denied him certain procedural protections, including that (1) after the judicial conference, he did not receive a written explanation as to why the interim sanction would remain in effect; (2) the University did not conduct any inquiry or investigation into the allegations beyond the police report; (3) a student did not file the complaint or bring the matter to the attention of the University; (4) the University received a copy of the police report from the Amherst Police Department; (5) the University was unaware of the statement provided by the student/victim; (6) neither Kuntz nor the Hearing Committee received the full police report or statement written by the student/victim; (7) no complaining witness was present at the hearing; (8) the University did not provide advance notice that there would be no witnesses present; and (9) according to the complaint, despite requests during the hearing that the hearing committee members receive additional information, the hearing was not postponed or continued as the Student Code and due process requires.   The complaint also alleges that defendants Gelaye and Vaillancourt acted with reckless disregard for Kuntz's constitutional rights.

The 2011-2012 Student Code, which governed disciplinary procedures at the time of Kuntz's interim and permanent expulsion states that "[a]ll undergraduate students are responsible for complying with the rules, regulations, policies, and procedures" contained in the Code and other official University publications and announcements.  Code, p. 2.  The Code "appl[ies] to violations of the law or acts of misconduct which occur in other locations when the behavior distinctly and directly affects the University community."  § I.C.

Upon the request "of any student, faculty or staff member or independently," the University may file charges against the accused student(s) so long as a complaint was filed no later than three months after discovery of the alleged violation and the identity of the student(s)

involved. § IV.A. "Charges may be filed by the *University* no later than four months after notification of the alleged violation." *Id.* (emphasis added). The Code also provides that disciplinary action "will not be subject to challenge on the ground that criminal charges involving the same incident have been dismissed or reduced." § I.E. Moreover, the board "follows prescribed procedures, but need not observe the rules of evidence observed by courts, and may exclude unduly repetitious or irrelevant evidence." § IV.E.6. The board "may rely upon oral statements of witnesses and upon written reports and other documents." § VI.E.5. Finally, according to the complaint, the handout detailing hearing procedures stated that both the complaining witness and charged student, here the University and Kuntz, would have up to one hour to present its case, which includes presenting information, presenting and questioning witnesses, and responding to questions from the charged student, complaint witness, and Board. This is not a mandatory list. Witnesses may be included as part of either party's case. Further, any requested delays once the hearing has begun shall be granted to either party at the discretion of the hearing board. § IV.C.

Here, Kuntz was admittedly afforded notice and the opportunity to be heard. See *Goss*, 419 U.S. at 579 ("requiring effective notice and informal hearing permitting the student to give his version of the events will provide a meaningful hedge against erroneous action"). The University is not required to provide a process akin to a common law criminal trial, but instead must merely afford the student an opportunity to answer, explain, and defend. *Gorman*, 837 F.2d at 14. Indeed, the question is not whether the hearing was ideal, or whether its procedure could have been better; rather, the question is whether, under the particular circumstances, the hearing

was fair and afforded the individual "the essential elements of due process." *Id.* at 13.  Such process was afforded here.[10]

With respect to an interim suspension, "[s]tudents whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school.  In such cases, the necessary notice and rudimentary hearing should follow as soon as practicable." *Goss*, 419 U.S. at 582-583.  See Code, §§ VII.A, B.  Kuntz participated in a conference with the Dean of Students regarding the interim suspension after its imposition where he admittedly presented his "version of the facts." § VII.C.[11]

Because the allegations of the complaint plainly establish that the essential elements of due process were met, the acts that Kuntz complains of do not amount to a violation of his due process rights.  Similarly, the complaint fails to allege any facts that the individual defendants deprived the plaintiff of any clearly established constitutional right of which they knew or reasonably should have known.  See *Longval* v. *Commissioner of Correction*, 448 Mass. 412, 418 (2007); *Clancy* v. *McCabe*, 441 Mass., 311 322 (2004).  Thus, Count I shall be dismissed.

## B.    Violation of G. L. c. 12, § 11I (Count II)

Count II of the complaint alleges that the defendants also violated G. L. c. 12, § 11I, the Massachusetts Civil Rights Act.  Specifically, according to the complaint, the defendants violated Kuntz's procedural due process rights guaranteed under Article 12 of the Massachusetts Declaration of Rights and individual defendants Gelaye and Vaillancourt acted with reckless disregard for Kuntz's constitutional rights, all in violation of the Act.

---

[10]  In addition, as alleged in the complaint, Kuntz further availed himself of the University's appeal process.
[11]  While the Code states that the official "shall determine in writing whether the interim restrictions will continue . . . with the reasons therefore," § VII.C, Kuntz was nonetheless afforded what due process requires in having the opportunity to be heard.

To state a claim for violation of the Massachusetts Civil Rights Act, "the complaint must contain factual allegations plausibly suggesting that the defendant (1) interfered with, or attempted to interfere with (2) the plaintiff's exercise or enjoyment of rights secured by the Constitution or laws of either of the United States or of the Commonwealth (3) by threats, intimidation, or coercion." *Vranos* v. *Skinner*, 77 Mass. App. Ct. 280, 290 (2010); *Swanset Dev. Corp.* v. *Taunton*, 423 Mass. 390, 395 (1996). See G. L. c. 12, §§ 11I, H. "'Threat' in this context involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Planned Parenthood League of Mass., Inc.* v. *Blake*, 417 Mass. 467, 474 (1994). "Intimidation" involves "fear for the purpose of compelling or deterring conduct," and "coercion" refers to "the application to another of such force, either physical or moral, as to constrain [a plaintiff] to do against his will something he would not otherwise have done." *Id.* Moreover, "a direct deprivation of rights, even if unlawful, is not coercive because it is not an attempt to force someone to do something the person is not lawfully required to do." *Swanset Dev. Corp.*, 423 Mass. at 396.

Here, the plaintiff has not alleged any facts to suggest that the defendants threatened, intimidated, or coerced him. Cf. *Planned Parenthood League of Mass., Inc.*, 417 Mass. at 475 (defendants' "conduct presented frightening, threatening and impermeable physical obstacles to patients attempting to enter the clinics, and forced those patients to forego their right to enter the clinics and obtain abortion services"). Therefore, the plaintiff's statutory claim is insufficiently pled and will be dismissed. *Iannacchino*, 451 Mass. at 636.

**C.      Breach of Contract and Good Faith and Fair Dealing (Count III)**

The complaint alleges that the University and Kuntz formed a contract where Kuntz paid the University, and in return, the University agreed to provide plaintiff with access to its

undergraduate degree programs.  According to the complaint, some of the duties owed between the parties via this alleged contract are contained in the Student Code.  The complaint further alleges that the University breached this contract, as well as the implied promise of good faith and fair dealing, when it failed to abide by certain provisions of the Code in the disciplinary process.[12]

Courts may find the existence of a contract in the form of a student manual or code between a student and a university.  Such a finding, however, is only appropriate in cases where the student plaintiffs attend private educational institutions.  See, e.g., *Mangla* v. *Brown Univ.*, 135 F.3d 80, 83 (1st Cir.1998); *Cloud* v. *Trustees of Boston Univ.*, 720 F.2d 721, 724 (1st Cir. 1983); *Lyons* v. *Salve Regina College*, 565 F.2d 200, 202 (1st Cir. 1977); *Dinu* v. *President & Fellows of Harvard College*, 56 F. Supp. 2d 129, 130 (D. Mass. 1999).  See also *Schaer* v. *Brandeis University*, 432 Mass. 474, 478 (2000) (assuming without deciding, and because parties agreed, that a contractual relationship existed).  Courts utilize this contract approach to ensure a fair process as students who attend private schools, which usually are "not sufficiently involved with the Federal Government to make its actions equivalent to Federal Government actions," are not afforded certain constitutional protections.  See *Giles* v. *Howard University*, 428 F. Supp. 603, 604 (1977); *Lyons* v. *Salve Regina College*, 565 F.2d 200, 202 (1st Cir. 1977) ("*some* elements of the law of contracts are used and should be used in the analysis of the relationship between plaintiff and the university to provide some framework into which to put the problem"); *Coveney* v. *President and Trustees of the College of the Holy Cross*, 388 Mass. 16, 21 (1983) ("because the college is a private institution, Coveney had no constitutional right to a hearing").  On the other hand, as discussed above, a student who attends a publicly funded

---

[12]  The Court notes that section I.G of the Student Code provides that its provisions "are not to be regarded as a contract between the student and the University."

college or university is guaranteed procedural due process under the Fourteenth Amendment of the United States Constitution. See *Gorman*, 837 F.2d at 12.

The University of Massachusetts at Amherst is a public university. Therefore, Kuntz's due process rights are constitutionally protected and any claims of a violation of those rights are appropriately filed pursuant to 42 U.S.C. § 1983 and parallel state provisions. Accordingly, the so-called breaches of contract, i.e. breaches of the Student Code, alleged in this complaint are unavailing. Because Kuntz attended a publicly funded university, the Court concludes that no contractual relationship existed between Kuntz and the University for purposes of ensuring adherence to the Student Code. Where there is no contract, there can be no implied promise of good faith and fair dealing. See *Anthony's Pier Four, Inc.* v. *HBC Associates*, 411 Mass 451, 471 (1991). Accordingly, Count III of the complaint will be dismissed.

## CONCLUSION

For the reasons stated herein, the Defendants' Motion to Dismiss is **ALLOWED.** The complaint is hereby **ORDERED** dismissed.

Bertha D. Josephson
Justice of the Superior Court

Dated: 4|1|14