# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOHN DOE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-12077-WGY |
| | ) | |
| UNIVERSITY OF MASSACHUSETTS, | ) | |
| TRUSTEES OF THE UNIVERSITY OF | ) | |
| MASSACHUSETTS, HANNAH MONBLEAU, | ) | |
| in her official and individual capacities, | ) | |
| KATE LEGEE, in her official and individual | ) | |
| capacities, ESMERALDA LEVESQUE, a/k/a | ) | |
| ESMERALDA MENDEZ, in her official and | ) | |
| individual capacities, ADAM DUNBAR, in his | ) | |
| official and individual capacities, | ) | |
| BRETT SOKOLOW, | ) | |
| Defendants. | ) | |

## UNIVERSITY DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The University of Massachusetts, the Trustees of the University of Massachusetts (together with the University of Massachusetts, the "University"), Hannah Monbleau, Kate Legee, Esmeralda Levesque, and Adam Dunbar (collectively, "University Defendants") submit the following proposed findings of fact and conclusions of law.

## UNIVERSITY DEFENDANTS' PROPOSED FINDINGS OF FACT

### PARTIES

1.      Doe is a male Indian national in a Ph.D. program at the University of Massachusetts Lowell. See Stipulated Facts, Dkt. No. 31-1 (hereafter "Stip. Facts"), ¶ 1.

2.      Defendant University of Massachusetts is a public institution of higher learning established by the Commonwealth in Mass. Gen. Laws ch. 75, § 1 et seq.

3.    Defendant Trustees of the University of Massachusetts is the governing board of the University of Massachusetts. Stip. Facts, ¶ 3.

4.    Defendant Hannah Monbleau was employed by UMass Lowell as its Assistant Director of Student Life and Well-Being. Stip. Facts, ¶ 7.

5.    Defendant Kate Legee was employed by UMass Lowell as its Director of Student Conduct and Prevention. Stip. Facts, ¶ 8.

6.    Defendant Adam Dunbar was employed by UMass Lowell as its Senior Associate Director of Student Affairs. Stip. Facts, ¶ 9.

7.    Defendant Esmeralda Levesque was employed by UMass Lowell as its River Hawk Scholars Academy Coordinator. Stip. Facts, ¶ 10.

**STUDENT CONDUCT CODE AT UMASS LOWELL**

8.    The University of Massachusetts has a campus in Lowell, Massachusetts ("UMass Lowell"). Stip. Facts, ¶ 4.

9.    UMass Lowell has a Student Conduct Code. Stip. Facts, ¶ 5; Ex.[1] 2.

10.    The Student Conduct Code sets forth "Standards related to Non-Title IX Sexual Misconduct." Ex. 2 at 5.

11.    The Student Conduct Code defines "sexual misconduct" as "unwelcomed conduct of a sexual nature when":

---

[1] "Ex." Refers to the exhibits identified on the Joint Exhibit List submitted with the Joint Pretrial Memorandum, see Dkt. 31-2, copies of which will be delivered to the Court at the Case Stated Hearing.

2

a. "submission to or rejection of such conduct by a person or persons is used as a basis for employment or educational decisions affecting such person or persons, or participation in University programs or activities; or

b. "such conduct unreasonably:

  i. "interferes with a person or person's work or academic performance;

  ii. "interferes with or limits a person or person's ability to participate in or benefit from a work or academic program or activity; or

  iii. "creates an intimidating, hostile, or offensive working or academic environment." Ex. 2 at 6-7.

12.    The Student Conduct Code sets forth the available sanctions for violations of the Student Conduct Code, which include, among other things, expulsion, suspension, removal from University housing, and probation. Ex. 2 at 10-11.

13.    The Student Conduct Code sets forth procedures for adjudicating violations of the Student Conduct Code. Ex. 2 at 11-16.

14.    One such procedure is the "Investigation/Hearing Panel Process." Ex. 2 at 13-15. This is the procedure used "for cases of sexual misconduct." Ex. 2 at 14.

15.    Under the Investigation/Hearing Panel Process, an investigator gathers information and makes a recommendation as to whether the preponderance of the evidence shows that there has been a violation of the Student Conduct Code. Ex. 2 at 14.

16.     If the investigator finds sufficient evidence to move forward with charges of a violation of the Student Conduct Code, the case moves to a Hearing Panel, which will make the final decision. Ex. 2 at 14.

17.     The responding student has the opportunity to respond to the investigator's report in writing, may present witnesses to the Hearing Panel, and may submit questions for the Hearing Panel to ask. Ex. 2 at 14.

18.     UMass Lowell has a separate Sexual Harassment Grievance Procedure. Stip. Facts, ¶ 6; Ex. 3.

19.     The Sexual Harassment Grievance Procedure applies to complaints of "Sexual Harassment," which is defined in the Sexual Harassment Grievance Procedure, in accord with Title IX regulations, as "conduct on the basis of sex that satisfies one or more of the following:

     a.  "An employee of the university conditioning the provision of an aid, benefit, or service of the university on an individual's participation in unwelcome sexual conduct";

     b.  "Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that [it] effectively denies a person equal access to the university's education program or activity"; or

     c.  " 'Sexual assault' as defined in 20 U.S.C. 1092(f)(6)(A)(v), 'dating violence' as defined in 34 U.S.C. 12291(a) (10), 'domestic violence' as defined in 34

U.S.C. 1229(a)(8), or 'stalking' as defined in 34 U.S.C. 12291(a) (30), as

amended." Ex. 3 at 4.

20.     The Sexual Harassment Grievance Procedure states that "Sexual

Misconduct complaints are reviewed and addressed in accordance with the Student

Code of Conduct, UMass Lowell's Equal Opportunity Complaint Procedure or other

university policies as applicable." Ex. 3 at 4.

21.     The Sexual Harassment Grievance Procedure allows for complaints to be

resolved through an "Informal Resolution" or a "Grievance Procedure" that includes

"Investigation & Live Hearing." Ex. 3 at 15-19.

22.     The Sexual Harassment Grievance Procedure does not refer to a "Hearing

Panel." Ex. 3.

**COMPLAINTS AGAINST DOE**

23.     Doe was a resident advisor ("RA") in a dormitory on the UMass Lowell

campus. Stip. Facts, ¶ 11.

24.     On Sunday, May 7, 2023, four of Doe's fellow RAs—J.T., C.T.Z., E.Z, and

E.H.[2]—met with their supervisor to report concerns about Doe and another RA, K.G.

Stip. Facts, ¶ 12; Ex. 11 at 2 & Appendix A.

25.     C.T.Z., J.T., and E.H. made formal complaints against Doe and K.G. Stip.

Facts, ¶ 13; Exs. G, H.

---

[2] Students aside from Doe are identified by their initials.

26.     On May 19, 2023, Doe received letters from both the Student Conduct Office and from a Deputy Title IX Coordinator. Stip. Facts, ¶ 13; Exs. 4, 5.

27.     The letter to Doe from the Student Conduct Office notified Doe that there would be an investigation into his potential violation of the sexual misconduct provision of the Student Conduct Code and summarized the allegations as "concerns about the words and actions of Resident Advisors [K.G.] and [John Doe] around how they interacted with female RAs." Ex. 4.

28.     The letter quoted the Student Conduct Code's definition of sexual misconduct. Exs. 2, 4. The letter notified Doe that "[t]he specific process [he was] involved with" was the "Investigation/Hearing Panel Process" that could be found in the "Adjudication Procedure" sub-section of the Student Conduct Code, and provided a link to the Student Conduct Code. Ex. 4. Finally, the letter notified Doe of his "rights in the conduct process" and attached a document titled "Rights of Students Involved in the Student Conduct Code Process." Ex. 4.

29.     The only reference to sexual harassment or the Sexual Harassment Grievance Procedure in the letter comes in an attachment titled "Conduct Process: Support Person Resource," which expressly contrasts the role of "[s]upport persons in the student conduct process" with "the role of advisor under a formal complaint processed through the Sexual Harassment Grievance Procedure." Ex. 4.

30.     The letter to Doe from Ann Ciaraldi, the Associate Dean of Students for Compliance and Violence Prevention and a Deputy Title IX Coordinator at UMass Lowell, explained that her office "received a report that involves you and concerns of potential sexual misconduct involving another student." The letter further explained that for "sexual misconduct matters" the University follows its Student Code of Conduct, whereas the University follows its Sexual Harassment Grievance Procedure for sexual harassment. Ex. 5 at 1.

31.     K.G. also received letters from both the Student Conduct Office and from a Deputy Title IX Coordinator that were identical to those sent to Doe. Exs. B, D.

32.     On May 19, 2023, Doe and K.G. were suspended from their duties as resident advisors. Stip. Facts, ¶ 14; Ex. 6, C. Each continued to receive his housing and meal plan waiver and was paid for his scheduled shifts. Ex. 6, C.

33.     15. On May 22, 2023, no-contact orders were put in place between Doe and each of E.H., E.Z., J.T., and C.T.Z., and between K.G. and each of E.H., E.Z., J.T., and C.T.Z. Stip. Facts, ¶ 15; Exs. E, F.

**THE INVESTIGATION OF DOE AND K.G.**

34.     Monbleau was assigned to investigate the Doe and K.G. cases. Stip. Facts, ¶ 16; Ex. 11.

35.     Monbleau interviewed E.H. on June 5, 2023. Stip. Facts, ¶ 18.

36.     E.H. told Monbleau that "nothing happened directly to [her] but she heard and saw these things happen to other RAs." Ex. 11 at 3.

37.     In the interview, Monbleau asked E.H. if there were witnesses E.H. would like Monbleau to interview. Stip. Facts, ¶ 19; Ex. 11 at 4.

38.     E.H. told Monbleau that she should interview S.K. as a witness, which Monbleau later did. Stip. Facts, ¶ 20; Ex. 11 at 4.

39.     Monbleau interviewed C.T.Z. and J.T. separately on June 6, 2023. Stip. Facts, ¶ 21; Ex. 11 at 4, 6.

40.     C.T.Z. told Monbleau that Doe said to her, "if the food is good, I'd have sex while eating." Ex. 11 at 5. She said the comment "[c]ame out of nowhere." Ex. 11 at 5.

41.     C.T.Z. also reported that she was in Doe's room with J.T. when Doe "[s]aid something about shaving his testicles" and told JT "she might not want to sit" where she was sitting because "that is where he shaves" and "there were pubes (pubic hair) all over the floor." Ex. 11 at 5.

42.     C.T.Z. further reported that Doe made a comment to another RA, S.K., about masturbation. Ex. 11 at 5.

43.     In the interview, Monbleau asked C.T.Z. if there were witnesses C.T.Z. would like Monbleau to interview. Stip. Facts, ¶ 22; Ex. 11 at 6.

44.     C.T.Z. told Monbleau that she should interview S.K. and G.D. as witnesses, which Monbleau later did. Stip. Facts, ¶ 23; Ex. 11 at 6.

45.     In Monbleau's interview with J.T., J.T. said Doe was "very touchy" and his "[h]and would sometimes touch her leg." According to J.T., this "crossed" a "personal boundary" and "was a little weird." Ex. 11 at 6.

46.     J.T. further reported that Doe "loved to hug" and would say "in this climate, people don't want to hug me," which "[m]ade her feel like she should hug him." Ex. 11 at 7.

47.     Doe's conduct "bothered" J.T. and she "wouldn't spend time alone with him." Ex. 11 at 6.

48.     Like C.T.Z., J.T. told Monbleau that Doe made a comment about shaving his pubic hair when J.T. went to sit on the floor of Doe's room, saying, "[J.T.] you picked the spot where I shave my pubes." Ex. 11 at 7.

49.     J.T. reported that, during the same visit to Doe's room, Doe moved her legs while she was on an exercise shaker without asking if he could touch her. Ex. 11 at 6.

50.     Monbleau interviewed S.K. on June 14, 2023. Stip. Facts, ¶ 25; Ex. 11 at 7.

51.     S.K. told Monbleau that she was alone on a shift with Doe when he "became emotional" about being "alone forever." He then said to her, "I don't need someone to have sex with, I just want someone to cuddle with" and "I'll be alone, so I'll

9

just jerk off and go to bed." Ex. 11 at 8. Doe's comments made S.K. "extremely

uncomfortable" and she "[felt] very strongly about not working with him again." Ex. 11

at 8. S.K. reported that she had "not fully healed" and was "extremely concerned that

[Doe] is an RA." Ex. 11 at 8.

52.     The University issued a no-contact order between Doe and S.K. on June

20, 2023. Stip. Facts, ¶ 26; Ex. K.

53.     S.K. subsequently made a formal complaint against Doe. Stip. Facts, ¶ 27;

Ex. M.

54.     Monbleau interviewed Doe and K.G. separately on June 23, 2023. Stip.

Facts, ¶ 28; Ex. 11 at 8, 16.

55.     In her interview with Doe, Monbleau asked Doe if there were witnesses

Doe would like Monbleau to interview. Stip. Facts, ¶ 29; Ex. 11 at 16.

56.     Doe told Monbleau that she should interview A.M. as a witness, which

Monbleau later did. Stip. Facts, ¶¶ 33, 34; Ex. 11 at 24.

57.     On June 26, 2023, Monbleau again asked Doe and K.G. if there were

witnesses they would like her to interview or screenshots of messages they wanted to

send her for inclusion in the report. Stip. Facts, ¶ 31; Ex. L.

58.     Doe sent Monbleau various screenshots of messages and extended

explanations of his interactions with the complainants, which Monbleau included in the

report. Stip. Facts, ¶ 32; Ex. 11 at Appendix G.

59.    Monbleau interviewed G.D. on June 27, 2023. Stip. Facts, ¶ 33; Ex. 11 at 22.

60.    G.D. told Monbleau that she was cooking with Doe and "he was making inappropriate jokes." They were discussing Jehovah's Witnesses, and Doe said to G.D., "Oh [G.D.] do you want me to shove my penis in your face?" G.D. said, "what?" And Doe repeated his comment "about shoving his penis in her face." Ex. 11 at 22.

61.    Monbleau interviewed another witness, F.C., on June 28, 2023. F.C. told Monbleau that Doe "tried to give [her] hugs." Ex. 11 at 24.

62.    Monbleau interviewed another witness, R.R., on June 30, 2023. R.R. told Monbleau that he was in Doe's dorm room when "Doe told [J.T.] not to sit on the floor because that is where he s[h]aves his pubes." Doe then told those present that near the window was the location "where [Doe] shaves," and Doe referred to either "pubes" or "testicles." R.R. found the comment "unsettling," "weird," and "awkward." Ex. 11 at 25-26.

63.    Monbleau separately interviewed Doe and K.G. for a second time on July 5, 2023. Stip. Facts, ¶ 36; Ex. 11 at 19, 20.

64.    The University sent the Investigative Report to Doe on July 11, 2023. Stip. Facts, ¶ 37; Ex. 7. While the University initially sent Doe the Investigative Report but not its appendices, a week later the University sent Doe (and Attorney Feoktistov) the complete Investigative Report, including its appendices. Stip. Facts, ¶ 42; Ex. 10.

65.    Monbleau concluded that there was not sufficient evidence that K.G. had violated University policy. Ex. 11 at 27. The Student Conduct Office informed K.G. on July 13, 2023 that the sexual misconduct charge against him had been dropped. Ex. O.

66.    In contrast, Monbleau found there was sufficient evidence that Doe violated policy and recommended the case move forward to a Hearing Panel. Ex. 11 at 27.

**HEARING PANEL**

67.    In recommending that the case against Doe should move forward, Monbleau wrote that the case should move, "per the Title IX Sexual Harassment Grievance Procedure, to a hearing panel for a charge against [Mr. Doe] . . . [of] Sexual Misconduct." Stip. Facts, ¶ 38; Investigative Report.

68.    On July 12, 2023, Michael Coughlin, UMass Lowell's Associate Director of Student Rights & Responsibilities, sent an email to Doe stating that Doe's case would move to a "Title IX hearing panel," scheduled for August 7, 2023, and that he "will need an advisor to conduct cross-examination." Stip. Facts, ¶ 39; Ex. 8.

69.    The University's Sexual Harassment Grievance Procedure has no provision for a "hearing panel" and excludes charges of "sexual misconduct" from its purview. Ex. 3.

70.    The next day, July 13, 2023, the University, by letter, clarified that Doe's case would move to a Hearing Panel under the Student Conduct Code, with the hearing

scheduled for August 7, 2023. Stip. Facts, ¶ 40; Ex. 9. The letter advised Doe he could learn more about the Hearing Panel process by reviewing the Student Conduct Code, and provided a link to the Code. The letter further advised Doe that the information he received "is only to be used for the Student Conduct process." Ex. 9.

71.     On July 20, 2023, the University reiterated to Doe and Attorney Feoktistov that his case would move to a Hearing Panel under the "Student Conduct process," scheduled for August 22, 2023, and identified the members of the Hearing Panel. Stip. Facts, ¶ 43; Ex. R. In the same letter, the University again provided a link to the Student Conduct Code. Ex. R.

72.     On July 28, 2023, the University notified Doe and Attorney Feoktistov of a change in the composition of the Hearing Panel, which would consist of Legee, Dunbar, and Levesque. Stip. Facts, ¶ 44; Ex. S.

73.     On July 30, 2023, Doe submitted a response to the Investigative Report on a form titled "University of Massachusetts Lowell Investigation Response Form (Non-Title IX)," to which he attached a seven-page document. Stip. Facts, ¶ 45; Exs. 12, T.

74.     In his response, Doe addressed the incidents highlighted by Monbleau in the conclusion to the Investigative Report. Ex. 12.

75.     He admitted to requesting hugs, but contended his requests were never refused. Ex. 12 at 4.

76.     He did not deny making a comment about sex and food, but said such "[s]exual metaphors for nonsexual pleasure from food are common in modern English." Ex. 12 at 4.

77.     He did not deny making a comment about shaving his testicles, but provided a diagram he contended showed it would be "physically impossible" for him to shave his testicles in front of his window. Ex. 12 at 4-5.

78.     He did not deny making a comment that he did not "need someone to have sex with." Ex. 12 at 5.

79.     He did not deny making a comment about sticking his penis in a female staff member's face. Ex. 12 at 5-6. He stated the "comparison of unwanted sexual conduct with unwanted religious proselytism was provocative but apt." Ex. 12 at 5

80.     On August 9, 2023, Legee notified Doe and Attorney Feoktistov of the individuals anticipated to attend the Hearing Panel. Stip. Facts, ¶ 46.

81.     On August 16, 2023, the University sent Doe and Attorney Feoktistov a copy of his response to the Investigative Report and the investigator's response to Doe. Stip. Facts, ¶ 47; Ex. V.

82.     On August 21, 2023, Attorney Feoktistov informed the University that Doe would not attend the Hearing Panel, and Doe did not attend. Stip. Facts, ¶¶ 48, 50.

83.     The Hearing Panel convened on August 22, 2023 to determine whether Doe was responsible for a violation of the Student Conduct Code. Stip. Facts, ¶ 49; Ex. 1.

84.     At the hearing, the Hearing Panel heard from four separate women who found Doe's sexual comments and non-consensual physical contact unwelcome. Ex. 1 at 4-7.

85.     G.D. told the Hearing Panel she felt "fear and confusion about [Doe's] intent" when Doe said to her, "What if I stuck my penis in your face?" Ex. 1 at 4-5.

86.     C.T.Z. told the Hearing Panel that Doe made the unwelcome comment to her that "If the food is good, I'd have sex while eating." Ex. 1 at 5.

87.     J.T. told the Hearing Panel that Doe made a comment to her about "shaving his pubes" and repeatedly touched her without her consent: Doe touched her legs without her consent to place her feet on a shaker plate, touched her thigh without her consent to show her a video on his phone, and hugged her without her consent by keeping his arms outstretched until she "felt obligated to engage." Ex. 1 at 5, 6.

88.     S.K. told the Hearing Panel that Doe said to her, "I don't need someone to have sex with, I just want someone to cuddle with," and "I'll be alone, so I'll just jerk off and go to bed." Ex. 1 at 6.

89.     One of the complainants, S.K., had asked not to be on RA duty with Doe any more. Ex. 1 at 6.

90.     Two other complainants, J.T. and C.T.Z., told the Hearing Panel they were likewise uncomfortable interacting with Doe any longer and that his behavior had impaired their ability to act as RAs. Ex. 1 at 7.

15

91.     While Doe did not attend the hearing, the Hearing Panel took into account his written response to the Investigative Report and his prior statements to the investigator. Ex. 1 at 4.

92.     The Hearing Panel noted that Doe disputed certain behavior, but his written response "agree[d] that many of the comments did occur with the complainants and witness." Ex. 1 at 4.

93.     In particular, he did not deny saying, "What if I stuck my penis in your face?," "I don't need someone to have sex with," discussing sex and food, or that he touched J.T.'s legs or hugged her. Ex. 1 at 6.

94.     The Hearing Panel found Doe responsible for sexual misconduct and issued a written decision setting forth its findings, rationale, and the sanctions it imposed on Doe. Stip. Facts, ¶ 52; Ex. 1.

95.     In determining the appropriate sanction, the Hearing Panel noted that Doe's behavior "impacted multiple members of the student community" and "[a]ll incidents occurred between female residents and the respondent while in university housing." Ex. 1 at 7.

96.     The Hearing Panel concluded that only "[b]y separating [Doe] from university housing" could the University "remediate the effects" of Doe's actions. Ex. 1 at 7. The panel also placed Doe on elevated probation status and required Doe to take a consent training course prior to registering for future classes. Ex. 1 at 7.

## UNIVERSITY DEFENDANTS' PROPOSED CONCLUSIONS OF LAW

I.  **COUNT I: PLAINTIFF'S FIRST AMENDMENT CLAIM**

   A.  **The University Has Sovereign Immunity From Plaintiff's First Amendment Claim.**

     1.    The University, as an arm of the Commonwealth of Massachusetts, has Eleventh Amendment immunity from federal suits.

     2.    "[T]he Eleventh Amendment bars federal suits by citizens against the state or state agencies and . . . this 'jurisdictional bar applies regardless of the nature of the relief sought.'" O'Neill v. Baker, 210 F.3d 41, 47 (1st Cir. 2000) (quoting Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100 (1984)).

     3.    The University is an arm of the Commonwealth of Massachusetts. U.S. v. Univ. of Mass., Worcester, 812 F.3d 35, 40 (1st Cir. 2016); Wong v. Univ. of Mass., 438 Mass. 29, 777 N.E.2d 161, 163 n. 3 (2002)).

     4.    As an arm of the Commonwealth, the University has immunity from suit unless it has waived immunity or its immunity has been abrogated by Congress pursuant to its power to enforce the Fourteenth Amendment. See Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 670 (1999).

     5.    Section 1983 authorizes suits against any "person" acting under color of state law, and it is well settled that "a state and its agencies are not 'persons'" under 42 U.S.C. § 1983. Brown v. Newberger, 291 F.3d 89, 92 (1st Cir. 2002) (citing Will v. Mich. Dept. of State Police, 491 U.S. 58, 71 (1989)).

6.      "Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." Will, 491 U.S. at 66.

7.      Because the Commonwealth's immunity has been neither waived nor abrogated by Congress, the Eleventh Amendment bars Doe's First Amendment claim against the University.

**B.  Monbleau, Legee, Levesque, and Dunbar Are Not Subject to Suit in Their Official Capacities under Section 1983 for Money Damages.**

8.      University employees may not be sued in their official capacity under Section 1983.

9.      "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," and "[a]s such, it is no different from a suit against the State itself." Will, 491 U.S. at 71.

10.     Section 1983 authorizes suits only against any "person" acting under color of state law, and "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." Id.

**C.  Prospective Injunctive Relief Is Not Warranted Because Defendants Reasonably Concluded Doe's Actions Substantially Disrupted School Activities and Interfered with the Rights of Other Students.**

11.     The Ex Parte Young exception to Eleventh Amendment immunity authorizes only prospective injunctive relief to compel "state officials to conform their

future conduct to the requirements of federal law." <u>Whalen v. Massachusetts Trial Ct.</u>, 397 F.3d 19, 29 (1st Cir. 2005) (quoting <u>Quern v. Jordan</u>, 440 U.S. 332, 337 (1979)).

12.    "First Amendment rights . . . must be analyzed in light of the special characteristics of the school environment." <u>Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez</u>, 561 U.S. 661, 685–86 (2010) (quoting <u>Widmar v. Vincent</u>, 454 U.S. 263, 268 n. 5 (1981)).

13.    "A university differs in significant respects from public forums such as streets or parks or even municipal theaters." <u>Widmar</u>, 454 U.S. at 268.

14.    Public schools may therefore regulate speech that may, in another context, be protected. <u>See</u> <u>Morse v. Frederick</u>, 551 U.S. 393, 405 (2007).

15.    First, public schools may regulate speech if "school officials reasonably conclude that it will 'materially and substantially disrupt the work and discipline of the school.'" <u>Id.</u> (quoting <u>Tinker v. Des Moines Indep. Cmty. Sch. Dist.</u>, 393 U.S. 503, 513 (1969)); <u>see</u> <u>Gay Students Org. of Univ. of New Hampshire v. Bonner</u>, 509 F.2d 652, 663 (1st Cir. 1974).

16.    Second, public schools may regulate speech that interferes "with the rights of other students to be secure and to be let alone." <u>Tinker</u>, 393 U.S. at 508; <u>see</u> <u>Healy v. James</u>, 408 U.S. 169, 189 (1972) (First Amendment did not require state college to "tolerate[]" "activities . . . [that] infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education");

Koeppel v. Romano, 252 F. Supp. 3d 1310, 1324 (M.D. Fla. 2017), aff'd sub nom. Doe v. Valencia Coll., 903 F.3d 1220 (11th Cir. 2018) (holding student's text messages were "simply outside the protections of the First Amendment because it disrupt[ed] another student's ability to pursue her education in a safe environment").

17.     Third, public schools may impose sanctions on students who engage in "offensively lewd and indecent speech." Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 685 (1986); see Corlett v. Oakland Univ. Bd. of Trustees, 958 F. Supp. 2d 795, 809 (E.D. Mich. 2013) (holding student's "expressions of lust for [his instructor] or descriptions of her physical appearance are not entitled to First Amendment protection" and "[i]t matters not whether" student's speech "satisfied the legal definition of obscenity or sexual harassment"); Sasser v. Bd. of Regents of Univ. Sys. of Georgia, No. 1:20-CV-4022-SDG, 2021 WL 4478743, at *6 (N.D. Ga. Sept. 30, 2021), aff'd, No. 21-14433, 2023 WL 2446720 (11th Cir. Mar. 10, 2023) (holding university could discipline student for use of "racially offensive term to describe a student" without addressing whether statement was "harassing or threatening").

18.     Fourth, public schools may restrict school-sponsored speech if those restrictions are "reasonably related to legitimate pedagogical concerns." Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 273 (1988).

19.     Fifth, public schools may "restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use." Morse, 551 U.S. at 403.

20.     School officials necessarily must exercise discretion in policymaking and disciplinary decisions and are owed deference in their decisionmaking. See Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist., 969 F.3d 12, 29 (1st Cir. 2020) ("The Supreme Court has repeatedly emphasized the necessary discretion school officials must exercise and the attendant deference owed to many of their decisions"); see also Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez, 561 U.S. 661, 686 (2010) ("Cognizant that judges lack the on-the-ground expertise and experience of school administrators, however, we have cautioned courts in various contexts to resist 'substitut[ing] their own notions of sound educational policy for those of the school authorities which they review.' " (alteration in original) (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206 (1982))).

21.     Courts defer to a school's regulation of student speech so long as the school's "judgment is reasonable." Norris, 969 F.3d at 30.

22.     The Hearing Panel reasonably concluded that Doe's behavior substantially disrupted the University's operations. See Morse, 551 U.S. at 403; Tinker, 393 U.S. at 513.

23.     The Hearing Panel reasonably concluded that Doe's behavior had interfered with the rights of other RAs "to be secure and to be let alone." Tinker, 393 U.S. at 508.

24.     The Hearing Panel "reasonably . . . forecast" that Doe would make further comments that harm students in the residential community.  Id. at 514.

25.     The University reasonably concluded that Doe's behavior was offensive. Fraser, 478 U.S. at 685 (1986).

**D.  Monbleau, Legee, Levesque, and Dunbar Are Entitled to Qualified Immunity from Doe's Claim for Damages Based on Violations of Section 1983.**

26.     The doctrine of "qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'" Diaz-Bigio v. Santini, 652 F.3d 45, 50 (1st Cir. 2011) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011)).

27.     There is a two-prong analysis to determine whether defendants are entitled to qualified immunity.

28.     First, courts ask "whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right." Id.

29.     Second, courts ask "whether the right was 'clearly established' at the time of the defendant's alleged violation." Id. (quoting Pearson v. Callahan, 555 U.S. 223, 269 (2009)).

30.     The second question itself has two sub-parts: "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable official would have understood that what he was doing violated that right, and (b) whether the particular factual violation in question would have been clear to a reasonable official." Id.

31.    As set forth above, Doe has not shown a violation of his First Amendment rights.

32.    Even if Doe had shown a constitutional violation, he has not shown that any reasonable official would have understood that the sanctions the University imposed on Doe would violate the First Amendment.

33.    Monbleau, Legee, Levesque, and Dunbar are therefore entitled to qualified immunity from Doe's claim for damages based on violations of Section 1983.

## II.  COUNT III: VIOLATION OF MCRA.

### A.  The University Has Sovereign Immunity from Plaintiff's MCRA Claim.

34.    The Commonwealth has sovereign immunity from claims under the MCRA. Commonwealth v. ELM Med. Lab'ys, Inc., 33 Mass. App. Ct. 71, 77, 596 N.E.2d 376, 380 (1992).

35.    The Commonwealth is not a "person" subject to suit under the MCRA. Id.

36.    The University is an arm of the Commonwealth. U.S. v. Univ. of Mass., Worcester, 812 F.3d 35, 40 (1st Cir. 2016); Wong v. Univ. of Mass., 438 Mass. 29, 777 N.E.2d 161, 163 n. 3 (2002))

37.    The University therefore has sovereign immunity from MCRA claims.

### B.  Monbleau, Legee, Levesque, and Dunbar Are Immune from Suit in Their Official Capacities from Doe's MCRA Claim.

38.    University employees may not be sued in their official capacity under the MCRA. See, e.g., Howcroft v. City of Peabody, 51 Mass. App. Ct. 573, 593, 747 N.E.2d

729, 745 (2001) (affirming summary judgment in favor of individual defendants sued in their official capacity); Anderson v. Heffernan, No. CIV.A. 12-12173-FDS, 2013 WL 1629122, at *3 (D. Mass. Apr. 9, 2013) (claims against employee in their official capacity "are not available, at least not pursuant to the Massachusetts Civil Rights Act, [and] the Court lacks subject-matter jurisdiction over them").

39.     The Ex Parte Young exception does not apply to Plaintiff's MCRA claim because it authorizes injunctions only where there is a "continuing violation of federal law." Green v. Mansour, 474 U.S. 64, 71, 106 S. Ct. 423, 427, 88 L. Ed. 2d 371 (1985) (emphasis added); see Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106 (1984) ("Young and Edelman are inapplicable in a suit against state officials on the basis of state law.").

### C. Monbleau, Legee, Levesque, and Dunbar Did Not Violate the MCRA.

40.     To prove his MCRA claim against Monbleau, Legee, Levesque, and Dunbar in their individual capacities, Doe must show that his rights under the constitution or laws of the United States or Massachusetts were interfered with through "threats, intimidation or coercion." M.G.L. c. 12, §§ 11H, 11I.

41.     "A direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the [MCRA]." Longval v. Comm'r of Correction, 404 Mass. 325, 333 (1989).

42.     As set forth above, there was no violation of Doe's speech rights.

24

43.     If there were a violation of Doe's speech rights, it was done directly by the Hearing Panel's imposition of sanctions on Doe and not through threats, intimidation, or coercion.

44. Monbleau, Legee, Levesque, and Dunbar did not violate the MCRA.

**D.  Monbleau, Legee, Levesque, and Dunbar Are Entitled to Qualified Immunity from Doe's Damages Claim Under the MCRA.**

45.     If there were a violation of the MCRA, Monbleau, Legee, Levesque, and Dunbar would be entitled to qualified immunity from any claim for damages under the MCRA.

46.     Qualified immunity is available to public officials for claims under the MCRA. Howcroft, 51 Mass. App. Ct. at 595.

47.     "The qualified immunity principles developed under § 1983 apply equally to claims under the MCRA." Id. (citing Duarte v. Healy, 405 Mass. 43, 46–48, 537 N.E.2d 1230 (1989)).

48.     "[P]ublic officials are not liable under the Civil Rights Act for their discretionary acts, unless they have violated a right under Federal or State

constitutional or statutory law that was 'clearly established' at the time." <u>Duarte</u>, 405 Mass. at 47.

49.     For the reasons stated above, it was not clearly established that Doe had a First Amendment right to make the unwelcome comments and unwelcome touches identified by Monbleau and the Hearing Panel.

50.     Monbleau, Legee, Levesque, and Dunbar are entitled to qualified immunity from Doe's damages claim under the MCRA.

### III. <u>COUNT IV: BREACH OF CONTRACT</u>

#### A. <u>The University Has Sovereign Immunity from Breach of Contract Claims in Federal Court.</u>

51.     While the Commonwealth has consented to breach of contract claims in state court, that waiver does not "extend so far as to permit lawsuits against the Commonwealth in <u>federal</u> court." <u>McGuigan v. Conte</u>, 629 F. Supp. 2d 76, 83 (D. Mass. 2009) (emphasis in original).

52.     Federal courts have dismissed contract claims against the University based on Eleventh Amendment immunity. <u>Kamayou v. Univ. of Massachusetts Lowell</u>, No. 16-CV-10098-IT, 2018 WL 4088074, at *5 (D. Mass. July 26, 2018), <u>report and recommendation adopted</u>, No. 16-CV-10098-IT, 2018 WL 4088931 (D. Mass. Aug. 27, 2018) ("the University does enjoy immunity from suit in this federal court for breach of contract"); <u>BT INS, Inc. v. Univ. of Massachusetts</u>, No. 10-11068-DPW, 2010 WL 4179678, at *4 (D. Mass. Oct. 19, 2010) ("there is no evidence that Massachusetts's general waiver

of immunity for contract claims extends to the Eleventh Amendment's protections against suit in federal court").

53.     Eleventh Amendment immunity therefore bars Doe's breach of contract claim.

**B. <u>Doe Does Not Have Contractual Rights Beyond the Protections of Due Process.</u>**

54.     "[A] student facing expulsion or suspension from a public educational institution is entitled to the protections of due process." <u>Gorman v. Univ. of Rhode Island</u>, 837 F.2d 7, 12 (1st Cir. 1988).

55.     "[T]he rights of a private college" to regulate student conduct "are more expansive . . . than are those of a public institution." <u>Dinu v. President & Fellows of Harvard Coll.,</u> 56 F. Supp. 2d 129, 133 (D. Mass. 1999).

56.     Students at "private institution[s]" have "no constitutional right to a hearing" even prior to receiving a sanction as severe as expulsion. <u>Coveney v. President and Trustees of the College of the Holy Cross</u>, 388 Mass. 16, 21 (1983).

57.     Courts therefore may apply "some elements of the law of contracts" to academic and disciplinary disputes between a student and a private university "to provide some framework into which to put the problem." <u>Lyons v. Salve Regina College</u>, 565 F.2d 200, 202 (1st Cir. 1977) (quoting <u>Slaughter v. Brigham Young University</u>, 514 F.2d 622 (10th Cir. 1975)) (applying contract law principles to student's challenge to university's decision in Grade Appeal Process); <u>see</u> Note, Bryce Freeman,

The Title IX Contract Quagmire, 118 Mich. L. Rev. 909 (2020) ("Finding that plaintiffs can state breach of contract claims against their private universities has the effect of creating a path to judicial review where none would otherwise exist.").

58.      Courts have imposed an obligation on private colleges and universities, arising out of the implied covenant of good faith and fair dealing, to conduct any disciplinary hearing with "basic fairness." Doe v. Trustees of Bos. Coll., 892 F.3d 67, 87–88 (1st Cir. 2018). This obligation exists even if the college or university was not obligated to conduct a hearing at all. Id.

59.      Finding a contractual relationship between a student and a university regarding disciplinary proceedings is "only appropriate in cases where the student plaintiffs attend private educational institutions." Kuntz v. Univ. of Mass. at Amherst, No. HSCV2013-00094A, at 11 (Hampshire Super. Ct. April 1, 2014) ("Because [plaintiff] attended a publicly funded university, the Court concludes that no contractual relationship existed between [plaintiff] and the University for purposes of ensuring adherence to the Student Code").[3]

60.      The University of Massachusetts is a public university. See M.G.L. c. 75.

61.      No contractual relationship existed between Doe and the University for purposes of ensuring adherence to the Student Conduct Code.

---

[3] A copy of the opinion in Kuntz is attached here as Attachment A.

**C.  There Is No Breach Because the University Followed Its Written Procedures.**

62.    If the Student Conduct Code and Sexual Harassment Grievance Procedure did create a contract between the University and Doe, there is still no breach because the University followed the terms of the Student Conduct Code and Sexual Harassment Grievance Procedure.

63.    "Even though 'some elements of the law of contracts are used and should be used in the analysis of the relationship between [a student] and the university,' because '[t]he student-university relationship is unique,' contract law need not be 'rigidly applied.'" Guckenberger v. Bos. Univ., 974 F. Supp. 106, 150-151 (D. Mass. 1997) (quoting Lyons v. Salve Regina Coll., 565 F.2d 200, 202 (1st Cir. 1977)).

64.    In construing a contract between a university and a student, courts apply "the standard of reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." Schaer v. Brandeis Univ., 432 Mass. 474, 478 (2000) (quoting Cloud v. Trustees of Boston Univ., 720 F.2d 721, 724 (1st Cir. 1983)).

65.    Courts show deference to universities' "academic and disciplinary decisions." Id., 432 Mass. at 482.

66.    Title IX regulations define sexual harassment and prescribe procedures for adjudicating complaints of sexual harassment, see 34 C.F.R. § 106.30(a), 34 C.F.R. § 106.45, but "Title IX is not the exclusive remedy for sexual misconduct" and "nothing in

the final [Title IX] regulations precludes recipients from vigorously addressing

misconduct (sexual or otherwise) that occurs outside the scope of Title IX."

"Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving

Federal Financial Assistance," 85 Fed. Reg. 30,026, 30,199 (May 19, 2020).

67.    The University should reasonably expect students such as Doe to

recognize that the Student Conduct Code and the Sexual Harassment Grievance

Procedure are two different policies that provide different procedures to address

distinct categories of conduct.

68.    The University could not reasonably expect students such as Doe to

believe the Sexual Harassment Grievance Procedure applies to sexual misconduct when

the Sexual Harassment Grievance Procedure expressly states that sexual misconduct is

addressed by other University policies.

### D.  The University Conducted the Student Conduct Code Process with Basic Fairness.

69.    If the University had a contractual obligation to provide "basic fairness"

apart from its obligation to provide due process, it met that obligation to Doe.

70.    Basic fairness can be met without complying with due process. Doe v.

Trustees of Bos. Coll., 942 F.3d 527, 533–34 (1st Cir. 2019) (citing Schaer, 735 N.E.2d at

381; Coveney, 445 N.E.2d at 138-40).

71.     Basic fairness does not require that a student be allowed to "to give any input during the investigation." Trustees of Bos. Coll., 942 F.3d at 534 (citing Schaer, 735 N.E.2d at 378, 380).

72.     Basic fairness does not require that a university allow the accused to ask questions of the accuser, whether directly or indirectly. Trustees of Bos. Coll., 942 F.3d at 533, 534.

73.     Doe was provided basic fairness through the opportunity to address the evidence against him in two interviews with an investigator, the opportunity to suggest witnesses and provide evidence, the opportunity to provide a written response to the investigator's report, and the opportunity to attend the Hearing Panel and suggest questions for the Hearing Panel to ask.

Dated: January 25, 2024

UNIVERSITY OF MASSACHUSETTS, TRUSTEES OF THE UNIVERSITY OF MASSACHUSETTS, HANNAH MONBLEAU, KATE LEGEE, ESMERALDA LEVESQUE, a/k/a ESMERALDA MENDEZ, ADAM DUNBAR,

By their attorney,

/s/ Michael Hoven
Michael Hoven, BBO No. 688593
Associate Counsel
University of Massachusetts
Office of the General Counsel
50 Washington Street, Suite 3000
Westborough, MA 01581
(774) 528-0205  mhoven@umassp.edu

A TRUE COPY
ATTEST

*[signature]* CLERK MAGISTRATE

**COMMONWEALTH OF MASSACHUSETTS**
**TRIAL COURT**

**HAMPSHIRE, ss.**
                                                                    **SUPERIOR COURT**
                                                                    **CIVIL ACTION** 13-00094

**BRENDAN KUNTZ**

**vs.**

**UNIVERSITY OF MASSACHUSETTS AT AMHERST & others**[1]

**MEMORANDUM OF DECISION ON THE DEFENDANTS'**
**MOTION TO DISMISS**

This civil action arises out of the plaintiff Brendan Kuntz ("Kuntz")'s expulsion from the

University of Massachusetts at Amherst ("University") after a disciplinary hearing and appeal.

The expulsion resulted in Kuntz's failure to graduate from the University. The complaint, filed

pursuant to 42 U.S.C. § 1983, Article 12 of the Massachusetts Declaration of Rights, G. L. c. 12,

§ 11I, and common law principles of contract, alleges that the defendants, the University and

certain of its administrators, violated Kuntz's constitutionally protected right to due process in

failing to provide a fair disciplinary hearing (Counts I and II) and that the University breached its

contract with Kuntz (Count III).

Pursuant to Mass. R. Civ. P. 12 (b)(6), the defendants have now filed a motion to dismiss,

arguing that (1) Kuntz fails to sufficiently allege a due process violation; (2) the individual

defendants, if sued in their individual capacities, are entitled to qualified immunity; and (3)

Kuntz fails to sufficiently allege that a contract exists between the two parties. For the reasons

stated below, the defendants' motion is **ALLOWED**.

---

[1] Enku Gelaye, David Vaillancourt, and Jean Kim.

## BACKGROUND

The relevant facts, as alleged in the complaint, are as follows.[2]  Though the Court reserves certain facts for the discussion below.

On February 6, 2012, at around 12:30 a.m., Kuntz entered an off-campus bar in downtown Amherst in order to use the restroom. While Kuntz was in the restroom, a person pounded on the door and startled Kuntz.  In response, Kuntz opened the restroom door and "moved" the person against the opposite wall and told the person to "chill the 'F' out." Kuntz then returned to the bathroom. At the time of the altercation, Kuntz was a twenty-four year old senior in good standing at the University.

The police were contacted and the other person involved ("victim") filed a report based on Kuntz's conduct.  The victim also alleged that Kuntz put a utility razor blade to his throat and threatened to kill him.  Kuntz denied this allegation.  After the altercation and while still at the bar, Kuntz voluntarily emptied his pockets, which did not reveal any razor blade in his possession.  Kuntz then left the bar and walked home.  Later, an employee of the bar emptied the contents of a garbage can from the bar and discovered a razor blade.  Kuntz was arrested and initially charged with assault with a dangerous weapon.  He was eventually charged with misdemeanor assault, which was continued with probationary conditions for less than one year, to be dismissed at that time.

---

[2]  The Court accepts, as it must, the facts alleged in the complaint as true and draws every reasonable inference therefrom in favor of the plaintiff.  Courts may also consider documents referenced in a complaint without turning the motion to dismiss into a motion for summary judgment.  See *Marram* v. *Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 45 n.4 (2004) ("Where, as here, the plaintiff had notice of these documents and relied on them in framing the complaint, the attachment of such documents to [the defendant's] motion to dismiss does not convert the motion to one for summary judgment").  Because Kuntz refers and cites the 2011-2012 Student Code in his complaint without it having been attached and the defendants have included it as Exhibit 1 to their motion, the Court will consider this pertinent document at this stage without converting the motion into one for summary judgment.  The Court will not consider the remaining exhibits submitted by the defendants.

On February 7, 2012, Kuntz received a notice from defendant Gelaye informing him that he was being charged with violating five sections of the 2011-2012 Code of Student Conduct ("Student Code" or "Code").[3] As a result, the letter advised Kuntz that the University was imposing an interim sanction of immediate expulsion. The letter also advised Kuntz to schedule an appointment to conduct a disciplinary conference with the Dean of Students about the charges.[4] According to the complaint, the letter further stated that Kuntz's "behavior represent[ed] a direct and imminent threat to [his] safety and the safety of the University community." As such, he was immediately expelled per the interim sanction.

The University had received a copy of the police report from the Amherst Police Department, giving rise to the disciplinary charges. The University did not conduct any further investigation into the incident and received no further information from the police.

Kuntz participated in a conference with defendant Vaillancourt and explained that much of the allegations were false; no weapon was involved in the incident; the victim wished him no further repercussions; and the matter warranted more investigation by the University before removing him from classes prior to conducting a hearing on the merits of the allegations. Kuntz did not receive written documentation as to why the interim sanction would remain in effect.

On February 27, 2012, the victim wrote a letter to the Commonwealth, expressing concern for Kuntz: "Although [Kuntz's] actions were violent and uncalled for I also see him as my peer and someone who could have simply made a mistake. I don't like the fact that he is

---

[3] Specifically, he was alleged to have violated the following provisions: section II.B.1 "Physical assault"; section II.B.2 "Harassment"; section II.B.8 "Possession or use of . . . hazardous or dangerous weapons"; section II.B.11a "Endangering behavior to persons or property; and section II.B.14 "Violations of University policies and regulations."
[4] "Upon the filing of charges, the charged student(s) will receive a Notice of Charge and will have at least forty-eight hours to request a Disciplinary Conference, at which time the nature of and the responsibility for an alleged offense is discussed. The student will also be advised of his or her option to resolve the matter." Code, § IV.B. For repeated violations and/or more serious infractions, various outcomes are listed in the Code. If an agreement is not signed at the time of conference and the facts are not agreed upon, the case will be referred to the disciplinary hearing board. § IV.B.2.

getting in trouble with the [University] . . . [and] hope that no serious criminal charges are successful . . . ." The University did not receive a copy of the victim's letter.

On April 20, 2012, Kuntz received notice from the Dean of Students that the University disciplinary hearing board had scheduled a sanction hearing on his pending charges for April 26, 2012.[5] The date was later changed to May 2, 2012. The notice listed the five sections of the Code that Kuntz allegedly violated and included an excerpt from the police report. Kuntz was advised to review the Student Code regarding his procedural and substantive rights in preparation for the hearing.

On April 26, 2012, Kuntz received a handout detailing the hearing procedures.

On May 2, 2012, the hearing was held.[6] Kutnz was advised of procedural safeguards at the beginning of the hearing. In support of the University's case, a staff member from the Office of the Dean of Students read aloud the portion of the police report that formed the basis of the charges. The University did not present any witnesses. It is unclear from the complaint whether Kuntz presented any witnesses. During the hearing, Kuntz requested that the hearing committee members "receive additional information from either actual witnesses or at least documents that contradicted the original allegation made against him." His objections were ignored and the hearing was not postponed or continued. In May 2012, Kuntz was enrolled in two courses in order to complete his final six credits for graduation.

After the hearing closed, the hearing board deliberated and determined that Kuntz had committed four of the five charged violations. The board recommended expulsion.[7]

---

[5] The hearing board is composed of University employees and students and shall not have fewer than three and not more than five members. Code, § III.A. The Dean of Students or the Dean's designee may conduct sanction hearings. § III.B.
[6] "Where the student denies the charge(s), the University shall bear the burden of proving the charge(s) by a preponderance of the evidence. § IV.D.3.
[7] "Any recommendation of a Hearing Board shall be based only upon evidence and testimony at the hearing." § IV.E.9.

Defendant Gelaye, in her capacity as Dean of Students, upheld the recommendation and imposed a permanent expulsion.[8]

Subsequently, Kuntz filed an appeal in accordance with the procedures outlined in the Student Code. Defendant Kim, acting in her capacity as Vice Chancellor of Student Affairs, denied the appeal and upheld the permanent expulsion.

## DISCUSSION

A motion to dismiss pursuant to Mass. R. Civ. P. 12 (b)(6) permits "prompt resolution of a case where the allegations in the complaint clearly demonstrate that the plaintiff's claim is legally insufficient." *Harvard Crimson, Inc.* v. *President & Fellows of Harvard Coll.*, 445 Mass. 745, 748 (2006). When evaluating the sufficiency of a complaint, the Court must accept as true the well-pled factual allegations of the complaint and draw all reasonable inferences in favor of the plaintiff. *Iannacchino* v. *Ford Motor Co.*, 451 Mass. 623, 635-636 (2008). To survive a motion to dismiss, labels and conclusions will not suffice; a complaint must allege facts "plausibly suggesting (not merely consistent with) an entitlement to relief." *Id.* at 636. (citations omitted).

The complaint is captioned as against the administrators both in their individual and official capacities. However, "the real party in interest in an official-capacity suit is the governmental entity and not the named official." *Hafer* v. *Melo*, 502 U.S. 21, 25 (1991). When sued in his or her official capacity for other than injunctive relief, a state official is not a person within the meaning of section 1983. *Will* v. *Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Thus, in this case, any claims for damages asserted against the individual defendants in their official capacity is without merit and must be dismissed.

---

[8] "In determining a sanction, a designated University official may consider the student's present demeanor and past disciplinary record, the nature of the offense, the severity of any damage, injury, or harm resulting therefrom, and other factors." § V.

A.    **Due Process Violation (Count I)**

"[A] student facing expulsion or suspension from a public educational institution is entitled to the protection of due process."[9]  *Gorman* v. *University of Rhode Island*, 837 F.2d 7, 12 (1st Cir. 1988).  Due process requires that student disciplinary action must comport with general notions of fundamental fairness, including notice and an opportunity to be heard.  *Id.* at 12-13. Although  "some kind of notice" and "some kind of hearing" is required, "[d]ue process which may be said to mean fair procedure, is not a fixed or rigid concept, but, rather, is a flexible standard which varies depending upon the nature of the interests affected, and the circumstances of the deprivation."  *Id.* at 12,13.  Thus, generally, "the procedures due to a student include notice, an explanation of the case against the student, and an opportunity to present his [or her] side of the story."  *Id.* at 14 (internal quotation marks omitted).

Here, the complaint plainly admits that Kuntz received notice of and an opportunity to be heard on the charges leveled against him.  Specifically, on February 7, 2006, Kuntz received a letter informing him that the University was imposing an interim sanction of expulsion based on five alleged violations of the Student Code and that he should make an appointment with the Dean of Students to conduct a disciplinary conference.  Kuntz attended the conference and explained his side of the story to the Dean. On April 20, 2006, Kuntz received notice of a scheduled hearing on the charges, which was later changed to May 2, 2006.  Prior to the hearing, he received copies of hearing procedure and was advised to review the Student Code regarding his procedural and substantive rights.  At the hearing, Kuntz had the opportunity to tell his side of the story, including presenting witnesses and information.

---

[9] "The *fourteenth amendment to the United States Constitution* provides that no state shall deprive any person of life, liberty, or property without due process of law. . . . [A] student's interest in pursuing an education is included within the *fourteenth amendment's* protection of liberty and property."  *Gorman*, 837 F.2d at 12, citing *Goss* v. *Lopez*, 419 U.S. 565, 574-575 (1975) (emphasis in original).

Nevertheless, Kuntz maintains that the University denied him certain procedural protections, including that (1) after the judicial conference, he did not receive a written explanation as to why the interim sanction would remain in effect; (2) the University did not conduct any inquiry or investigation into the allegations beyond the police report; (3) a student did not file the complaint or bring the matter to the attention of the University; (4) the University received a copy of the police report from the Amherst Police Department; (5) the University was unaware of the statement provided by the student/victim; (6) neither Kuntz nor the Hearing Committee received the full police report or statement written by the student/victim; (7) no complaining witness was present at the hearing; (8) the University did not provide advance notice that there would be no witnesses present; and (9) according to the complaint, despite requests during the hearing that the hearing committee members receive additional information, the hearing was not postponed or continued as the Student Code and due process requires.   The complaint also alleges that defendants Gelaye and Vaillancourt acted with reckless disregard for Kuntz's constitutional rights.

The 2011-2012 Student Code, which governed disciplinary procedures at the time of Kuntz's interim and permanent expulsion states that "[a]ll undergraduate students are responsible for complying with the rules, regulations, policies, and procedures" contained in the Code and other official University publications and announcements.  Code, p. 2.  The Code "appl[ies] to violations of the law or acts of misconduct which occur in other locations when the behavior distinctly and directly affects the University community."  § I.C.

Upon the request "of any student, faculty or staff member or independently," the University may file charges against the accused student(s) so long as a complaint was filed no later than three months after discovery of the alleged violation and the identity of the student(s)

involved.  § IV.A.  "Charges may be filed by the *University* no later than four months after

notification of the alleged violation."  *Id*. (emphasis added).  The Code also provides that

disciplinary action "will not be subject to challenge on the ground that criminal charges

involving the same incident have been dismissed or reduced."  § I.E.  Moreover, the board

"follows prescribed procedures, but need not observe the rules of evidence observed by courts,

and may exclude unduly repetitious or irrelevant evidence."  § IV.E.6.  The board "may rely

upon oral statements of witnesses and upon written reports and other documents." § VI.E.5.

Finally, according to the complaint, the handout detailing hearing procedures stated that both the

complaining witness and charged student, here the University and Kuntz, would have up to one

hour to present its case, which includes presenting information, presenting and questioning

witnesses, and responding to questions from the charged student, complaint witness, and Board.

This is not a mandatory list.  Witnesses may be included as part of either party's case.  Further,

any requested delays once the hearing has begun shall be granted to either party at the discretion

of the hearing board.  § IV.C.

     Here, Kuntz was admittedly afforded notice and the opportunity to be heard.  See *Goss*,

419 U.S. at 579 ("requiring effective notice and informal hearing permitting the student to give

his version of the events will provide a meaningful hedge against erroneous action").  The

University is not required to provide a process akin to a common law criminal trial, but instead

must merely afford the student an opportunity to answer, explain, and defend.  *Gorman*, 837 F.2d

at 14.  Indeed, the question is not whether the hearing was ideal, or whether its procedure could

have been better; rather, the question is whether, under the particular circumstances, the hearing

was fair and afforded the individual "the essential elements of due process." *Id.* at 13. Such process was afforded here.[10]

With respect to an interim suspension, "[s]tudents whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school. In such cases, the necessary notice and rudimentary hearing should follow as soon as practicable." *Goss*, 419 U.S. at 582-583. See Code, §§ VII.A, B. Kuntz participated in a conference with the Dean of Students regarding the interim suspension after its imposition where he admittedly presented his "version of the facts." § VII.C.[11]

Because the allegations of the complaint plainly establish that the essential elements of due process were met, the acts that Kuntz complains of do not amount to a violation of his due process rights. Similarly, the complaint fails to allege any facts that the individual defendants deprived the plaintiff of any clearly established constitutional right of which they knew or reasonably should have known. See *Longval* v. *Commissioner of Correction*, 448 Mass. 412, 418 (2007); *Clancy* v. *McCabe*, 441 Mass., 311 322 (2004). Thus, Count I shall be dismissed.

## B.    Violation of G. L. c. 12, § 11I (Count II)

Count II of the complaint alleges that the defendants also violated G. L. c. 12, § 11I, the Massachusetts Civil Rights Act. Specifically, according to the complaint, the defendants violated Kuntz's procedural due process rights guaranteed under Article 12 of the Massachusetts Declaration of Rights and individual defendants Gelaye and Vaillancourt acted with reckless disregard for Kuntz's constitutional rights, all in violation of the Act.

---

[10] In addition, as alleged in the complaint, Kuntz further availed himself of the University's appeal process.
[11] While the Code states that the official "shall determine in writing whether the interim restrictions will continue . . . with the reasons therefore," § VII.C, Kuntz was nonetheless afforded what due process requires in having the opportunity to be heard.

To state a claim for violation of the Massachusetts Civil Rights Act, "the complaint must contain factual allegations plausibly suggesting that the defendant (1) interfered with, or attempted to interfere with (2) the plaintiff's exercise or enjoyment of rights secured by the Constitution or laws of either of the United States or of the Commonwealth (3) by threats, intimidation, or coercion." *Vranos* v. *Skinner*, 77 Mass. App. Ct. 280, 290 (2010); *Swanset Dev. Corp.* v. *Taunton*, 423 Mass. 390, 395 (1996). See G. L. c. 12, §§ 11I, H. "'Threat' in this context involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Planned Parenthood League of Mass., Inc.* v. *Blake*, 417 Mass. 467, 474 (1994). "Intimidation" involves "fear for the purpose of compelling or deterring conduct," and "coercion" refers to "the application to another of such force, either physical or moral, as to constrain [a plaintiff] to do against his will something he would not otherwise have done." *Id.* Moreover, "a direct deprivation of rights, even if unlawful, is not coercive because it is not an attempt to force someone to do something the person is not lawfully required to do." *Swanset Dev. Corp.*, 423 Mass. at 396.

Here, the plaintiff has not alleged any facts to suggest that the defendants threatened, intimidated, or coerced him. Cf. *Planned Parenthood League of Mass., Inc.*, 417 Mass. at 475 (defendants' "conduct presented frightening, threatening and impermeable physical obstacles to patients attempting to enter the clinics, and forced those patients to forego their right to enter the clinics and obtain abortion services"). Therefore, the plaintiff's statutory claim is insufficiently pled and will be dismissed. *Iannacchino*, 451 Mass. at 636.

## C.    Breach of Contract and Good Faith and Fair Dealing (Count III)

The complaint alleges that the University and Kuntz formed a contract where Kuntz paid the University, and in return, the University agreed to provide plaintiff with access to its

undergraduate degree programs. According to the complaint, some of the duties owed between the parties via this alleged contract are contained in the Student Code. The complaint further alleges that the University breached this contract, as well as the implied promise of good faith and fair dealing, when it failed to abide by certain provisions of the Code in the disciplinary process.[12]

Courts may find the existence of a contract in the form of a student manual or code between a student and a university. Such a finding, however, is only appropriate in cases where the student plaintiffs attend private educational institutions. See, e.g., *Mangla* v. *Brown Univ.*, 135 F.3d 80, 83 (1st Cir.1998); *Cloud* v. *Trustees of Boston Univ.*, 720 F.2d 721, 724 (1st Cir. 1983); *Lyons* v. *Salve Regina College*, 565 F.2d 200, 202 (1st Cir. 1977); *Dinu* v. *President & Fellows of Harvard College*, 56 F. Supp. 2d 129, 130 (D. Mass. 1999). See also *Schaer* v. *Brandeis University*, 432 Mass. 474, 478 (2000) (assuming without deciding, and because parties agreed, that a contractual relationship existed). Courts utilize this contract approach to ensure a fair process as students who attend private schools, which usually are "not sufficiently involved with the Federal Government to make its actions equivalent to Federal Government actions," are not afforded certain constitutional protections. See *Giles* v. *Howard University*, 428 F. Supp. 603, 604 (1977); *Lyons* v. *Salve Regina College*, 565 F.2d 200, 202 (1st Cir. 1977) ("*some* elements of the law of contracts are used and should be used in the analysis of the relationship between plaintiff and the university to provide some framework into which to put the problem"); *Coveney* v. *President and Trustees of the College of the Holy Cross*, 388 Mass. 16, 21 (1983) ("because the college is a private institution, Coveney had no constitutional right to a hearing"). On the other hand, as discussed above, a student who attends a publicly funded

---

[12] The Court notes that section I.G of the Student Code provides that its provisions "are not to be regarded as a contract between the student and the University."

college or university is guaranteed procedural due process under the Fourteenth Amendment of the United States Constitution.  See *Gorman*, 837 F.2d at 12.

The University of Massachusetts at Amherst is a public university.  Therefore, Kuntz's due process rights are constitutionally protected and any claims of a violation of those rights are appropriately filed pursuant to 42 U.S.C. § 1983 and parallel state provisions.  Accordingly, the so-called breaches of contract, i.e. breaches of the Student Code, alleged in this complaint are unavailing.  Because Kuntz attended a publicly funded university, the Court concludes that no contractual relationship existed between Kuntz and the University for purposes of ensuring adherence to the Student Code.  Where there is no contract, there can be no implied promise of good faith and fair dealing.  See *Anthony's Pier Four, Inc.* v. *HBC Associates*, 411 Mass 451, 471 (1991).  Accordingly, Count III of the complaint will be dismissed.

## CONCLUSION

For the reasons stated herein, the Defendants' Motion to Dismiss is **ALLOWED.**  The complaint is hereby **ORDERED** dismissed.

Bertha D. Josephson
Justice of the Superior Court

Dated:  4|1|14

12