# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-12077-WGY |
| | ) | |
| UNIVERSITY OF MASSACHUSETTS, | ) | |
| TRUSTEES OF THE UNIVERSITY OF | ) | |
| MASSACHUSETTS, HANNAH MONBLEAU, | ) | |
| in her official and individual capacities, | ) | |
| KATE LEGEE, in her official and individual | ) | |
| capacities, ESMERALDA LEVESQUE, a/k/a | ) | |
| ESMERALDA MENDEZ, in her official and | ) | |
| individual capacities, ADAM DUNBAR, in his | ) | |
| official and individual capacities, | ) | |
| BRETT SOKOLOW, | ) | |
| Defendants. | ) | |

## PLAINTIFF'S TRIAL BRIEF

The University of Massachusetts stated that it had found Plaintiff responsible for sexual misconduct under its Student Conduct Code based on three instances of pure speech and two instances of expressive conduct over the span of a year.

On the basis of this speech and expressive conduct, the University of Massachusetts terminated Plaintiff from his job as a residential advisor and trespassed Plaintiff from living in or entering university housing under threat of police force, for the stated purpose that "further comments of this nature can be prevented from impacting other students in the residential community." The University of Massachusetts also required Plaintiff to demonstrate through an approved research and

training course that he "has learned appropriate ways to interact with others in conversations related to sex" before Plaintiff is allowed to sign up for his spring semester classes.

Well-settled principles of First Amendment law prohibit state universities from taking adverse action to prevent their adult students from having non-obscene conversations related to sex in informal settings. It is also well settled that the use of police power to deny the plaintiffs their constitutional right to engage in protected activity constitutes interference with First Amendment rights by threats, intimidation and coercion. Therefore, all University Defendants infringed on Doe's First Amendment rights in violation of 42 U.S.C. § 1983 and interfered with Doe's First Amendment rights by threats, intimidation and coercion.

## FACTS

On May 6, 2023, Plaintiff John Doe, a UMass Lowell graduate student and resident advisor, encountered several of his coworkers and their friends drinking and making noise in his residence hall in violation of the UMass Lowell Student Conduct Code. *See* Ex. [1] 11 at 13; Ex. 1 at 5. On May 7, 2023, several female coworkers accused Plaintiff of sexual misconduct. *See* Stip. Facts, ¶ 13.

---

[1] "Ex." Refers to the exhibits identified on the Joint Exhibit List submitted with the Joint Pretrial Memorandum, see Dkt. 31-2, copies of which will be delivered to the Court at the Case Stated Hearing.

Title IX regulations define sexual harassment and prescribe procedures for adjudicating complaints of sexual harassment, *see* 34 C.F.R. § 106.30(a), 34 C.F.R. § 106.45, but "Title IX is not the exclusive remedy for sexual misconduct" and "nothing in the final [Title IX] regulations precludes recipients from vigorously addressing misconduct (sexual or otherwise) that occurs outside the scope of Title IX." *See* 85 Fed. Reg. 30,026, 30,199 (May 19, 2020).

UMass Lowell has a Title IX Sexual Harassment Grievance Procedure (Title IX Procedure), which governs the conduct of its students. Stip. Facts, ¶ 6; Ex. 3. UMass Lowell UMass Lowell has a Student Conduct Code, which also governs the conduct of its students. Stip. Facts, ¶ 5; Ex. 2. The Title IX Procedure and the Student Conduct Code use two separate terms, a) "Title IX Sexual Harassment," *see* Ex. 3 at 4, and b) "Non-Title IX Sexual Misconduct," *see* Ex. 2 at 6-7, to define nearly-identical conduct.

Title IX Sexual Harassment is defined by the Title IX Procedure, in relevant part, as "conduct on the basis of sex that satisfies one or more of the following:

> i) An employee of the university conditioning the provision of an aid, benefit, or service of the university on an individual's participation in unwelcome sexual conduct;
> ii) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that effectively denies a person equal access to the university's education program or activity. . ."

Ex. 3 at 4

Non-Title IX Sexual Misconduct is defined by the Student Conduct Code as "unwelcomed conduct of a sexual nature when:

1. submission to or rejection of such conduct by a person or persons is used as a basis for employment or educational decisions affecting such person or persons, or participation in University programs or activities; or 2. such conduct unreasonably: interferes with a person or person's work or academic performance; interferes with or limits a person or person's ability to participate in or benefit from a work or academic program or activity; or creates an intimidating, hostile, or offensive working or academic environment.

Ex. 2 at 6-7

The only substantive difference between the definitions of Title IX Sexual Harassment and Non-Title IX Sexual Misconduct is that the latter does not require the conduct to be "severe, pervasive, and objectively offensive." *Compare* Ex. 2 at 6-7, *with*, Ex. 3 at 4.

On August 22, 2023, a Student Conduct Hearing Panel of three University administrators acting on behalf of the University (Doe Hearing Panel) found Plaintiff responsible for sexual misconduct as a result of five separate incidents alleged by four individual female coworker resident advisors, J.T., C.T., S.K., and G.D. *See* Ex. 1 at 4-5. The Hearing Panel found:

a.   Plaintiff said to female student S.K.: "I don't need someone to have sex with." *Id.* at 6.

b.   Plaintiff was "saying the word sex while talking about food" with female student C.T. *Id.*

c.   Plaintiff said to female student G.D, in order to "compare unwanted sexual conduct to religious proselytism in conversation and mean[ing] to

do so in disagreement with both" practices: "what if I stuck my penis in your face?" *Id.*

d.    Plaintiff approached female student J.T. to "hug her without asking until his arms were outstretched and she felt obligated to engage." *Id.*

e.    While female student J.T. was on Plaintiff's "shaker plate" exercise equipment, Plaintiff "moved her feet on the shaker plate, and did so with his own feet" without "any conversation asking for consent." *Id.*

The Hearing Panel did not find that Doe had committed any of the other conduct alleged by the complainants and witnesses. *Id.* During the investigation Doe denied all of the other conduct alleged by the complainants and witnesses. *Ex.* 11 at 13-15. Doe denied saying to female student S.K.: "I don't need someone to have sex with." *Id.* at 14. Doe denied comparing Jehovah's witnesses to sticking his penis in [G.D.]'s face, and stated that he made a "comparison of unwanted sexual conduct with unwanted religious proselytism" when speaking with G.D. Ex. 11 at 21; Ex. 12 at 5-6. Doe denied stretching his hands out for hugs without asking J.T. Ex. 12 at 3. 51.  Doe sent Monbleau a Valentine's Day card that J.T. had made for him, which featured two stick figures labeled [Doe] and [J.T.] appearing to approach each other with arms outstretched for a hug. Ex. 11 at 48.

As a consequence of the sexual misconduct finding against Plaintiff, the Hearing Panel severely disciplined, retaliated, and otherwise took adverse action against him.

Plaintiff was placed on Elevated Probation status until graduation, with any further misconduct resulting in "suspension, or expulsion from the University." This status will remain part of Plaintiff's "disciplinary record for seven years after completion of all sanctions, and is reported to inquiring parties when background checks are conducted." Ex. 1 at 7.

Plaintiff was evicted from his dormitory housing. He was trespassed "from entering any UMass Lowell Residence Halls, with the exception of" two dining areas. Plaintiff was told that "UMass Lowell Police have been notified of this status, and any attempt to enter the residence halls will result in future action through the University Conduct Process." *Id.* According to the Doe Hearing Panel, Plaintiff was restricted from residence halls because "[b]y separating [Plaintiff] from university housing, further comments of this nature can be prevented from impacting other students in the residential community." *Id.* Plaintiff was required to "engage in research of and completion of an approved consent training required prior to registering for future classes." *Id.*

## ARGUMENT

## I.  COUNT I: DEPRIVATION OF FIRST AMENDMENT RIGHTS UNDER COLOR OF STATE LAW IN VIOLATION OF 42 U.S.C. § 1983 AND THE FOURTEENTH AMENDMENT

In order to succeed on the merits of a First Amendment retaliation claim, a plaintiff must "prove that (1) he or she engaged in constitutionally protected conduct,

(2) he or she was subjected to an adverse action by the defendant, and (3) the protected

conduct was a substantial or motivating factor in the adverse action." *See D.B. v.*

*Esposito*, 675 F.3d 26, 43 (1st Cir. 2012).

> **A.    A. Plaintiff's Non-Obscene Comments and Conversations About and Related to Sex are Protected as Speech on a Matter of Public Concern**

[I]t is a highly appropriate function of [elementary and secondary] public school

education to prohibit the use of vulgar and offensive terms in public discourse. *Bethel*

*Sch. Dist. v. Fraser*, 478 U.S. 675, 683, 106 S. Ct. 3159, 3164 (1986). The constitutional

rights of "children in a public school . . . are not automatically coextensive with the

rights of adults in other settings," such as public universities. *Fraser*, 478 U.S. at 682

("[T]he First Amendment gives a high school student the classroom right to wear

Tinker's armband, but not Cohen's jacket.") (citation omitted).

In considerable contrast to the function of elementary and secondary public

schools, a state university's ability lawfully to restrict the content of speech on campus

extends only to its authority, "consistent with fundamental constitutional safeguards, to

prescribe and control conduct in the schools." *See Healy v. James*, 408 U.S. 169, 180 (1972)

(*citing Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 507 (1969)

(quotation marks omitted).). Those constitutional safeguards, nevertheless, may not

apply with "less force on college campuses than in the community at large." *Healy*, 408

U.S. 1at 180. "A university differs in significant respects from public forums such as

streets or parks or even municipal theaters," in the sense that it does not need to make

its "facilities equally available to students and nonstudents alike." *Widmar v. Vincent*,

454 U.S. 263, 268-269 (1981). Yet "with respect to persons entitled to be there," Supreme

Court cases "leave no doubt that the First Amendment rights of speech and association

extend to the campuses of state universities." *See id*. *See also Healy*, 408 U.S. at 180-81

("[T]he college classroom with its surrounding environs is peculiarly the marketplace of

ideas."); *Gay Students Org. of Univ. of N.H. v. Bonner*, 509 F.2d 652, 658 (1st Cir. 1974)

("[T]he First Amendment applies with full vigor on the campuses of state

universities.").

 The Puritan sexual norms of Massachusetts remain in the State's past for now;

and across all the United States, "[t]he First Amendment guarantees wide freedom in

matters of adult public discourse." *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 682 (1986).

While "obscenity is not protected by the freedoms of speech and press[,] . . . sex and

obscenity are not synonymous." *Roth v. United States*, 354 U.S. 476, 481, 487 (1957). *See*

*also Erznoznik v. Jacksonville,* 422 U.S. 205, 213 (1975) ("Clearly all nudity cannot be

deemed obscene. . ."). "Sex, a great and mysterious motive force in human life, has

indisputably been a subject of absorbing interest to mankind through the ages; it is one

of the vital problems of human interest and public concern." *Roth*, 354 U.S. at 481, 487

(1957). While sexual obscenity may be unprotected by the First Amendment, non-

obscene comments and conversations among adults about or related to sex are entitled

to the heightened protections of the First Amendment for speech related to "matters of public concern." *Id.* at 487 n.20, 488 (1957) (defining sexual obscenity as expression "having a tendency to excite lustful thoughts").

Unlike an elementary or secondary public school, a state university may not prohibit vulgar and offensive pure speech, but only may prohibit "actions which 'materially and substantially disrupt the work and the discipline of the school,' such as "overt sexual activity." *See Bonner*, 509 F.2d at 663. State universities also may only prohibit "[a]ssociational activities," as opposed to pure speech, that "substantially interfere with the opportunity of other students to obtain an education." *See Healey*, 408 U.S. at 189.

It is well-established in the First Circuit, that public universities may not prohibit or take adverse action against students for expressing personal "thoughts and feelings concerning sexuality and sexual roles" to other students "in an informal atmosphere" outside of the classroom. *See Gay Students Org. of Univ. of N.H. v. Bonner*, 509 F.2d 652, 661, 654 n.1 (1st Cir. 1974) (protecting expressive activity that "educate[s] the public about bisexuality and homosexuality"). This is true even if the expressed "sexual values [are] in direct conflict with the deeply imbued moral standards of much of the community whose taxes support the university." *Id.* at 658. Even the profane four-letter epithet for sex may not be banned from "the public vocabulary," merely because it may be extremely offensive or unwelcome to some. *Cohen v. California*, 403 U.S. 15, 15 (1971).

"Whatever else may be necessary to give rise to the States' broader power to prohibit obscene expression, such expression must be, in some significant way, erotic." *Id.* at 20.

None of the three statements related to sex that Plaintiff allegedly made to three separate female students was obscene or had "a tendency to excite lustful thoughts." *Cf. Roth*, *357 U.S.* at 487 n.20. *See also Fraser*, 478 U.S. at 682; *Cohen* 403 U.S. at 20. Indeed, Plaintiff's statement, "I don't need to someone to have sex with," to female student S.K. would seem to be precisely the opposite. *Cf.* Ex. 1 at 6. As an expression of Plaintiff's "thoughts and feelings concerning sexuality and sexual roles" to another student "in an informal atmosphere," it is well-established that such a statement is protected. *Cf. Bonner*, 509 F.2d 652, 661, 654 n.1 (1st Cir. 1974). Using the anodyne "word sex while talking about food," *cf.* Ex. 1 at 6 is also protected speech, *Cf. Cohen*, 403 U.S. at 20 (1971) Indeed, the University of Massachusetts may not take adverse action against Plaintiff for using any particular word in "the public vocabulary" while talking about any "one of the vital problems of human interest and public concern." *Cf. id.* at 22-23.

Like sex, religion is indisputably one of the vital problems of public concern. *See, e.g.*, *Shurtleff v. City of Boston*, 596 U.S. 243 (2022) (finding that religious viewpoint discrimination abridged freedom of speech). The Doe Hearing Panel found that Plaintiff was having a discussion about religion with female student G.D., in which he "compare[d] unwanted sexual conduct to religious proselytism in conversation and

meant to do so in disagreement with both" by making the statement: "what if I stuck

my penis in your face?" *See* Ex. 1 at 6.

In the context of a true unwanted sexual advance, such a statement indeed may

seem to be an obscene sexual advance intended to excite lustful thoughts in the

recipient. *Cf. Fraser*, 478 U.S. at 682; *Cohen* 403 U.S. at 20; *Roth*, 357 U.S. at 487 n.20.

However, in the context of a college dorm room debate about religious proselytism, the

statement was a rhetorical question in an appeal to pathos. *See* Ex. 1 at 6. Like the "f**k

the draft" statement in Cohen, 403 U.S. at 15, "[i]t cannot plausibly be maintained that

this vulgar allusion to [religious proselytism] would conjure up such psychic

stimulation in" G.D. as to make the allusion obscene. *Cf. Cohen*, 403 U.S. at 20. Merely

"shocking and offensive" statements, even those related to sex, are protected. *See*

*Bonner*, 509 F.2d at 661. *See also Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (protecting

"outrageous" speech about homosexuality); *Cohen*, 403 U.S. at 21. "Speech is often

provocative and challenging. It may strike at prejudices and preconceptions and have

profound unsettling effects as it presses for acceptance of an idea." *Terminiello v.*

*Chicago*, 337 U.S. 1, 4 (1949) "[T]he Constitution does not permit government to decide

which types of otherwise protected speech are sufficiently offensive to require

protection for the unwilling listener or viewer." *Erznoznik*, 422 U.S. at 210-211. The

University of Massachusetts may not take adverse action against Plaintiff for posing

provocative rhetorical questions in a college dorm room bull session about religion. *Cf.*

*Erznoznik*, 422 U.S. at 210-211; *Terminiello*, 337 U.S. at 4.

Plaintiff's alleged statement, "I don't need to someone to have sex with," to

female student S.K. was protected as an expression of Plaintiff's "thoughts and feelings

concerning sexuality and sexual roles" to another student "in an informal atmosphere,"

*cf. Bonner*, 509 F.2d 652, 661, 654 n.1 (1st Cir. 1974), which did not have "a tendency to

excite lustful thoughts." *Cf. Roth, 357 U.S.* at 487 n.20. *See also Fraser*, 478 U.S. at 682;

*Cohen* 403 U.S. at 20.

Plaintiff's alleged use of the "word sex while talking about food" is protected

under the First Amendment because Defendants may not take adverse action against

Plaintiff for using any particular word in "the public vocabulary" while talking about

any "one of the vital problems of human interest and public concern." *Cf. Cohen*, 403

U.S. at 20, at 22-23 (1971)

Plaintiff's alleged comparison of unwanted sexual conduct to religious

proselytism, while intending to express disagreement with both, using the statement:

"what if I stuck my penis in your face?", was protected under the First Amendment as

"provocative and challenging" speech used to "press[] for acceptance of an idea."

*Erznoznik v. Jacksonville*, 422 U.S. 205, 210-211 (1975). The University of Massachusetts

may not take adverse action against Plaintiff for posing provocative rhetorical questions

in a college dorm room bull session about religion. *Cf. Erznoznik*, 422 U.S. at 210-211;

*Terminiello*, 337 U.S. at 4.

**B.**     **Plaintiff's Communicative Conduct Was Protected Because it Was Non-Sexual and Sufficiently Imbued with Elements of Communication**

The First Amendment protects conduct "sufficiently imbued with elements of communication." *See Texas v. Johnson*, 491 U.S. 397, 404 (1989). "In deciding whether conduct deserves First Amendment protection, [courts] ask both whether it was 'intended to be communicative' and whether it, 'in context, would reasonably be understood by the viewer to be communicative.'" *Hernández-Gotay v. United States*, 985 F.3d 71, 80 (1st Cir. 2021) (*quoting Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984).). "It is the duty of the party seeking to engage in allegedly expressive conduct to demonstrate that the First Amendment applies to that conduct." *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 49 (1st Cir. 2005).

As defined in Merriam-Webster Dictionary, the human gesture of "open arms" is universally understood to communicate "an eager or warm welcome," instead of an obscene request to engage in erotic conduct. Plaintiff's alleged greeting of J.T. with his "arms . . . outstretched," *cf.* Ex. 1 at 6; Comp. at ¶ 164(c)—as distinct from the accomplished physical contact of an actual unconsented-to hug—is a purely communicative act. *Cf.* Cohen, 403 U.S. at 18 ("The only 'conduct' which the State sought to punish is the fact of communication."). *See also* Donna M. Goldstein & Kira Hall, *Darwin's hug: Ideologies of gesture in the science of human exceptionalism*, 11 HAU:

Journal of Ethnographic Theory 693, 694 (2021) ("[T]he movement made to request a hug would be classified as a gesture but not the movement that realizes this request.").

To the extent that J.T. was offended by Plaintiff's alleged open arms gesture, the University of Massachusetts may not take adverse action against Plaintiff to shield J.T. from such purely communicative acts. *Cf. Phelps*, 562 U.S. at 459; *Erznoznik*, 422 U.S. at 210-211; *Cohen*, 403 U.S. at 18. Whatever she may have "felt," J.T. was not, as she complained, "obligated to engage" in a hug with Plaintiff by any explicit or implicit quid pro quo. *Cf.* Ex. 1. at 6; Comp. at 164(c). She could have informed Plaintiff that a hug would be unwelcome or simply given him the cold shoulder. Lastly, hugs themselves are not inherently sexual activity. *Cf. Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 610 (D. Mass. 2016) (finding that it is a broad generalization to characterize "kissing [a]s sexual activity").

Plaintiff's conduct of "moving [J.T.'s] feet . . . with his own feet" in order to "move her feet on [Plaintiff's] shaker plate" exercise equipment also was intended to be non-sexually communicative, and had been understood by J.T. as such. *See* Ex. 1. at 6; Comp. at 164(d). *Cf. Hernández-Gotay*, 985 F.3d at 80. J.T. "stated in her interview with the investigator as well as in the hearing panel" during Plaintiff's disciplinary process that she understood Plaintiff's intent in making foot-to-foot contact with her was "to place her feet on the shaker plate." *See* Ex. 1 at 5; *Hernández-Gotay, supra.*

Of course, "a physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment." *See Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993). At the same time, in Massachusetts, like in many other states, "[p]layers, when they engage in sport, agree to undergo some physical contacts which could amount to assault and battery absent the players' consent." *See Gauvin v. Clark*, 404 Mass. 450, 454 (1989)  (*citing* Restatement (Second) of Torts § 50 comment b (1965).).This is true of contact or non-contact sports. *See Gray v. Giroux*, 49 Mass. App. Ct. 436, 439 (2000). *See also Johnson v. Verizon New Eng., Inc.*, 23 Mass. L. Rep. 40, 2007 Mass. Super. LEXIS 333 at *12 (Mass. Worcester Cty. Super. Ct. 2007) (and cases cited) ("The standard of care in recreational activities is willful, wanton, or reckless even when those activities do not have definable rules or customs recognized by the greater community."). Plaintiff's communicative conduct of making foot-to-foot contact with J.T. in order to "to place her feet on the shaker plate" was neither sexual nor reckless. *Cf. Gray*, 49 Mass. App. Ct. at 439. There was no "conversation asking for consent" to do so because, in the recreational activity context, J.T. agreed to potential physical contact by participating in using Plaintiff's exercise machine. *Cf. Gauvin*, 404 Mass. at 454.

It was unreasonable for the Defendants to punish Plaintiff for a non-sexual hug gesture pursuant to the Non-Title IX Sexual Misconduct definition. The Defendants may not take adverse action against Plaintiff to shield J.T. from such non-sexual communicative acts. *Cf. Cohen*, 403 U.S. at 18. Plaintiff's communicative conduct of

making foot-to-foot contact with J.T. in order to to place her feet on the shaker plate was not sexual in nature or related to sex. It was unreasonable for the Defendants to punish Plaintiff for non-sexual sports-related physical contact pursuant to the Non-Title IX Sexual Misconduct definition.

A public university may not take discipline against a student for speech related to sex that is not "severe, pervasive, and objectively offensive." *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 652 (1999). In *Davis*, 526 U.S. at 667, Justice Kennedy and three other Justices dissented from Court's holding that a private damages action under Title IX of the Education Amendments of 1973 may lie against the school board in cases of student-on-student harassment. The *Davis* dissent predicted precisely the situation that Doe finds himself now as a consequence of the majority's ruling:

> A university's power to discipline its students for speech that may constitute sexual harassment is also circumscribed by the First Amendment. At the college level, the majority's holding is sure to add fuel to the debate over campus speech codes that, in the name of preventing a hostile educational environment, may infringe students' First Amendment rights. See supra, at 14. Indeed, under the majority's control principle, schools presumably will be responsible for remedying conduct that occurs even in student dormitory rooms. As a result, schools may well be forced to apply workplace norms in the most private of domains.").

*Davis*, 526 U.S. at 667 (Kennedy, J., dissenting).

The majority assured the dissenting justices that this would never happen because the "severe, pervasive, and objectively offensive" standard for liability set out in Davis:

is sufficiently flexible to account both for the level of disciplinary authority available to the school and for the potential liability arising from certain forms of disciplinary action. A university might not, for example, be expected to exercise the same degree of control over its students that a grade school would enjoy, see post, at 14, and it would be entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims.")

*Id.* at 652.

Defendants admit in their Trial Brief that "[s]exual misconduct, as defined in the Student Conduct Code, does not require the conduct to be 'severe, pervasive, and objectively offensive.'" Defendants disciplined Plaintiff pursuant to the Student Conduct Code instead of the Title IX Procedure, which necessarily means they concluded that plaintiff's speech related to sex does not meet Title IX's definition of sexual harassment because it was not "severe, pervasive, and objectively offensive."

Because Defendants concluded that Plaintiff's dormitory room speech related to sex and non-sexual expressive conduct was not "severe, pervasive, and objectively offensive," Defendants had no power under the First Amendment to discipline Plaintiff for his speech in "student dormitory rooms." *See Davis*, 526 U.S. at 652. Because Defendants concluded that Plaintiff's dormitory room speech related to sex was not "severe, pervasive, and objectively offensive," it was unreasonable for the Hearing Panel to conclude that the speech substantially disrupted the University's operations, that the speech interfered with the rights of other RAs to be secure and to be left alone, or that the speech was offensive.

Because Plaintiff's non-obscene comments related to sex are constitutionally protected speech; because his "open arm" gestures are constitutionally protected communicative conduct; and because his communicative foot-to-foot contact with J.T. was in the context of recreational activity; Plaintiff is likely to prove that he engaged in constitutionally protected conduct. *Cf. Esposito*, 675 F.3d at 43. Because the University of Massachusetts put Plaintiff on elevated probation status in retaliation for this conduct, and separated Plaintiff from university housing to prevent this conduct "from impacting other students in the residential community," *see* Ex. B. at 7, Plaintiff is likely to prove that he was subjected to an adverse action by the University of Massachusetts, and that the protected conduct was a substantial or motivating factor in the adverse action." *Cf. Esposito*, 675 F.3d at 43.

For the reasons stated above, Doe engaged in constitutionally protected conduct, the Defendants punished him for it, and the protected conduct was a substantial or motivating factor in the punishment. Therefore, all University Defendants infringed on Doe's First Amendment rights in violation of 42 U.S.C. § 1983. The Court should grant the prospective injunctive relief in Count I as to the University and as to Monbleau, Legee, Levesque, and Dunbar in their official capacities by ordering Defendants University of Massachusetts and Trustees of the University of Massachusetts to remove Plaintiff from elevated probationary student conduct status, and to reinstate his room and board at the University of Massachusetts campus in Lowell, Massachusetts (UMass

Lowell. The Court should grant the prospective injunctive relief in Count I as to the

University and as to Monbleau, Legee, Levesque, and Dunbar in their official capacities

by enjoining the Defendants from reporting its finding of sexual misconduct by Plaintiff

to any inquiring parties when background checks are conducted, and from requiring

Plaintiff to complete "consent training" prior to registering for future classes.

> **C.    Defendants Monbleau, Legee, Dunbar, and Mendez are Not Protected by
> Qualified Immunity Because Plaintiff's Rights to Speech and Expressive
> Activity Related to Sex Were Clearly Established Fifty Years Ago**

The doctrine of "qualified immunity 'protects all but the plainly incompetent or

those who knowingly violate the law.'" *Diaz-Bigio v. Santini*, 652 F.3d 45, 50 (1st Cir.

2011) (*quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). There is a two-prong analysis

to determine whether defendants are entitled to qualified immunity. First, courts ask

"whether the facts alleged or shown by the plaintiff make out a violation of a

constitutional right." *Id.* Second, courts ask "whether the right was 'clearly established'

at the time of the defendant's alleged violation." *Id.* (*quoting Pearson v. Callahan*, 555 U.S.

223, 269 (2009)).

To determine whether the right was clearly established, courts must find that

"the right allegedly violated must be established,  not as a broad general proposition,

but in a particularized sense so that the contours of the right are clear to a reasonable

official. In other words, "existing precedent must have placed the statutory or

constitutional question beyond debate." *See Reichle v. Howards*, 566 U.S. 658, 664-65

(2012) (internal citations and quotation marks omitted) (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam).).

"Official reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of the protected right, and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (internal citations and quotation marks omitted) (*quoting* Crawford-El v. Britton, 523 U.S. 574, 588, n. 10 (1998) (*citing Perry v. Sindermann*, 408 U.S. 593, 597, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972) (noting that the government may not punish a person or deprive him of a benefit on the basis of his "constitutionally protected speech").).

As set forth above, Doe has shown that Defendants punished him on the basis of his constitutionally protected speech and expressive conduct, constituting personal thoughts and feelings concerning sexuality and sexual roles, to other students in an informal atmosphere outside of the classroom. *See Bonner*, 509 F.2d at 661, 654 n.1.

Half-century-old First Circuit precedent clearly establishes and places it beyond debate that public universities may not prohibit or take adverse action against students specifically for expressing personal "thoughts and feelings concerning sexuality and sexual roles" to other students "in an informal atmosphere" outside of the classroom. *See id.* (protecting expressive activity, such as dance functions, that "educate the public about bisexuality and homosexuality"). See also *Papish v. Board of Curators*, 410 U.S. 667,

(1973); *Healy v. James*, 408 U.S. 169 (1972); *Cohen v. California*, 403 U.S. 15 (1971); *Roth v. United States*, 354 U.S. 476 (1957); *Norris v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020).

Monbleau, Legee, Levesqu, and Dunbar therefore are not entitled to qualified immunity from Doe's claim for damages based on violations of 42. U.S.C. § 1983, and are liable to Doe for damages and attorney fees in an amount to be adduced at an evidentiary hearing.

## II.   COUNT III VIOLATION OF MASSACHUSETTS CIVIL RIGHTS ACT, M.G.L. c. 12, §§ 11H-11

"To establish a claim under the [MCRA] the plaintiffs must prove that (1) their exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'" *Reprod. Rights Network v. President of Univ. of Mass.*, 45 699 N.E.2d 829, 837 (1998) (*quoting Swanset Dev. Corp. v. Taunton*, 668 N.E.2d 333 (1996) (citations omitted).).

The use of police force to interfere with "with [a student's] right to use University facilities on the basis of the content or viewpoint of the [student's] message," is sufficient intimidation or coercion to satisfy the MCRA. *See President of Univ. of Mass.*, 699 N.E.2d at 834 (1998) By separating and trespassing Doe from university housing in order to prevent Plaintiff's speech from impacting "other students in the residential

community," as well as by telling Doe that "UMass Lowell Police have been notified of this status," Monbleau, Legee, Levesque, and Dunbar interfered with Doe's right to use University facilities on the basis of the content or viewpoint of his message with threats, intimidation, and coercion in violation of the MCRA. *Cf. id.*

"The qualified immunity principles developed under § 1983 apply equally to claims under the MCRA." *Howcroft*, 51 Mass. App. Ct. at 595. (*citing Duarte v. Healy*, 405 Mass. 43, 46–48, 537 N.E.2d 1230 (1989)). *President of Univ. of Mass.*, 699 N.E.2d at 838, which dealt with speech of a sexual nature because the speech was related to "abortion rights, AIDS education in public schools, and gay and lesbian rights," as well as *Batchelder*, 473 N.E.2d at 1131, clearly establish for "University of Massachusetts officials" in particular, and place it beyond debate that the University of Massachusetts may not "police power . . . to deny the plaintiffs their constitutional right to engage in protected political activity." *President of Univ. of Mass.*, 699 N.E.2d at 834 ("Other public universities have had to contend with First Amendment challenges and it is likely that University of Massachusetts officials may do so in the future."). Monbleau, Legee, Levesque, and Dunbar are not entitled to qualified immunity under the MCRA, and are liable to Doe for damages and attorney fees in an amount to be adduced at an evidentiary hearing.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter judgment in their favor on Counts I, III, and IV.

DATED: February 1, 2023

Respectfully submitted,
John Doe,
By his Attorney,

_____
Ilya I. Feoktistov, Esq.
B.B.O. No. 704458
LAW OFFICE OF ILYA FEOKTISTOV
292 Newbury Street, No. 544
Boston, MA 02115
(617) 462-7938
if@ilyafeoktistov.com

## SERVICE CERTIFICATE

I, Ilya Feoktistov, counsel for Plaintiff John Doe in the above-captioned matter, hereby certify that on February 1, 2023, I served a true and accurate copy of the foregoing document on the parties of record by filing electronically.

_____
Ilya I. Feoktistov, Esq.