UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
JOHN DOE,                     )
                              )
              Plaintiff,      )
                              )        CIVIL ACTION
v.                            )        No. 23-12077-WGY
                              )
UNIVERSITY OF MASSACHUSETTS,  )
TRUSTEES OF THE UNIVERSITY OF )
MASSACHUSETTS, HANNAH MONBLEAU,)
KATE LEGEE, ADAM DUNBAR, and  )
ESMERALDA LEVESQUE,           )
                              )
              Defendants.     )
_____)
```

YOUNG, D.J.                                    April 9, 2024

**FINDINGS OF FACT, RULINGS OF LAW, AND ORDER FOR JUDGMENT**

**I.   BACKGROUND**

Public universities are necessarily loci of unpopular
opinions that add to the educational discourse.  At the same
time, public universities have an obligation to protect their
students from other students' misconduct that disrupts or
interferes with the operations of the university or rights of
others.  The Supreme Court in <u>Tinker</u> v. <u>Des Moines Independent
Community School District</u>, 393 U.S. 503, 507 (1969) recognizes
that issues inevitably arise where "the exercise of First
Amendment rights collide with the rules of the school
authorities" and, as discussed in more detail below, instructs

the district courts -- this Court -- not to act as an appellate court, but rather to defer to "reasonable" actions by public school officials in carrying out their difficult charge.  See id.

In this action, John Doe ("Doe")[1] a graduate student and resident advisor ("RA") was disciplined by the University of Massachusetts ("UMass Lowell") for violation of its Student Conduct Code for what it deemed was Doe's sexual misconduct. UMass Lowell employee Hanna Monbleau ("Monbleau") investigated complaints by four RAs (also students) which uncovered other misconduct.  A hearing panel comprised of UMass Lowell employees Kate Legee ("Legee"), Adam Dunbar ("Dunbar"), and Esmeralda Levesque ("Levesque") (Monbleau, Legee, Dunbar, and Levesque are collectively the "Individual Defendants") held a hearing -- that Doe chose not to attend -- and found that Doe had engaged in a pattern of conduct towards female students that violated the Student Conduct Code.  Doe was not expelled, but banned from campus housing, ordered to stay away from the victims, and required to complete a remedial behavior class before continuing his classes.  Doe filed this lawsuit.

On November 20, 2023, the Court, as is its practice, collapsed Doe's motion for a preliminary injunction against

---

[1] Plaintiff is proceeding by pseudonym.

Legee, ECF No. 20, with a trial on the merits pursuant to Rule
65 of the Federal Rules of Civil Procedure.  See Electronic
Clerk's Notes, ECF No. 25.  On November 28, 2023, UMass Lowell,
Trustees of UMass Lowell (the "Trustees"), and the Individual
Defendants (collectively, the "University Defendants") filed
their answer to the complaint, raising affirmative defenses,
including qualified immunity and sovereign immunity.  Answer,
ECF No. 26.

On December 18, 2023, the parties agreed in their pretrial
memorandum, Pretrial Mem., ECF No. 31, to proceed case stated,
filing a joint statement of stipulated facts, Stipulated Facts
("Stip. Facts"), ECF No. 31-1, and joint exhibit list, Joint Ex.
List ("Ex."), ECF No. 31-2.  The University Defendants filed a
trial brief, Univ. Defs.' Trial Br., ECF No. 35, and a proposed
findings of fact and conclusions of law, University Defs.'
Proposed Findings of Fact & Conclusions of Law, ECF No. 36.
Similarly, Doe filed a trial brief, Doe's Trial Br., ECF No. 39,
and proposed findings of fact and conclusions of law, Pl.'s
Proposed Findings of Fact & Conclusions of Law, ECF No. 38.

Doe dismissed count II (Title IX) by a purported notice of
voluntary dismissal, Pl.'s Notice of Voluntary Dismissal of
Count II, ECF No. 33,[2] and dismissed count IV (Breach of

---

[2] Doe does not have the right voluntarily to dismiss a count
without prejudice, as here, after an answer has been served.

Contract) at the case stated hearing held on February 5, 2024, after which the Court took the matter under advisement.  See Electronic Clerk's Notes, ECF No. 41.

What remains of Doe's original complaint, Compl., ECF No. 1, are two counts against UMass Lowell, the Trustees, and the Individual Defendants for monetary and equitable relief based on: (1) a claim for First Amendment retaliation under 42 U.S.C. § 1983 (count I) (the "Section 1983 Claim"); and (2) a claim under the Massachusetts Civil Rights Act (the "MCRA"), Mass. Gen. Laws ch. 12, §§ 11H, 11I (count III) (the "MCRA Claim") (the Section 1983 and MCRA Claim are collectively the "Remaining Counts").  At the hearing, the Court admitted the agreed-upon exhibits into evidence and, also disputed exhibits B through V. Doe does not attack the Student Conduct Code itself under these counts.  See Compl.  Rather, Doe's claim is that his conduct was protected under the United States and Massachusetts' constitutions.

For the reasons stated below, the Court finds and rules that the University Defendants acted reasonably, and therefore

---

See Fed. R. Civ. P. 41(a)(1)(A)(i) (providing that a plaintiff may dismiss an action by filing "a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment" (emphasis added)).  At the hearing the parties proceeded on the basis that count II was dismissed.  The Court dismisses count II with prejudice.

judgment shall enter in favor of the University Defendants and against Doe.

## II.  FINDINGS OF FACT

The parties stipulated to, and the Court adopts and finds, the Joint Statement of Undisputed Facts, see Stip. Facts, which are recited almost verbatim and without quotations for ease of reference.  The Court also has considered exhibits 1 through 13, and disputed exhibits B through V (giving them such weight as they are due) as part of the record in this case-stated action.

### A.  The Parties

Doe is a male Indian national in a Ph.D. program at UMass Lowell.  Stip. Facts ¶ 1.  The defendant UMass Lowell is a public university established by the Commonwealth in Mass. Gen. Laws ch. 75, § 1 et seq.  Id. ¶ 2.  It receives federal funding for its education programs.  Id.

The defendant Trustees is the governing board of UMass Lowell.  Id. ¶ 3.  UMass Lowell has a campus in Lowell, Massachusetts.  Id. ¶ 4.  UMass Lowell has a Student Conduct Code.  Id. ¶ 5.  As part of that Student Conduct Code, sexual misconduct is defined as:

> Sexual misconduct: unwelcomed conduct of a sexual nature when: . . . such conduct unreasonably interferes with a person or person's work or academic performance; interferes with or limits a person or person's ability to participate in or benefit from a work or academic program or activity; or creates an intimidating, hostile, or offensive working or academic environment.

[5]

Student Conduct Code, Ex. 2.  UMass Lowell has a Sexual

Harassment Grievance Procedure.  Stip. Facts ¶ 6; see Sexual

Harassment Grievance Procedure, Ex. 3.

UMass Lowell employed defendant Monbleau as its Assistant

Director of Student Life and Well-Being, defendant Legee as its

Director of Student Conduct and Prevention, defendant Dunbar as

its Senior Associate Director of Student Affairs, and defendant

Levesque as its River Hawk Scholars Academy Coordinator.  Stip.

Facts ¶¶ 7-10.  Doe worked as an RA in a dormitory on campus.

Id. ¶ 11.

### B.   Doe's Purported Conduct and UMass Lowell's Investigation

On May 7, 2023, four female RAs J.T., C.T.Z., E.Z, and

E.H., met with their supervisor to report concerns about Doe.

Id. ¶ 12.  C.T.Z., J.T., and E.H. made formal complaints against

Doe.  Id. ¶ 13.

On May 19, 2023, Doe received letters from both the Student

Conduct Office and from a Deputy Title IX Coordinator.  Id.  On

May 19, 2023, UMass Lowell suspended Doe from his role as an RA.

Id. ¶ 14.  On May 22, 2023, it issued no-contact orders between

Doe and each of J.T., C.T.Z., E.Z, and E.H.  Id. ¶ 15.  UMass

Lowell assigned Monbleau to investigate the Doe case.  Id. ¶ 16.

E.Z. did not participate in the investigation.  Id. ¶ 17.

Monbleau interviewed E.H. on June 5, 2023.  Id. ¶ 18.  On June 5, 2023, Monbleau asked E.H. if there were witnesses E.H. would like Monbleau to interview.  Id. ¶ 19.  E.H. told Monbleau that she should interview S.K. as a witness.  Id. ¶ 20.

Monbleau interviewed C.T.Z. and J.T. on June 6, 2023.  Id. ¶ 21.  On June 5, 2023, Monbleau asked C.T. if there were witnesses C.T. would like Monbleau to interview.  Id. ¶ 22.  C.T told Monbleau that she should interview S.K. and G.D. as witnesses. Id. ¶ 23.

On June 6, 2023, Monbleau contacted Doe to schedule an interview.  Id. ¶ 24.

Monbleau interviewed S.K. as a witness on June 14, 2023. Id. ¶ 25.  UMass Lowell issued a no-contact order between Doe and S.K. on June 20, 2023.  Id. ¶ 26.  S.K. subsequently made a formal complaint against Doe.  Id. ¶ 27.

Monbleau interviewed Doe on June 23, 2023.  Id. ¶ 28.  On June 23, 2023, Monbleau asked Doe if there were witnesses Doe would like Monbleau to interview.  Id. ¶ 29.  Doe told Monbleau that she should interview A.M. as a witness.  Id. ¶ 30.

On June 26, 2023, Monbleau again asked Doe if there were other witnesses he would like her to interview or screenshots of messages he wanted to send her for inclusion in the report.  Id. ¶ 31.  Doe sent Monbleau various screenshots of messages and extended explanations of his interactions with the complainants,

which Monbleau included in the report.  Id. ¶ 32; see
Investigative Report, Ex. 10.

    Monbleau interviewed G.D. as a witness on June 27, 2023.
Stip. Facts ¶ 33.  Monbleau interviewed A.M. as a witness on
June 29, 2023.  Id. ¶ 34.  Monbleau wrote to Doe on June 30,
2023 to request a second interview.  Id. ¶ 35.  Monbleau
interviewed Doe for a second time on July 5, 2023.  Id. ¶ 36.

    UMass Lowell sent the Investigative Report, Ex. 11,
excluding its appendices, to Doe on July 11, 2023.  Stip. Facts
¶ 37.  In the Investigative Report, Monbleau recommended "to
move this case, per the Title IX Sexual Harassment Grievance
Procedure, to a hearing panel for a charge against [Mr. Doe] . .
. [of] Sexual Misconduct."  Id. ¶ 38.

    On July 12, 2023, Michael Coughlin, UMass Lowell's
Associate Director of Student Rights & Responsibilities,
notified Doe that his case would move to a "Title IX hearing
panel," scheduled for August 7, 2023, and that he "will need an
advisor to conduct cross-examination."  Id. ¶ 39.  On July 13,
2023, UMass Lowell notified Doe that his case would move to a
hearing panel scheduled for August 7, 2023.  Id. ¶ 40.

    On July 19, 2023, Doe notified UMass Lowell that he is
designating Attorney Ilya Feoktistov (Doe's counsel here) as his
"support person concerning this matter."  Id. ¶ 41.  UMass
Lowell sent the Investigative Report, including its appendices,

to Doe and Attorney Feoktistov on July 20, 2023.  Id. ¶ 42.  On
July 20, 2023, the University notified Doe and Attorney
Feoktistov that his case would move to a hearing panel under the
"Student Conduct process," scheduled for August 22, 2023, and
identified the members of the hearing panel.  Id. ¶ 43.

On July 28, 2023, UMass Lowell notified Doe and Attorney
Feoktistov of a change in the composition of the hearing panel,
which would consist of Legee, Dunbar, and Levesque.  Id. ¶ 44.

On July 30, 2023, Doe submitted a written response to the
Investigative Report.  Id. ¶ 45; see Doe's Response to
Investigative Report, Ex. 12.  On August 9, 2023, Legee notified
Doe and Attorney Feoktistov of the individuals anticipated to
attend the hearing panel.  Stip. Facts ¶ 46.

On August 16, 2023, UMass Lowell sent Doe and Attorney
Feoktistov a copy of Doe's response to the Investigative Report
and the investigator's response to Doe.  Id. ¶ 47.  On August
21, 2023, Attorney Feoktistov informed UMass Lowell that Doe
would not be attending the hearing.  Id. ¶ 48.

UMass Lowell convened a hearing panel on August 22, 2023 to
determine whether Doe was responsible for a violation of the
Student Conduct Code.  Id. ¶ 49.  Doe did not attend the hearing
panel.  Id. ¶ 50.  The complainants and a witness attended and
gave evidence to the panel.

On September 7, 2023, UMass Lowell notified Doe that the hearing panel found him responsible for sexual misconduct.  Id. ¶ 51.  The panel issued a written decision setting forth its findings, rationale, and the sanctions it imposed on Doe.  Id. ¶ 52; see Letter from Legee to Doe re Decision of Hearing Panel ("Hearing Panel's Decision"), Ex. 1.  The charge, material findings of fact, finding, and rationale are set forth in full here:

Alleged Violations:

Violation: Sexual Misconduct

Sexual Misconduct: unwelcomed conduct of a sexual nature when: submission to or rejection of such conduct by a person or persons is used as a basis for employment or educational decisions affecting such person or persons, or participation in University programs or activities; or such conduct unreasonably: interferes with a person or person's work or academic performance; interferes with or limits a person or person's ability to participate in or benefit from a work or academic program or activity; or creates an intimidating, hostile, or offensive working or academic environment.

Response: Respondent did not attend the hearing panel. The hearing panel considered Respondent's statements to the investigator as well as his July 30, 2023 written response to the investigation report in reaching its findings.

Hearing Panel Findings:

Charge: Sexual Misconduct

Material findings of fact:

During the investigation interviews, as well as in the hearing on August 22, 2023, the complainants and witness described respondent John Doe engaging in multiple

sexual comments and touches without consent or prior
warning. All complainants stated that the comments made
by John Doe were not welcome. John Doe['s] July 30,
2023 response to the investigation report indicates that
he agrees that many of the comments did occur with the
complainants and witness, all of whom he met as a student
in the residence halls. The following comments and
actions are confirmed as fact by all parties involved in
each incident: John Doe hugged female students, John Doe
stated to SK "I don't need to someone to have sex with,"
and John Doe['s] 'comparison of unwanted sexual conduct
with unwanted religious proselytism was provocative but
apt . . .' Further, multiple witnesses indicated that
John Doe moved JT['s] feet without consent. There were
discrepant reports about the specific comment about sex
while eating food and about the reference to shaving
pubes and testicles.

Witness GD stated that John Doe stated "what if I stuck
my penis in your face?" This statement, according to GD
in the hearing panel on August 22, 2023, caused her to
feel fear and confusion about John Doe['s] intent in the
moment. John Doe states that he did compare unwanted
sexual conduct to religious proselytism in this
conversation and meant to do so in disagreement with
both. In the hearing panel on August 22, 2023, GD stated
that this comment was not welcome.

CT stated in the hearing panel on August 22, 2023, that
when she did see KG and John Doe, she waved at them. In
his interview with the investigator, KG stated that "CT
came out and waved her hand and a wine bottle. It was
informal because they were on duty and he doesn't have
the relationship for them to do that. He just waved
back and told John Doe they're probably just enjoying
themselves." In his interview with the investigator,
John Doe stated that when he and KG saw CT, she waved
the wine bottle at them. In his response to the
investigation report, John Doe stated that CT told KG
that "I know you'll snitch on me." Witness CT stated in
the hearing panel on August 22, 2023 that she and other
students were, in fact, drinking on the night of May 6,
2023. She stated that she did not make any statements
to KG, nor John Doe related to not "snitching" on them.

In the hearing panel on August 22, 2023, as well as in
her interview with the investigator, CT stated that John

[11]

Doe told her "If the food is good, I'd have sex while eating." She did not welcome this comment. In his interview with the investigator, John Doe stated that he does not remember saying the word sex while talking about food, but that he may have done so. In his response to the investigation report, John Doe stated that CT may have misunderstood what he was saying in regard to food, and that he may have been speaking similar to the popular hashtag #foodporn.

JT stated in her interview with the investigator as well as in the hearing panel on August 22, 2023, that John Doe touched her legs with his hands, and possibly with his feet, without her consent to place her feet on the shaker plate. In his response to the investigator's report, John Doe stated that he used his feet to move her feet. This was confirmed by Witness DI in the investigator's report. In the hearing panel on August 22, 2023, JT stated that she did not welcome the touching of her feet by John Doe.

In the hearing panel on August 22, 2023, JT stated that John Doe touched her thigh without consent when he attempted to show her a video on his phone. John Doe denied ever touching any other students, in either an inappropriate or appropriate manner.

JT stated in the investigator's interview and the hearing panel on August 22, 2023 that John Doe made a comment to her about shaving his pubes and to several students shaving his testicles while there was a group of students together in his room to look at his workout equipment. This was confirmed by witness RR in the investigator's report. In the hearing panel on August 22, 2023, the investigator stated that she learned that RR was there during the comment from Witness DI, and not from any other party involved; this is why she asked him to provide his account. John Doe denies making these statements, as does Witness DI.

JT stated, in both her interview with the investigator as well as the hearing panel on August 22, 2023, that she would be hugged by John Doe without him asking to hug her, but rather by him approaching her closely with outstretched arms to embrace her. She stated that she did not feel comfortable with these hugs. In his interview with the investigator, he stated that he and

[12]

JT were close friends, and that she had made him a valentine. In his response to the investigation report, John Doe stated that his request for hugs were not unwelcome.

In her interview with the investigator, as well as the hearing on August 22, 2023, SK indicated that John Doe told her "I don't need someone to have sex with, I just want someone to cuddle with," and "I'll be alone, so I'll just jerk off and go to bed." In the interview with the investigator, John Doe stated he did not make any comments of this nature. In his response to the investigator's report, John Doe stated that he said "I don't need to someone to have sex with." In the hearing panel on August 22, 2023, SK stated that she did not welcome the comment.

Finding: Responsible

Rationale: In the hearing on August 22, 2023, JT, CT, SK, and GD all stated that the conduct by John Doe was not welcome.

As noted above, related to the comment "what if I stuck my penis in your face" in conversation with GD, John Doe states that he did compare unwanted sexual conduct to religious proselytism in this conversation and meant to do so in disagreement with both. With this context of intent assumed as fact, the statement remains unwelcome by the recipient.

Related to the comment in conversation with CT, John Doe stated that he does not remember saying the word sex while talking about food, but that he may have done so. In his response to the investigation report, John Doe stated that CT may have misunderstood what he was saying in regard to food, and that he may have been speaking similar to the popular hashtag #foodporn. With this context of intent assumed as fact, the statement remains unwelcome by the recipient.

Related to moving JT['s] feet without her consent, John Doe stated that he did so to move her feet on the shaker plate, and did so with his own feet. This touching was unwelcome and no party noted any conversation asking for consent.

[13]

JT stated that John Doe would hug her without asking
until his arms were outstretched and she felt obligated
to engage.  John Doe stated that his hugs with JT were
not unwelcome.  With this context of intent assumed as
fact, the hugs were not welcome by the recipient.

SK stated that the comments that John Doe made about sex
were not welcome.  John Doe stated that he said to SK "I
don't need to someone to have sex with."  This comment
was not welcome by the recipient.

The **comments to SK, CT, and GD, as well as hugs and
touching of JT['s] feet constitute a pervasive pattern
of unwelcome conduct related to sex directed to female
students**.  These comments **affected SK, who left the room
after the comment occurred to avoid John Doe['s]
conduct, and asked to not be on duty with John Doe
afterward.  JT and CT also indicated that they were not
comfortable interacting with John Doe any longer, and
that the interactions impacted their ability to work
their student employment positions at UMass Lowell.**

Given the aforementioned information provided through
the investigation, response to the report, and hearing,
the panel finds that John Doe['s] comments and touching
actions were more likely than not **unwelcome, were of a
sexual nature, and created a working environment in an
academic setting that was offensive for multiple female
students**.  A reasonable person would find comments of a
sexual nature in the academic living and working
environment to be offensive.  On the preponderance of
evidence standard, this constitutes a violation of the
sexual misconduct standard in the Student Conduct Code.

Id. at 4-6 (emphasis added).  As a result, Doe was

sanctioned:

Sanctions: [(1)] Permanent housing removal, [(2)]
elevated probation through graduation, [(3)] research of
and completion of approved consent training required
prior to registering for future classes, [(4)] no
contact orders between all complainants as well as
witness GD and John Doe

Rationale: Sexual misconduct impacts members of the
campus community tremendously.   The respondent's

behavior in this case impacted multiple members of the
student community. Past cases of findings of
responsibility for sexual misconduct have led to
sanctions ranging from elevated probation to housing
removal, suspension, and expulsion.

**The complainants all indicated being made uncomfortable
to a degree that shows a pattern of sexually
inappropriate comments with females who live in
university housing. All incidents occurred between
female residents and the respondent while in university
housing. By separating the respondent from university
housing, further comments of this nature can be
prevented from impacting other students in the
residential community.** The lowest sanction given in
cases such as these would not remediate the effects of
the actions.

The panel believes completion of a self-researched and
approved consent training that can show that the
respondent has learned appropriate ways to interact with
others in conversations related to sex to prevent
further harm and enable him to partake in the academic
community in appropriate ways. Once proof of an
appropriate consent training is provided and approved,
the respondent can resume registering for courses on
campus. The course may be taken online or in person,
but must be approved by the Office of Student Rights &
Responsibilities as appropriate.

Id. at 6 (emphasis added). Doe did not appeal the findings.

Instead, he filed this action.

## III. CONCLUSIONS OF LAW

### A.  A Case Stated

The parties have waived their right to a trial and are

proceeding on a case stated basis. In a case stated,

"the parties waive trial and present the case to the
court on the undisputed facts in the pre-trial record."
TLT Constr. Corp. v. RI, Inc., 484 F.3d 130, 135 n.6 (1st
Cir. 2007). "The court is then entitled to 'engage in a
certain amount of factfinding, including the drawing of

[15]

inferences.'" <u>Id.</u> (quoting <u>United Paperworkers Int'l Union Loc. 14</u> v. <u>International Paper Co.</u>, 64 F.3d 28, 31 (1st Cir. 1995)).

<u>Doe</u> v. <u>Hopkinton Pub. Schools</u>, 19 F.4th 493, 502 (1st Cir. 2021).  The Court proceeds on this basis and has done so on First Amendment cases such as the instant action.  <u>Id.</u>

**B.  Eleventh Amendment Sovereign Immunity**

The University Defendants properly raise the affirmative defense of Eleventh Amendment sovereign immunity because Doe, by suing a public university and its officials, is suing the state and state officials in their official capacity.  Under the Eleventh Amendment to the Constitution, "[s]tates and their agencies are entitled to sovereign immunity 'regardless of the relief sought.'"  <u>Poirier</u> v. <u>Massachusetts Dep't of Correction</u>, 558 F.3d 92, 97 (1st Cir. 2009) (quoting <u>Kentucky</u> v. <u>Graham</u>, 473 U.S. 159, 167 n.14 (1985)).[3]  UMass Lowell, as an arm of the state, is entitled sovereign immunity under the Eleventh Amendment, <u>see</u> <u>Langadinos</u> v. <u>Board of Trustees of U. of Massachusetts</u>, No. Civ. A. 12-11159-GAO, 2013 WL 5507042, at *18 (D. Mass. Sept. 30, 2013) (O'Toole, J.) (collecting cases and holding that "UMass is an arm of the state entitled to sovereign

---

[3] The Eleventh Amendment to the Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.

immunity"); Doe v. University of Massachusetts-Amherst, No. CV 14-30143-MGM, 2015 WL 4306521, at *5 (D. Mass. July 14, 2015) (Mastroianni, J.). Accordingly, the remaining counts are dismissed against UMass Lowell on the ground of Eleventh Amendment sovereign immunity. Langadinos, 2013 WL 5507042, at *19; see also Doe v. Ohio State U., 219 F. Supp. 3d 645, 654 (S.D. Ohio 2016).

"While a state may not be sued directly absent its own consent, the Ex Parte Young doctrine permits suits to proceed against state officers in their official capacities to compel them to comply with federal law." Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 477-78 (1st Cir. 2009) (citing Ex Parte Young, 209 U.S. 123 (1908)). As the First Circuit explains, this exception "stems from the notion -- some say fiction -- that, since a state could not authorize an official to violate federal law, by doing so, a state official is stripped of her authority and thus a suit against her does not implicate the state's sovereign immunity." Id. at 478 (citation omitted). Therefore, "[s]uch suits . . . may only seek prospective injunctive or declaratory relief; they may not seek retroactive monetary damages or equitable restitution." Id. Applied here, with respect to the Section 1983 Claim, the Trustees and Individual Defendants can be sued in their official capacity for prospective injunctive and declaratory relief. See

Doe v. Northern Mich. U., 393 F. Supp. 3d 683, 693 (W.D. Mich. 2019).

At the same time, Eleventh Amendment sovereign immunity bars claims for injunctive relief against state officials in their official capacity for violation of **state** law.  See Doe v. UMass-Amherst, No. CV 19-30056-MGM, 2023 WL 8851056, at *30 n.24 (D. Mass. Dec. 21, 2023) (Mastroianni, J.) ("[T]he Ex Parte Young exception is not available . . . [where] there is no ongoing violation of federal law to enjoin.").  Accordingly, with respect to the MCRA Claim, the Trustees and Individual Defendants in their official capacities are entitled to sovereign immunity for all claims for injunctive relief.

C.   **Qualified Immunity**

The University Defendants also raise the affirmative defense of qualified immunity.  "Qualified immunity protects government officials . . . from liability when they act under color of state law, and when their actions or decisions, 'although injurious, "do[ ] not violate clearly established statutory or constitutional rights of which a reasonable person would have known."'"  Johnson v. City of Biddeford, 92 F.4th 367, 375 (1st Cir. 2024) (quoting Swartz v. Sylvester, 53 F.4th 693, 698 (1st Cir. 2022)).[4]  The Court employs a two-part

_____

[4] The Supreme Court and the First Circuit have emphasized that district courts ought "resolv[e] immunity questions at the

analysis: (1) "[t]he plaintiff must 'identify either controlling authority or a consensus of persuasive authority sufficient to put an officer on notice that his conduct fell short of the constitutional norm,'" and (2) "[t]he plaintiff must . . . 'show that an objectively reasonable officer would have known that his conduct violated the law.'"  Id. (quoting Estate of Rahim, 51 F.4th at 410).  It is well-understood that "[t]he purpose of these examinations is to determine 'whether the state of the law [at the time of the officer's conduct] gave [him or her] fair warning that [his or her] alleged treatment of [the plaintiff] was unconstitutional.'"  Id. (quoting Lachance v. Town of Charlton, 990 F.3d 14, 20-21 (1st Cir. 2021)).  The burden is on Doe, and it is a heavy burden to surmount:

> "[A]n officer is entitled to qualified immunity '[i]f . . . an objectively reasonable officer could have concluded (even mistakenly) that his or her conduct did not violate [the plaintiffs'] rights.'" Stamps v. Town of Framingham, 813 F.3d 27, 34 n.7 (1st Cir. 2016) (second alteration in original) (quoting Mlodzinski v. Lewis, 648 F.3d 24, 28 (1st Cir. 2011)).  A court will hold otherwise **only if "the unconstitutionality of the officer's conduct [is] beyond debate in light of an existing principle of law."** French v. Merrill, 15 F.4th 116, 126 (1st Cir. 2021).  This is a "heavy burden" for a plaintiff to meet. Est. of Rahim, 51 F.4th at 410 (quoting Lachance, 990 F.3d at 20).  Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but

_____

earliest possible stage in litigation." Estate of Rahim v. Doe, 51 F.4th 402, 411 (1st Cir. 2022) (quoting Pearson v. Callahan, 555 U.S. 223, 232 (2009)).  This Court's accelerated resolution of the merits of this action also has the benefit of resolving the qualified immunity issue at the earliest possible stage of the litigation.

the plainly incompetent or those who knowingly violate the
law." <u>Hunt</u> v. <u>Massi</u>, 773 F.3d 361, 367 (1st Cir. 2014)
(internal quotation marks omitted) (quoting <u>Carroll</u> v.
<u>Carman</u>, 574 U.S. 13, 17 (2014)).

<u>Id.</u> at 375-76 (emphasis added).  "Clearly established means
that, at the time of the officer's conduct, the law was
sufficiently clear that **every reasonable official would
understand that what he is doing is unlawful**." <u>District of
Columbia</u> v. <u>Wesby</u>, 583 U.S. 48, 63 (2018) (internal
quotation marks omitted) (emphasis added).  Moreover, the
"clearly established" analysis requires a high-level of
specificity:

> The "clearly established" standard also requires that the
> legal principle clearly prohibit the officer's conduct in
> the particular circumstances before him.  The rule's
> contours **must be so well defined that it is "clear to a
> reasonable officer that his conduct was unlawful in the
> situation he confronted."** <u>Saucier</u> v. <u>Katz</u>, 533 U.S. 194,
> 202 (2001).  This requires a high "degree of specificity."
> <u>Mullenix</u> v. <u>Luna</u>, 577 U.S. (2015) (per curiam).  **We have
> repeatedly stressed that courts must not "define clearly
> established law at a high level of generality, since doing
> so avoids the crucial question whether the official acted
> reasonably in the particular circumstances that he or she
> faced."** <u>Plumhoff</u>, <u>supra</u>, at . . . 2023 (internal quotation
> marks and citation omitted).  A rule is too general if the
> unlawfulness of the officer's conduct "does not follow
> immediately from the conclusion that [the rule] was firmly
> established." <u>Anderson</u>, <u>supra</u>, at 641, 107 S.Ct. 3034.

<u>Wesby</u>, 583 U.S. at 63-64 (emphasis added); <u>accord</u> <u>Ablordeppey</u> v.
<u>Walsh</u>, 85 F.4th 27, 33 (1st Cir. 2023) ("When defining clearly
established law, the Supreme Court has instructed courts that
the dispositive question is whether the violative nature of

[20]

particular conduct is clearly established." (internal quotation marks and citation omitted)).  In undertaking its analysis, this Court may proceed with either prong of the analysis. Ablordeppey, 85 F.4th 27, 33.  Failure of the plaintiff to establish both prongs results in qualified immunity. Turning to the second prong, it is not clearly established that every reasonable state official would know that their conduct in finding a violation of the Student Conduct Code was a violation of Doe's constitutional rights under the First Amendment.  In fact, in the absence of First Circuit precedent, there is persuasive recent Eighth Circuit authority contrary to Doe's position on this issue.  See Rowles v. Curators of U. of Missouri, 983 F.3d 345, 357 (8th Cir. 2020) ("We agree with the district court that . . . [the individual defendants] are nonetheless entitled to qualified immunity because [plaintiff] cannot show that he was deprived of a clearly established constitutional right. . . . It was reasonable for [the individual defendants] to conclude that it was permissible under the First Amendment to punish Rowles for violating the University's policies against harassment and stalking.").  Here, Doe's claims of clearly established constitutional rights are asserted at too general a level.  Rather, Doe cites cases that are not directly in point and do not address the circumstances presented here.  Doe fails to meet his high burden.  The

Individual Defendants are also entitled to qualified immunity
because, as the Court determines below, there was no violation
of a constitutional right.  Accordingly, the Individual
Defendants are entitled to qualified immunity for monetary
damages under Section 1983 on this prong.

### D.    Section 1983 Claim – The University Defendants Acted Reasonably

All that's left is Doe's claim for prospective injunctive
relief against the Individual Defendants.

"Federal law creates a cause of action under 42 U.S.C. §
1983, which allows a plaintiff to sue persons acting under color
of state law for constitutional transgressions or other
violations of federal law."  Martin v. Somerset Cnty., 86 F.4th
938, 943 (1st Cir. 2023).  Section 1983 provides in pertinent
part:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State . . .
> subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall
> be liable to the party injured in an action at law, suit
> in equity, or other proper proceeding for redress . . .
> .

42 U.S.C. § 1983.  "[N]either a State nor its officials acting
in their official capacities are 'persons' under § 1983."  Will
v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).  This
includes UMass Lowell, which is an agency of the Commonwealth,

and therefore not a person under Section 1983.  See Langadinos,
2013 WL 5507042, at *16 ("UMass is not a person for the purpose
of Section 1983.").  Accordingly, Doe's Section 1983 Claim
against UMass Lowell, and official-capacity monetary damages
claims brought against the Trustees and Individual Defendants,
fail because they are not "persons" under the statute.

Doe's Section 1983 Claim fails on the merits.  For over a
century it has been well-settled that "First Amendment rights,
applied in light of the special characteristics of the school
environment, are available to teachers and students.  It can
hardly be argued that . . . students . . . shed their
constitutional rights to freedom of speech or expression at the
schoolhouse gate."  Tinker, 393 U.S. at 506; accord Gay Students
Org. of U. of N.H. v. Bonner, 509 F.2d 652, 658 (1st Cir. 1974)
("[T]he First Amendment applies with full vigor on the campuses
of state universities.").  At the same time, the Supreme Court
"has repeatedly emphasized the need for affirming the
comprehensive authority of the States and of school officials,
consistent with fundamental constitutional safeguards, to
prescribe and control conduct in the schools."  Tinker, 393 U.S.
at 507.  Issues arise where "the exercise of First Amendment
rights collide[s] with the rules of the school authorities."
Id.  "[I]n Tinker, the Supreme Court explicitly stated that
'conduct, by the student, in class or out of it, which for any

[23]

reasons -- whether it stems from time, place, or type of behavior . . . is not immunized by the constitutional guarantee of free speech' if leads to material disruption, substantial disorder, or the invasion of the rights of others." Doe ex rel. Doe v. Portland Pub. Schools, No. 2:23-CV-00409-JAW, 2023 WL 7301072, at *12 (D. Me. Nov. 3, 2023) (quoting Tinker, 393 U.S. at 513).

The burden is on UMass Lowell to justify Doe's speech restrictions. Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist., 969 F.3d 12, 25 (1st Cir. 2020). The First Circuit, applying Tinker, holds that "school officials' restriction of student speech is justified when: (1) actual 'disturbances or disorders on the school premises in fact occur[ ]'; (2) 'the record . . . demonstrate[s] . . . facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities'; or (3) the speech invades the rights of others." Norris, 969 F.3d at 25 (quoting Tinker, 393 U.S. at 513-14.). The test is objective, and UMass Lowell may only rely on the reasons it provided Doe at the time of the discipline. Id. Furthermore, "courts applying Tinker generally consider all relevant facts known to the school administrators at the time they disciplined the student or decided to restrict the speech." Id. at 30; see Doe v.

Hopkinton Pub. Schools, 490 F. Supp. 3d 448, 469 (D. Mass. 2020), aff'd sub nom. Hopkinton Pub. Schools, 19 F.4th 493.

The First Circuit has reiterated the deference that is due to school officials' discretion with respect to curtailment of speech, noting "[t]he Supreme Court has repeatedly emphasized the necessary discretion school officials must exercise and the attendant deference owed to many of their decisions." Norris, 969 F.3d at 29.  Indeed, "[c]ourts generally defer to school administrators' decisions regarding student speech so long as their judgment is reasonable." Id. at 30.  Said another way, "[b]ecause school officials are far more intimately involved with running schools than federal courts are, '[i]t is axiomatic that federal courts should not lightly interfere with the day-to[-]day operation of schools," Hardwick ex rel. Hardwick v. Heyward, 711 F.3d 426, 440 (4th Cir. 2013) (quoting Augustus v. School Bd. of Escambia Cnty., Fla., 507 F.2d 152, 155 (5th Cir. 1975)), and courts must "not second guess their reasonable decisions," id.; see B.A.P. v. Overton Cnty. Bd. of Educ., 600 F. Supp. 3d 839, 846 (M.D. Tenn. 2022) (observing that "the touchstone of Tinker is reasonability"); DeFabio v. East Hampton Union Free Sch. Dist., 658 F. Supp. 2d 461, 481 (E.D.N.Y. 2009) ("Although plaintiffs seek to second-guess with hindsight the

judgment of school administrators, that is not the role of the courts.").

Here, UMass Lowell's written decision detailed both uncontroverted and controverted evidence, and provided a detailed rationale based upon all of the evidence before it. The Court rules that the findings were well-supported by all of the evidence in the record, including Monbleau's Investigative Report, Doe's response, Monbleau's response to Doe's response, and evidence gathered at the hearing in the form of complainant and witness statements. See Exs. 1, 11-13. While Doe admits that UMass Lowell found Doe responsible for "five separate incidents alleged by four individual female coworker resident advisors," Doe's Trial Br. 4, the Court rejects the notion that UMass Lowell found Doe not responsible for other conduct discussed in the rationale. Indeed, the fact that, according to Doe, the issues span four co-students/co-workers and five incidents that are largely undisputed is, itself, problematic for Doe. Doe's attempt to spin his intent with respect to his speech is irrelevant; "[t]he test under Tinker is objective, focusing on the reasonableness of the school's response, not the intent of the student." Hopkinton Pub. Schools, 19 F.4th at 509 (citing Norris, 969 F.3d at 25). Indeed, Doe goes to great lengths to isolate his speech and conduct from the effect of his conduct. By doing so, he misses the forest for the trees. This

Court is viewing all of the evidence available to the Individual Defendants at the time of the discipline, as it is required, to determine whether UMass Lowell was reasonable.

Another point that ought not be overlooked is that Doe **chose** -- after retaining his counsel in this action -- not to attend the hearing and provide his evidence to the hearing panel.  Doe's non-attendance is a fact that necessarily goes into the mix as to whether UMass Lowell acted reasonably.  Indeed, at a hearing, the panel heard from the complainants and a witness, and was able to evaluate their credibility.  Had Doe attended, the hearing panel would have had the benefit of hearing from him and assessing his credibility.  By Doe's non-attendance, UMass Lowell was left with the proverbial "empty chair" on the one hand, and the live statements of complainants and witnesses on the other.[5]

To be sure, there may be myriad reasons why Doe may have chosen not to attend, and the Court does not speculate as to what were those reasons.  Regardless, Doe's knowing and voluntary failure to attend the hearing makes it difficult for him credibly to complain about what occurred at the hearing, the

---

[5] The Court does not have the benefit of the record of the hearing (audio or transcribed) other than what is on the deliberation form as set forth in full above.  <u>See</u> Letter from M. Coughlin to Doe re Hearing Panel 1, Ex. 9 ("The Hearing will be recorded.").  Neither party has submitted the recording for this Court's consideration.

Individual Defendants' assessment of the evidence at the
hearing, and reasonableness of UMass Lowell's ultimate findings.
Nevertheless, even though Doe declined to attend the hearing,
UMass Lowell filled in the holes as best it could with Doe's
response statement -- a reasonable way to proceed -- and
apparently would have allowed Doe an appeal even though his
absence otherwise foreclosed that option.

Focusing on the task at hand, this Court is not expected to
retry the disciplinary case, but merely to determine whether
UMass Lowell acted reasonably upon the evidence, disputed or
not, it had in front of it at the time it made its decision
Here, all three of the above <u>Tinker</u> factors are present.  The
University Defendants did not need to track <u>Tinker</u> word for
word.  As found by the University Defendants:

> [Doe's] **comments affected SK, who left the room after
> the comment occurred to avoid John Doe['s] conduct,
> and asked to not be on duty with John Doe afterward.
> JT and CT also indicated that they were not
> comfortable interacting with John Doe any longer, and
> that the interactions impacted their ability to work
> their student employment positions at UMass Lowell.**

> Given the aforementioned information provided through
> the investigation, response to the report, and
> hearing, **the panel finds that John Doe comments and
> touching actions were more likely than not unwelcome,
> were of a sexual nature, and created a working
> environment in an academic setting that was offensive
> for multiple female students.  A reasonable person
> would find comments of a sexual nature in the academic
> living and working environment to be offensive.**  On
> the preponderance of evidence standard, this

> constitutes a violation of the sexual misconduct
> standard in the Student Conduct Code.

Hearing Panel's Decision 5-6 (emphasis added).  Based upon

the above, and the record evidence, the Court rules that

UMass Lowell reasonably determined that Doe's conduct

caused a substantial disruption at UMass Lowell as to

female students/RAs.  The above conclusion is also a

reasonable determination that Doe's conduct constituted an

invasion of the rights of other students.

In addition, the sanction raises the reasonable

inference that UMass Lowell had facts that under Tinker

"might reasonably have led school authorities to forecast

substantial disruption of or material interference with

school activities," 393 U.S. at 514:

> The complainants all indicated being made
> uncomfortable to a degree that shows a pattern of
> sexually inappropriate comments with females who live
> in university housing.  All incidents occurred between
> female residents and the respondent while in
> university housing.  **By separating the respondent from
> university housing, further comments of this nature
> can be prevented from impacting other students in the
> residential community.**

Hearing Panel's Decision 7 (emphasis added).  Indeed, UMass

Lowell's discipline is specifically, and narrowly, designed to

stop the conduct from occurring in the future.

Reviewing the record as a whole, the Court rules that UMass

Lowell acted reasonably in its discipline of Doe.  This case is

somewhat different than a typical student conduct case because the students involved were also RAs -- co-workers -- who live and work in the same environment in the dormitories.  In sum, the conclusion that this Court draws from all of the evidence is that UMass Lowell disciplined Doe after it found he acted inappropriately with several fellow female students and employees in violation of the Student Conduct Code.  Doe does not have a First Amendment right under the United States Constitution to engage in inappropriate behavior -- sexual misconduct -- with co-students and co-workers to disrupt the academic and work environment, and invade others' rights. Accordingly, under Tinker and its progeny, the Court rules that the UMass Defendants acted reasonably and defers to that action; there has been no violation of Doe's First Amendment rights on this record.

### E.   The MCRA Claim

"The MCRA is the state 'counterpart' to Section 1983 and, in general, is coextensive therewith."  Maroney as Tr. of Premiere Realty Tr. v. Fiorentini, 673 F. Supp. 3d 30, 56 (D. Mass. 2023) (Casper, J.) (quoting Bruce v. Worcester Reg'l Transit Auth., 655 F. Supp. 3d 1, 11–12 (D. Mass. 2023) (Hillman, J.)).  It is more restrictive, however, because "the MCRA provides a right of action to any person whose exercise or enjoyment of rights secured by the federal or state

constitutions or laws has been interfered with by 'threats, intimidation or coercion.'"  Thomas v. Harrington, 909 F.3d 483, 492 (1st Cir. 2018) (quoting Mass. Gen. Laws ch. 12, §§ 11H, 11I).  As an initial matter, "Massachusetts state courts have held that 'the Commonwealth [including its agencies] is not a 'person' for purposes of M.G.L. ch. 12, §§ 11H and 11I.'" Powell v. Massachusetts, No. 16-CV-30004-MGM, 2016 WL 7115887, at *12 (D. Mass. Sept. 20, 2016) (Robertson, M.J.), report and recommendation adopted, No. CV 16-30004-MGM, 2016 WL 7118260 (D. Mass. Dec. 6, 2016) (Mastroianni, J.) (citation omitted) (collecting cases).  Accordingly, the MCRA Claim is dismissed as to UMass Lowell and official-capacity claims against the Trustees and Individual Defendants under the terms of the statute.

Under the MCRA, "[a] 'threat' is 'the intentional exertion of pressure to make another fearful or apprehensive of injury or harm'; 'intimidation' involves putting one 'in fear for the purpose of compelling or deterring conduct'"; and "'[c]oercion' is the application of force 'to constrain him to do against his will something he would not otherwise have done.'"  Id. at *15 (quoting Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474 (1994)).  To prevail, "the MCRA contemplates a two-part sequence: [liability may be found where] (1) the defendant threatens, intimidates, or coerces the plaintiff, in

order to (2) cause the plaintiff to give up something that [she] has the constitutional right to do." Goddard v. Kelley, 629 F. Supp. 2d 115, 128 (D. Mass. 2009) (Saylor, J.).

All that's left, as pressed by Doe, is a claim under the MCRA against the Individual Defendants for viewpoint discrimination in separating him from university housing and informing him that the Lowell Police Department has been notified of his status.  Doe's Trial Br. 21-22.

As for the monetary damages claims, the Court rules that, the Individual Defendants are entitled to qualified immunity for substantially the same reasons as the Section 1983 Claim, namely both prongs of the test are not met.  See Bonamo v. Betz, 92 Mass. App. Ct. 1222 (2018) ("The doctrine of qualified immunity under 42 U.S.C. § 1983 (2012), applies equally to MCRA claims. . . .").  As for the remaining claims from injunctive or declaratory relief, this Court cannot issue prospective injunctive relief with respect to **state** officials' purported violations of state law.  Thus, claims under the MCRA fail without reaching the merits.

Presuming without ruling that the Individual Defendants' actions constituted coercion, see Reproductive Rights Network v. President of U. of Mass., 45 Mass. App. Ct. 495 (1998), the claim fails.  The Court has already determined that the Individual Defendants did not engage in unconstitutional conduct

under federal law.  To be sure, "Article 16 of the Declaration

of Rights, as amended by art. 77 of the Amendments, is at least

as protective of the freedom of speech as the First Amendment."

Shak v. Shak, 484 Mass. 658, 661 (2020).  Doe does not argue

that the Commonwealth's protection of speech in the context of

student discipline is **more** extensive than the Constitution of

the United States under the First Amendment at the university

level.  Indeed, while the Massachusetts General Court has

codified Tinker with respect to secondary school speech, the

parties have not directed the Court to any authority suggesting

that post-secondary-level speech ought be analyzed differently

under Article 16 of the MCRA.[6]  Accordingly, the MCRA Claim

--------

[6] Arguably, the Massachusetts General Court by codifying
Tinker to apply to public secondary school speech, and not
modifying that statute to keep up with subsequent Supreme Court
precedent provides more (or at least different) protection for
secondary education speech.  As the Supreme Judicial Court
reported to the First Circuit with respect to a certified
question concerning Massachusetts General Laws Chapter 71,
Section 82:

> The parties agree that the authors of the bill
> intended to codify the First Amendment protection
> discussed in Tinker v. Des Moines Indep. Sch. Dist.,
> 393 U.S. 503 (1969).  The defendants, however, argue
> that more recent Supreme Court decisions in the area
> of students' First Amendment rights, see Bethel Sch.
> Dist. No. 403 v. Fraser, 478 U.S. 675 (1986), and
> Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260
> (1988), have narrowed and redefined the holding of
> Tinker to allow school administrators to regulate
> vulgar or indecent speech in school-sponsored
> expressive activities.  This may be true, but there
> is no reason to believe that these cases, decided more

collapses on the merits with the Section 1983 Claim and fails
for the same reasons as set forth above.

## IV.  CONCLUSION

Public universities have an interest and duty in the safety
and security of their students and employees.  In the context of
a public university, even in the so-called "marketplace of
ideas," First Amendment rights are necessarily limited where a
student's speech creates a hostile educational and working
environment.  The delicate balance of these competing interests
requires public universities to protect unwarranted intrusions
into a student's civil rights while at the same time protecting
other students from harm -- a tall order.

The Supreme Court, recognizing the special relationship
that public educators have with their students, requires school
officials act reasonably -- not perfectly.  The First Circuit,
in turn, has emphasized the Supreme Court's mandate that

---

than ten years after the original enactment of G.L. c.
71, § 82, in any way limit the protection granted
under the statute.  **Our Legislature is free to grant
greater rights to the citizens of this Commonwealth
than would otherwise be protected under the United
States Constitution.  The decision to do so rests
squarely with the Legislature and we are not free
judicially to create new limitations.**

Pyle v. School Comm. of S. Hadley, 423 Mass. 283, 286-87
(1996)(emphasis added).

district courts defer to reasonable school officials' conduct in this area.

Here, Doe was disciplined for a pattern of misconduct against female students.  He was provided a fair opportunity to be heard, and was represented by counsel when he decided -- for whatever reason -- not to appear at the hearing.  While Doe may disagree with the results of UMass Lowell's decision, and while this Court makes no finding or ruling as to whether it would have made similar findings, the Court rules that on the case stated record the University Defendants' investigation, hearing, conclusions and concomitant discipline was -- and is -- reasonable.  Accordingly, judgment shall enter in favor of the University Defendants and against Doe in this action.

**SO ORDERED.**

<u>/s/ William G. Young</u>
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[7]

---

[7] This is how my predecessor, Peleg Sprague (D. Mass 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 46 years.