# United States Court of Appeals
## For the First Circuit

---

No. 24-1458

JOHN DOE,

Plaintiff, Appellant,

v.

UNIVERSITY OF MASSACHUSETTS; TRUSTEES FOR THE UNIVERSITY OF
MASSACHUSETTS; HANNAH MONBLEAU, in her official and individual
capacities; KATE LEGEE, in her official and individual
capacities; ESMERALDA LEVESQUE, in her official and individual
capacities, a/k/a Esmeralda Mendez; ADAM DUNBAR, in his official
and individual capacities,

Defendants, Appellees,

BRETT SOKOLOW,

Defendant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

---

Before

Montecalvo and Kayatta,*
Circuit Judges.

---

* Judge Selya heard oral argument in this case and
participated in the initial semble thereafter. His death on
February 22, 2025, ended his involvement in this case. The
remaining two panelists issued this opinion pursuant to
28 U.S.C. § 46(d).

<u>Ilya I. Feoktistov</u>, with whom <u>Law Office of Ilya Feoktistov</u> was on brief, for appellant.

<u>Michael Hoven</u>, Associate Counsel, Office of the General Counsel, University of Massachusetts, with whom <u>Andrea Joy Campbell</u>, Attorney General of the Commonwealth of Massachusetts, <u>Denise Barton</u>, Special Assistant Attorney General, and <u>Julia Low</u>, Associate Counsel, Office of the General Counsel, University of Massachusetts, were on brief, for appellees.

————————————

July 25, 2025

————————————

MONTECALVO, **Circuit Judge**. In 2023, the University of Massachusetts ("the University") found John Doe[1] -- a graduate student and resident advisor ("RA") at the University's Lowell campus -- responsible for sexual misconduct and sanctioned him accordingly. Doe responded by filing a complaint in federal court against the University, its trustees, and the members of the hearing panel who handled his case. Doe alleged, among other things, that the University deprived him of his First Amendment rights by punishing him for protected speech and expressive conduct. About two months after filing his complaint, Doe moved for a preliminary injunction. With the parties' consent, and pursuant to Federal Rule of Civil Procedure 65, the district court considered the matter on a "case stated" basis wherein the court consolidates the preliminary injunction hearing with the trial on the merits and the parties present the case to the court on the undisputed facts in the pre-trial record. Following that hearing, the district court ruled against Doe, finding that his First Amendment rights had not been violated. Doe timely appealed. For the reasons below, we reverse in part and affirm in part.

---

[1] Plaintiff-appellant is proceeding by pseudonym. Other students will be referred to by their initials to protect their privacy.

## I. Factual Background

### A. Initial Complaints and Investigation

In May 2023, four female RAs at the University -- J.T., C.T.,[2] E.H., and E.Z.[3] -- reported concerns to their supervisor about Doe's interaction with female RAs.  Their concerns, followed by formal complaints by J.T., C.T., and E.H., prompted the University to suspend Doe from his RA duties and investigate his alleged misconduct.

The University appointed defendant Hannah Monbleau, the Assistant Director of Student Life and Well-Being, to conduct the investigation to "gather[] evidence to allow the University to determine whether [Doe] . . . violat[ed] the Student Conduct Code['s]" prohibition on "[s]exual misconduct."  In pertinent part, the Student Conduct Code defines sexual misconduct as "unwelcomed conduct of a sexual nature when . . . such conduct unreasonably[] interferes with a . . . person's work or academic performance; interferes with or limits a person or person's ability to participate in or benefit from a work or academic program or

---

[2] The district court's order variously refers to this student as C.T. and C.T.Z.  We refer to her only as C.T.

[3] Although E.Z. reported concerns about Doe to her supervisor, she did not file a formal complaint against him and did not participate in the University's investigation of Doe's alleged behavior.

activity; or creates an intimidating, hostile, or offensive working or academic environment."

In the course of the investigation, Monbleau interviewed J.T., C.T., and E.H., as well as additional students they recommended to her, including S.K. and G.D. After S.K.'s interview with Monbleau, she, too, filed a formal complaint against Doe. Monbleau also twice interviewed Doe and spoke on one occasion to another student, A.M., on Doe's recommendation. Monbleau then compiled the information she gathered from these interviews in a document titled the "Student Rights & Responsibilities Investigative Report." The report concluded that Doe's conduct met the Student Conduct Code's definition of sexual misconduct. Once she finalized the report, the University sent it to Doe, who then filed a written response. Monbleau, in turn, filed a reply.

Next, pursuant to the "Student Conduct process," Doe's case was assigned to a three-member panel of University officials (the "Conduct Panel"). The Conduct Panel -- comprised of Kate Legee, Director of Student Conduct and Prevention; Adam Dunbar, Senior Associate Director of Student Affairs; and Esmeralda Levesque, River Hawk Scholars Academy Coordinator (collectively, the "Individual Defendants") -- was tasked with determining whether Doe had engaged in sexual misconduct (as defined by the Student Conduct Code). In doing so, the Conduct Panel considered Monbleau's report, Doe's response, and Monbleau's corresponding

reply, and held a hearing on August 22, 2023, at which C.T., J.T., S.K., and G.D. testified.[4]

## B. The Conduct Panel's Decision

Following the hearing, the Conduct Panel issued a written decision in a document titled the "Panel Deliberation Form." There the Conduct Panel first identified the charge against Doe: engaging in sexual misconduct as defined by the Student Conduct Code. The charge is followed by a section labeled "Material findings of fact."[5] Next, the Conduct Panel set forth its ultimate conclusion that Doe was "[r]esponsible" for sexual misconduct. That conclusion was immediately followed by the Conduct Panel's rationale.

### 1. Doe's Alleged Conduct[6]

The Conduct Panel identified the following conduct as the basis for its determination that Doe was responsible for sexual

---

[4] As the district court noted below, we do not have the benefit of the transcript, or any other record, from the Conduct Panel's hearing on August 22, 2023, other than the information included in the "Panel Deliberation Form." We also note that Doe did not attend the hearing.

[5] We pause to note the misleading nature of this heading. While the section identifies undisputed and disputed facts, it makes no findings as to the veracity of any disputed allegations. Rather, it merely recites the complainants' allegations against Doe, Doe's admissions as to some, and his denials as to others.

[6] In reviewing First Amendment claims, we consider only the government actor's contemporaneous rationale for its action, and not any post hoc rationalizations. See Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist., 969 F.3d 12, 25-26, 30 (1st Cir. 2020).

misconduct: three verbal comments that Doe made to three individuals (G.D., C.T., and S.K.), one isolated physical act (that Doe adjusted the position of J.T.'s feet on a piece of exercise equipment), and one repeated physical act (that Doe would extend his arms towards J.T. to invite or initiate a hug). The Conduct Panel's rationale also discussed the impact that Doe's behavior had on G.D., C.T., S.K., and J.T. The specifics of those allegations are laid out below.[7]

### i. Alleged Statement to G.D.

In her interview with Monbleau, G.D. -- another university student -- reported that, sometime during the 2022 spring semester, she and Doe "were cooking together" and discussing Jehovah's Witnesses and religious proselytizing when "Doe said 'Oh [G.D.] do you want me to shove my penis in your face?' [and G.D.] said 'what?!'" Doe repeated the statement and "said that [the question] is like what Jehovah's Witness folks do," they "shov[e] their beliefs in your face." When interviewed, Doe asserted, as he does now, that he made the comment to "compare unwanted sexual conduct to religious proselytism . . . and meant to do so in

_____

Thus, in recounting the pertinent facts we focus on the conduct and speech the Conduct Panel identified as the basis for its sanction.

[7] The Conduct Panel labeled the evidence concerning other alleged misconduct "discrepant," and it made no findings concerning these other allegations.

disagreement with both."  In its rationale, the Conduct Panel accepted Doe's assertion and "assumed as fact" that "context of intent."  But even with that context assumed, it found that the comment was "unwelcome."

Relatedly, G.D. initially told Monbleau that she "[d]id not really think about [the interaction] much until she heard about what had happened with her peers."  But at the August 22, 2023 hearing, G.D. testified that Doe's comment "caused her to feel fear and confusion about [Doe]'s intent in the moment."

### ii. Alleged Statement to C.T.

C.T. told Monbleau that while she and Doe were on RA duty together and talking about food, Doe said, "if the food is good, I'd have sex while eating."  Doe told Monbleau that he did not remember using the word "sex" but that he may have.  Rather, he asserted that C.T. "may have misunderstood what he was saying in regard to food, and that he may have been speaking similar to the popular hashtag #foodporn."  The Conduct Panel's decision did not make a finding as to what Doe said.

Asked how Doe's comment impacted her job or academics, C.T. replied, "[i]t's awkward" and that "[i]t was awkward when she was experiencing [the alleged behavior] but it's more awkward now that they [-- i.e., Doe and another male RA, K.G. --] know [that complaints had been made against them.]"  In its decision, the Conduct Panel also wrote that C.T. "indicated that [she] w[as] not

comfortable interacting with [Doe] any longer, and that the interactions impacted [her] ability to work [her] student employment position[] at UMass Lowell." The evidence supporting that finding, however, was limited to C.T.'s statement that it was "awkward" to experience Doe's conduct and that it was "more awkward" once he learned that she had filed a complaint against him.

### iii. Alleged Statement to S.K.

S.K.'s complaint against Doe also stemmed from a time she and Doe were on RA duty together. S.K. told Monbleau that during the shift in question Doe was "talkative and started going off about dating apps" and "started venting about how he's going to be alone forever." S.K. reported that Doe then said, "I don't need someone to have sex with, I just want someone to cuddle with," and "I'll be alone, so I'll just jerk off and go to bed." Doe, however, admitted only to saying, "I don't need to [sic] someone to have sex with." The Conduct Panel's decision again did not make a finding regarding what was said. Rather, it implied that the Conduct Panel relied only on the statement that Doe admitted to making.[8]

---

[8] In its rationale, the Conduct Panel concluded that Doe's "comment [to S.K.] was not welcome." The use of the singular -- "comment" -- suggests that the Conduct Panel considered only the statement Doe admitted to in reaching its determination that he engaged in sexual misconduct as defined by the Student Conduct Code.

S.K. told Monbleau that she thought that the comments were "[i]nappropriate in the workplace," made her feel "really uncomfortable" and "in shock," and that she did "not want to work with [Doe] again." The Conduct Panel's rationale states that Doe's comment was "not welcome" and caused S.K. to "le[ave] the room . . . to avoid [Doe]'s conduct, and [to] ask[] to not be on duty with [Doe] afterward."

### iv. Alleged Physical Acts Involving J.T.

The Conduct Panel's rationale also cited two physical acts -- one singular and one recurring -- involving J.T. First, J.T. reported that on one occasion Doe moved her feet with his own to adjust her stance on a piece of exercise equipment located in Doe's dorm room. Second, J.T. told Monbleau that, on an unspecified number of occasions, Doe extended his arms towards J.T. to initiate or invite a hug, which caused her to feel "obligated to engage." Doe admitted to the hugs but contended that no one, including J.T., ever said that his "hugs were unwelcome." The Conduct Panel's rationale nonetheless stated that both instances of Doe's conduct were unwelcome and that, with respect to Doe adjusting J.T.'s feet, "no party noted any conversation asking for consent."

When asked "[h]ow . . . the discomfort [she] felt" due to Doe's conduct "impacted [her] job/academics," J.T. reported that her discomfort caused "[n]ot too bad of an impact on her job"

but that she "d[id not] want to be alone with [Doe]" and "would be more uncomfortable" if "it was just her and him."  In its rationale, the Conduct Panel stated that Doe's behavior caused J.T. to "not [be] comfortable interacting with [Doe] any longer, and that the interactions impacted [her] ability to work [her job] at UMass Lowell."  The only factual support for the latter assertion, however, was J.T.'s statement that the "discomfort [she] felt" caused "[n]ot too bad of an impact on her job" and that she did not want to be alone with him.

## 2. The Conduct Panel's Conclusion

Based on these allegations, the Conduct Panel concluded that Doe's actions "created a working environment in an academic setting that was offensive for multiple female students" and that "[a] reasonable person would find comments of a sexual nature in the academic living and working environment to be offensive." Indeed, the Conduct Panel expressly stated that its ultimate conclusion -- that Doe engaged in sexual misconduct as defined by the Student Conduct Code -- was based on its finding that his comments were offensive.  It also stated that Doe's actions "constitute[d] a pervasive pattern of unwelcome conduct related to sex directed to female students."  The Conduct Panel therefore imposed sanctions, including permanently banning Doe from living in campus-provided housing or entering any residence hall,

notifying campus police of the ban, and placing Doe on "elevated probation" through his graduation.

## II. Procedural History

The Conduct Panel sent Doe its written decision on September 7, 2023, and Doe filed suit in federal court in Massachusetts on September 10, 2023. In pertinent part, Doe's complaint charged the University, its trustees ("Trustees"), and the Individual Defendants (collectively, "defendants") with unlawfully depriving him of his First Amendment rights in violation of 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, §§ 11H, 11I, and sought monetary and equitable relief. Doe later moved for a preliminary injunction first against the University and its Trustees and then against defendant Kate Legee in her capacity as chair of the Conduct Panel.[9]

With the parties' consent, the district court collapsed Doe's motion for a preliminary injunction with a trial on the merits pursuant to Federal Rule of Civil Procedure 65. The parties also agreed to proceed on a "case stated" basis, in which the parties "present the case to the court on the undisputed facts in the pre-trial record." TLT Constr. Corp. v. RI, Inc., 484 F.3d

---

[9] Upon Doe's filing of his motion for a preliminary injunction as to Kate Legee, the district court entered a text order terminating as moot Doe's initial preliminary injunction motion as to the University of Massachusetts and the Trustees thereof.

130, 135 n.6 (1st Cir. 2007).  In that posture, the district court
is "entitled to 'engage in a certain amount of factfinding,
including the drawing of inferences.'"  Id. (quoting United
Paperworkers Int'l Union Loc. 14 v. Int'l Paper Co., 64 F.3d 28,
31 (1st Cir. 1995)).  The case stated hearing took place on
February 5, 2024.  For reasons not germane to this appeal, Doe's
case went forward only on Doe's charge alleging violation of his
First Amendment rights, pursuant to 42 U.S.C. § 1983, and his
charge alleging violation of the MCRA.

On April 9, 2024, the district court issued an order
setting forth its Findings of Fact and Rulings of Law.  In it, the
district court adopted the parties' joint statement of undisputed
facts, including the Student Conduct Code's definition of sexual
misconduct, the timeline of Monbleau's investigation, and the
chronology of proceedings before the Conduct Panel.  The order
quoted the Conduct Panel's decision at length, but the district
court disclaimed agreement with any of the Conduct Panel's
findings, stating that it "ma[de] no finding or ruling as to
whether it would have made similar findings [as the Conduct
Panel]."

Turning to questions of law, the district court held
that Doe's section 1983 claim alleging deprivation of First
Amendment rights could be brought against the Individual
Defendants only in their official capacities and that his potential

- 13 -

remedies were limited to prospective injunctive and declaratory relief.[10]  Addressing the merits of Doe's First Amendment claim, the district court applied the standard established by the Supreme Court in Tinker v. Des Moines Independent Community School District, 393 U.S. 503 (1969), for evaluating such claims in the public-school context.  The district court held that Doe's claim failed because the University -- acting through the Conduct Panel -- reasonably determined or forecast that Doe's conduct (1) caused a substantial disruption, (2) would cause a substantial disruption of school activities, and (3) invaded the rights of others.  The district court further held that even if Doe's First Amendment claim could succeed on the merits, the Individual Defendants were entitled to qualified immunity for monetary damages.  Doe v. Univ. of Mass., No. 23-12077, 2024 WL 1521758, at *9 (D. Mass. Apr. 9, 2024).  The district court also held that the Eleventh Amendment barred Doe's claims against the University and

---

[10]  The district court also held that Doe's section 1983 claim could be brought against the Trustees in their individual capacities.  Yet Doe's complaint did not purport to do so.

Additionally, although Doe does not appeal the district court's holding that his section 1983 claim could be brought only against the Individual Defendants, his briefing on appeal refers to defendants generally as "UMass Lowell."  The defendants note that incongruity in their opposition but nonetheless present their arguments on behalf of "Appellees," who they define as including all named defendants.  We will follow the defendants' lead and refer collectively to the named defendants as "defendants," although Doe's appeal pertains to the district court's holding only as to the Individual Defendants.

his claim alleging violation of the MCRA.  Id. at *7, *13.  Doe timely noticed his appeal.  Before us, he challenges the district court's judgment only with respect to its finding that his section 1983 claim failed on the merits and that the Individual Defendants were entitled to qualified immunity as to his request for money damages.

### III. Standard of Review

As we noted above, the district court decided this case at summary judgment pursuant to the "case stated" procedure.  Under our precedent, this procedure may be used in "somewhat unusual cases" "when the basic dispute between the parties concerns only the factual inferences that one might draw from the more basic facts to which the parties have agreed."  United Paperworkers, 64 F.3d at 31.  In deciding the case, the district court "engage[s] in a certain amount of factfinding, including the drawing of inferences."  Brotherston v. Putnam Invs., LLC, 907 F.3d 17, 24 (1st Cir. 2018) (quoting Pac. Indem. Co. v. Deming, 828 F.3d 19, 22 (1st Cir. 2016)).

On appeal, "[i]n reviewing the entry of summary judgment on a case-stated record, we review legal questions de novo and factual determinations for clear error."  Id. at 24-25.  In other words, to prevail before us Doe must establish either that the district court's "factual determinations are clearly erroneous or

[that] the district court made an error of law." <u>Watson</u> v. <u>Deaconess Waltham Hosp.</u>, 298 F.3d 102, 108 (1st Cir. 2002).

## IV. Discussion

We begin with three important caveats to bear in mind when reading or applying this opinion. First, even though Doe's alleged misconduct included touching another student's feet and greeting that student with unwanted hugs, both parties' briefs treat that conduct as expression protected by the First Amendment. The district court's decision did not assess whether Doe's alleged misconduct was a form of speech. Taking the record as we find it, and accepting the framing of the issues as presented by the parties, we too shall assume that all the conduct at issue is speech.

Second, notwithstanding that Doe was an RA, the defendants did not argue below or on appeal that we should regard the University's relationship with Doe as that of employer-employee. Rather, both sides contend that we should treat the case as one of student discipline and apply <u>Tinker</u>'s three-prong analysis of student-speech restrictions, subject to -- Doe argues -- adjustment because the students in this case are all adults.

Third, we also do not understand defendants to argue that any of Doe's conduct, collectively or separately, falls within any recognized exceptions to First Amendment protection other than

*Tinker*.    To the extent that defendants disagree, any such contention is waived for lack of development.    *See* *United States* v. *Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

The narrow question we are left to decide, then, is whether -- assuming that Doe's conduct enjoyed First Amendment protection -- *Tinker* permitted defendants to punish that conduct. With that in mind, we turn to Doe's First Amendment claim and *Tinker*'s familiar framework.

## A. Doe's First Amendment Claim

The Free Speech Clause of the First Amendment prohibits the government from "abridging the freedom of speech." U.S. Const. amend. I; *see also* *Cantwell* v. *Connecticut*, 310 U.S. 296, 303 (1940) (applying this prohibition to states and their political subdivisions through the Fourteenth Amendment).    Its protections extend to public schools and the students who attend them. *Tinker*, 393 U.S. at 506 (explaining that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate").    But, because of public schools' unique characteristics, in certain "carefully restricted circumstances," schools may "reasonabl[y] regulat[e]" speech that would otherwise be protected.    *Id.* at 513.

## 1. The <u>Tinker</u> Standard

In <u>Tinker</u>, the Supreme Court established the standard to evaluate whether public school officials' regulation of student speech violates students' First Amendment rights. <u>Id.</u> at 512-13. While acknowledging that student speech is generally protected, <u>Tinker</u> held that a school may restrict student speech that (1) "materially disrupts classwork or involves substantial disorder" or (2) "inva[des] . . . the rights of others."[11] <u>Id.</u> at 513. Public school officials may not suppress "expression that does not interfere with a class (such as by straying from the topic, interrupting the teacher or other students, etc.)" unless one of <u>Tinker</u>'s prongs is satisfied. <u>Mahanoy Area Sch. Dist.</u> v. <u>B.L. ex rel. Levy</u>, 594 U.S. 180, 201 (2021) (Alito, J., concurring).

Along with identifying what speech may be restricted, <u>Tinker</u> and its progeny also inform which facts bear on our review. To begin, as noted, we consider only the school's contemporaneous

---

[11] The Supreme Court has used various formulations to refer to the first prong of this test. <u>See, e.g.</u>, <u>Tinker</u>, 393 U.S. at 513 ("materially disrupts classwork or involves substantial disorder"); <u>id.</u> ("materially and substantially disrupt[s] the work and discipline of the school"); <u>Healy</u> v. <u>James</u>, 408 U.S. 169, 189 ("substantial threat of material disruption"); <u>Mahanoy Area Sch. Dist.</u> v. <u>B.L. ex rel. Levy</u>, 594 U.S. 180, 192 (2021) ("'substantial disruption' of a school activity"). Because the parties treat "material" and "substantial" as synonymous for purposes of the <u>Tinker</u> analysis, we here use the term "substantial disruption," consistent with the Supreme Court's language in <u>Mahanoy</u>, 594 U.S. at 192.

justifications for restricting student speech.  Norris, 969 F.3d at 25-26, 30.  In so doing, however, we consider all the "relevant facts" known to the school at the time the school acted, id. at 30, and "the special characteristics" of the particular educational environment, Healy v. James, 408 U.S. 169, 180 (1972) (quoting Tinker, 393 U.S. at 506).  The latter requirement -- accounting for the particular educational environment -- reflects the commonsense view that speech or conduct that is highly disruptive in one context may pass without notice in another.  See, e.g., Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 272 (1988) (noting that discussing "the existence of Santa Claus" may be disruptive "in an elementary school setting" while "the particulars of teenage sexual activity" may be similarly "sensitive" in "a high school setting").  We therefore pause to consider a few characteristics unique to the educational environment at a public university.

We begin with the oft cited observation that a public university and its "surrounding environs is peculiarly the 'marketplace of ideas.'"  Healy, 408 U.S. at 180 (quoting Keyishian v. Bd. of Regents, 385 U.S. 589, 603 (1967)).  And while there are many characteristics that distinguish the educational environment of a university from that found at a public elementary or high school, perhaps the most salient (and obvious) to our discussion is the relative maturity of the students.

While there are undoubtedly exceptions, most university students are at least eighteen years old.  As such, they are "young adults" who, importantly, "are less impressionable than younger students."  Widmar v. Vincent, 454 U.S. 263, 274 n.14 (1981); see also Tilton v. Richardson, 403 U.S. 672, 686 (1971) ("There is substance to the contention that college students are less impressionable and less susceptible to religious indoctrination.").  Their relative maturity, in turn, undermines an argument frequently cited to justify restrictions on younger students' speech: the need to protect them from "exposure to" speech deemed harmful.  Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 684-85 (1986); see also Keefe v. Geanakos, 418 F.2d 359, 361-62 (1st Cir. 1969) ("A high school senior is not devoid of all discrimination or resistance [to offensive speech].").

Thus, when considering whether certain conduct is disruptive or invasive of the rights of others, we do so keeping in mind that these events took place on a university campus and involved interactions between university students.[12]

Finally, our review of Doe's First Amendment claim is objective, meaning we ask whether it was reasonable for the school

---

[12]  While the residential context of Doe's conduct might also constitute a "special characteristic" of the school environment, Healy, 408 U.S. at 180, the parties do not argue that anything about the dormitory environment made the University's disciplinary decisions more or less reasonable vis-a-vis Tinker's legal analysis.  We therefore do not consider that issue here.

to conclude -- based on its contemporaneous justifications -- that a student's conduct did, or would, cause a substantial disruption or invade the rights of others.  <u>Norris</u>, 969 F.3d at 25.  And because courts lack "on-the-ground expertise," we will defer to a school's decision if it is reasonable under the circumstances.  <u>Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law</u> v. <u>Martinez</u>, 561 U.S. 661, 686 (2010); <u>Norris</u>, 969 F.3d at 30.

With that overview, we turn to <u>Tinker</u>'s first prong and whether it was reasonable to conclude that Doe's conduct caused a substantial disruption.

### i. Substantial Disruption

Doe contends that the sanctions the Conduct Panel imposed violated his First Amendment rights because, pursuant to the <u>Tinker</u> analysis, it was not reasonable to conclude that his conduct caused or would cause a substantial disruption.  Defendants reject Doe's assertion and argue that such a conclusion was reasonable given the impact of Doe's behavior on "multiple female RAs."[13]

---

[13]  Doe also maintains that we should not consider defendants' arguments that his conduct caused a substantial disruption because the Conduct Panel did not use that language in its decision. Defendants correctly note, however, that Doe did not make this argument below, and it therefore "cannot be surfaced for the first time on appeal."  <u>Zhou</u> v. <u>Desktop Metal, Inc.</u>, 120 F.4th 278, 287-88 (1st Cir. 2024) (quoting <u>McCoy</u> v. <u>Mass. Inst. of Tech.</u>, 950 F.2d 13, 22 (1st Cir. 1991)).

Under Tinker's substantial-disruption prong, student speech or expressive conduct may be restricted if it "materially and substantially interfer[es] with the requirements of appropriate discipline in the operation of the school." 393 U.S. at 513 (quoting Burnside v. Byars, 363 F.2d 744, 749 (5th Cir. 1966)). But a school may not restrict speech based on "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." Id. at 509. Tinker also does not "permit a 'hurt feelings' exception that any opinion that could cause 'offense' may trigger." L.M. v. Town of Middleborough, 103 F.4th 854, 875 (1st Cir. 2024), cert. denied, 145 S. Ct. 1489 (2025) (quoting Zamecnik v. Indian Prairie Sch. Dist. No. 204, 636 F.3d 874, 877 (7th Cir. 2011)). The standard to satisfy the substantial-disruption prong is "demanding." Mahanoy, 594 U.S. at 193.

The Supreme Court's recent decision in Mahanoy offers helpful guidance as to the amount of disruption sufficient to satisfy the substantial-disruption prong. There, the Court considered whether a high school violated a student's First Amendment rights when it disciplined her for speech communicated via posts on a social media platform. See 594 U.S. at 183-84. The student -- B.L. -- published the posts in anger after failing to make the varsity cheerleading squad, using "vulgar language and gestures" to criticize the school and the cheerleading team. Id.

at 183-85.  The posts were seen by several members of the cheer squad, who were "upset" by them, and discussions instigated by the posts interrupted "5 to 10 minutes" of a math class at B.L.'s school for "a couple of days."  Id. at 185, 192.

Having learned of the posts, the school disciplined B.L. and, in the lawsuit that followed, argued that doing so was necessary to prevent disruption to the school or a school-sponsored activity, or substantial interference with "the school's efforts to maintain team cohesion" and morale.  Id. at 193.  Despite evidence that the posts disrupted a math class on multiple occasions and upset community members, the Supreme Court held that the school could not carry its burden under Tinker because there was "no evidence in the record of the sort of 'substantial disruption' of a school activity . . . that might justify the school's action."  Id. at 192-94 (quoting Tinker, 393 U.S. at 514).

And in Tinker itself, the Court held that middle- and high-school students' First Amendment rights were violated where school officials prohibited them from wearing black armbands to protest the Vietnam War despite evidence that the speech "wrecked" at least one math lesson at the high school and "took the students' minds off their classwork."  393 U.S. at 504; id. at 517-18 (Black, J., dissenting); see id. at 514 (majority opinion) ("[T]he record does not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or

material interference with school activities, and no disturbances or disorders on the school premises in fact occurred.").

Likewise, in this court's recent decision in L.M., we noted that speech by one student that demeans other students and risks causing a "decline[]" in other students' "academic performance" or "increases . . . their absences from school" -- i.e., "symptoms of a sick school" -- could support a school's forecast of substantial disruption. 103 F.3d at 882 (quoting Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. No. 204, 523 F.3d 668, 674 (7th Cir. 2008)); id. at 872-74.

In our view, these cases simply underscore Tinker's instruction that the disruption caused by a student's conduct must truly be substantial to warrant impinging on that student's First Amendment rights. Applying that standard here, while the record contains evidence that Doe's conduct was offensive, unwelcome, and caused discomfort to his peers, it lacks evidence that Doe's conduct caused, or would cause, a disruption so significant as to satisfy Tinker's "demanding standard." Mahanoy, 594 U.S. at 193. As such, we cannot conclude that the Conduct Panel's decision to the contrary was reasonable.

To begin, there is no evidence to suggest that Doe's conduct disrupted any class or classwork at the University or any complainant's academics. In light of prior precedent's focus on evidence of disruption to the academic environment, its absence

here is noteworthy.  Recall that in <u>Mahanoy</u>, the speech at issue "upset" other students and interrupted a math class on "a couple of days" for up to "5 to 10" minutes per day.  594 U.S. at 192. And in <u>Tinker</u>, the dissent emphasized that the student conduct "wrecked" a class and "took the students' minds off their classwork." 393 U.S. at 517-18 (Black, J., dissenting).  But in both cases the evidence was insufficient to demonstrate a substantial disruption that could justify the schools' speech restrictions.  <u>See</u> <u>id.</u> at 514 (majority opinion); <u>Mahanoy</u>, 594 U.S. at 192-94.  Here, there is even less evidence of disruption to classes or classwork than in <u>Mahanoy</u> or <u>Tinker</u>.  Rather, the best evidence of any disruption to academics is C.T.'s statement that "[i]t's awkward" when asked about any effect on her job or academics.[14]  In our view, that does not come close to rising to the level of disruption necessary to satisfy <u>Tinker</u>'s "demanding standard." <u>Mahanoy</u>, 594 U.S. at 193.  Indeed, there is no evidence whatsoever that Doe's behavior degraded any individual's academic pursuits or the academic environment generally.

Defendants nonetheless contend that they can satisfy <u>Tinker</u> because it was reasonable for the Conduct Panel to conclude

---

[14]  While S.K., J.T., and C.T. reported they did not want to be alone with Doe, there is no evidence that this desire had any impact on their academics.  Indeed, there is nothing to suggest that they were enrolled in any of the same classes as Doe, or that completing classwork would require them to be alone with him.

that Doe's conduct caused a substantial disruption to the university RA system. We do not agree that the record supports such a finding. Certainly the complainant RAs found Doe's several utterances unpleasant -- enough that they expressed discomfort and the desire not to be alone with him. But the complainants described Doe's comments and conduct as merely "awkward" and "uncomfortable," and the record does not suggest that any complainant understood Doe's conduct as a sexual advance.

Furthermore, the record is devoid of any evidence as to any impact on the complainants' jobs beyond their desire to avoid being on duty with Doe or be alone with him. There is no evidence or suggestion, for example, that any complainant was required to be on duty with Doe against their wishes, left their position (voluntarily or involuntarily), felt as if their only option was to leave the position, or missed or changed a shift to avoid Doe. As we noted above, although the Conduct Panel's decision states that Doe's conduct "impacted" J.T. and C.T.'s ability to work as RAs, the only factual support for that statement is J.T.'s comment that "the discomfort [she] felt" because of Doe's conduct had "[n]ot too bad of an impact on her job," and C.T.'s statement that it was "awkward." Without more, and considering the evidence objectively as we must, those impacts do not suffice to show a substantial disruption under Tinker. See L.M., 103 F.4th at 875.

The record also cannot support a finding that Doe's comment to G.D. justified the sanction imposed. The record reflects that during a conversation with G.D. about Jehovah's Witnesses and the practice of religious proselytism, Doe twice asked: "what if I stuck my penis in your face." As G.D. herself explained, Doe followed up his statements by explaining that his comment was meant to caricature "what Jehovah's Witness folks do[,] . . . 'shoving their beliefs in your face.'" The record also shows that G.D. "[d]id not think about [the interaction] much" at the time and that her momentary reaction -- of "fear and confusion" about Doe's "intent" -- was the extent of the comment's impact. There is no evidence that her reaction was more than momentary.

We are similarly unpersuaded by defendants' argument that it was reasonable to forecast future disruption because Doe's behavior constituted "a pervasive pattern of unwelcome conduct." Simply put, the statements, hugs, and single incident of foot-adjusting on which the Conduct Panel relied fall considerably short of "a pervasive pattern." Recall that the findings about Doe's comments to complainants were limited to one comment to G.D. in 2022, one comment to C.T. in 2023, and one comment to S.K. in 2023.

In sum, the record lacks evidence sufficient to show that Doe's conduct caused a disruption as substantial as those at

issue in <u>Tinker</u> or <u>Mahanoy</u>, which themselves were insufficient to constitute a substantial disruption.  See <u>Tinker</u>, 393 U.S. at 514; <u>Mahanoy</u>, 594 U.S. 193–94.  Likewise, we do not see how that evidence could reasonably support finding that Doe's behavior would cause such a disruption in the future.  Indeed, there is no evidence that Doe ever made similar statements or physical contact once he was told that such statements and contact were unwelcome and offensive.  Finally, this is also not a case where Doe's comments were repeatedly directed at a single target, such that the cumulative effect could reasonably be seen as threatening. <u>Cf.</u> <u>Doe</u> v. <u>Valencia Coll.</u>, 903 F.3d 1220, 1224–26, 1230–31 (11th Cir. 2018) (holding that a school did not violate a student's First Amendment rights in suspending the student where he persistently harassed another student).  Rather, Doe's cited verbal conduct included three separate statements to three different individuals.

      We now turn to <u>Tinker</u>'s remaining prong.

### ii. Rights of Others

      We start with the parties' arguments.  Doe contends that none of his conduct could reasonably be found to have invaded the rights of others and that the evidence does not show that his conduct "impacted any complainant's ability to study or work" at the University.  He also argues that his conduct is easily distinguished from the behavior at issue in prior cases in which courts have held that the rights of others have been invaded.

Defendants counter that the evidence of the impact of Doe's conduct on his colleagues was "more than sufficient to support" finding that the panel "reasonabl[y] determin[ed]" Doe invaded the rights of others.  See Valencia Coll., 903 F.3d 1220.  We agree with Doe.

In Tinker, the Supreme Court held that school officials may restrict speech that "inva[des] . . . the rights of others." 393 U.S. at 513.  Since then, however, the rights-of-others prong has been rarely litigated such that its scope remains somewhat "unclear."  Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 217 (3d Cir. 2001); see also Eisner v. Stamford Bd. of Educ., 440 F.2d 803, 808 (2d Cir. 1971) ("The phrase 'invasion of the rights of others' is not a model of clarity or preciseness.").  That said, we endeavor to glean what we can from precedent.

We are aware of only three prior First Circuit opinions that have addressed Tinker's rights-of-others prong.  First, in Norris, we explained that "bullying is the type of conduct that implicates the governmental interest in protecting against the invasion of the rights of others, as described in Tinker."  969 F.3d at 29.  We also stated that "[i]t is clear . . . that speech that is merely offensive to the listener is not enough" to constitute bullying and, consequently, does not suffice to evidence invasion of the rights of others.  Id. at 29 n.18.  Rather, we suggested that speech constituting bullying will involve conduct that is "more severe or pervasive" than merely offensive

speech.[15]    Id.    Second, in a similar vein, we held in Doe v. Hopkinton Public Schools that student speech that "actively and pervasively encourages bullying" could constitute "invading the rights of others" under Tinker. 19 F.4th 493, 509 (1st Cir. 2021). Finally, we confronted the rights-of-others prong in L.M., but there we noted only that "we ha[d] not addressed the scope of th[e rights-of-others] limitation," other than to find that bullying falls within it.  103 F.4th at 868.  These cases offer little guidance here, as defendants do not allege that Doe's behavior constituted bullying.

Likely due to the lack of in-circuit precedent, defendants urge us to look to the Eleventh Circuit's decision in Valencia College for guidance, arguing that it dealt with analogous conduct.  Indeed, defendants highlight that like the plaintiff in Valencia College, Doe caused at least one student to be "made 'fearful'" and further contend that Doe's behavior was, in fact, "more pervasive and more closely tied to campus than the conduct in Valencia College."  But Valencia College involved prolonged virtual stalking of a woman by a rejected suitor who persisted around the clock and in the face of law enforcement involvement.

---

[15]  Moreover, in Mahanoy the Supreme Court applied Tinker to suggest that public schools may regulate "severe bullying and harassment targeting particular individuals."  See 594 U.S. at 188.  The Court declined to specify, however, whether bullying falls under or satisfies the substantial disruption prong, the rights-of-others prong, or both.

See 903 F.3d at 1225-27.  Doe's "awkward" comments, hugs, and a single incident of foot-touching simply do not compare to the extreme course of conduct in Valencia College.

Finally, defendants appear to suggest that there is some significance to the argument that "Doe's conduct was likely at least tortious."  We are aware of only one circuit -- the Eighth Circuit -- that has recognized any connection between the rights-of-others prong and tort liability.  See Kuhlmeier v. Hazelwood Sch. Dist., 795 F.2d 1368, 1375-77 (8th Cir. 1986), rev'd on other grounds, 484 U.S. 260 (1988).  There, however, the court held that a school may restrict student speech under the rights-of-others prong "only when publication of that speech could result in tort liability for the school."  Id. at 1376 (emphasis added).  But here no party argues that Doe's conduct created tort liability for the University.  Thus, insofar as defendants can be understood to urge us to endorse the Eighth Circuit's decision in Kuhlmeier, we see no need to do so here.[16]

---

[16]    In  L.M.,  we  noted -- in  dicta -- that  "while  the rights-of-others limitation appears to encompass tortious speech," we did not have to address the issue because "there [was] no developed contention that speech of that sort [was] involved." 103 F.4th at 867.  As the issue was not presented in that case, we did not affirmatively address or make any findings about the scope of the rights-of-others prong (other than affirming that certain instances of bullying may satisfy that prong).  See id. at 867-68.

We thus turn to Defendants' remaining argument that the Individual Defendants are entitled to qualified immunity as to Doe's claim for money damages.

## B. Qualified Immunity

When public officials, like the Individual Defendants, are sued in their personal capacity for money damages, the doctrine of qualified immunity shields them from pecuniary liability "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" District of Columbia v. Wesby, 583 U.S. 48, 62-63 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). "The goal of qualified immunity is to 'give[] government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" Ciarametaro v. City of Gloucester, 87 F.4th 83, 87-88 (1st Cir. 2023) (alteration in original) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011)). Accordingly, we will not find that a rule was "clearly established" unless at the time the official acted, "the law was sufficiently clear [such] that every reasonable official would understand that what they [were] doing [was] unlawful." Heredia v. Roscoe, 125 F.4th 34, 46-47 (1st Cir. 2025) (quoting Segrain v. Duffy, 118 F.4th 45, 57 (1st Cir. 2024)). In consequence, qualified immunity protects "all but the plainly incompetent or

those who knowingly violate the law."  Wesby, 583 U.S. at 63 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

To be clearly established, there must be "controlling authority or a robust consensus of cases of persuasive authority, clearly demonstrating the violative nature of the defendant's particular conduct."  Ciarametaro, 87 F.4th at 88 (cleaned up) (quoting Ashcroft, 563 U.S. at 741-42).  Although the authority need not be "directly on point," it must be "sufficiently analogous to 'place[] the statutory or constitutional question beyond debate.'"  Id. (alteration in original) (quoting Ashcroft, 563 U.S. at 741-42).  It is a "heavy burden."  Est. of Rahim by Rahim v. Doe, 51 F.4th 402, 410 (1st Cir. 2022) (quoting Lachance v. Town of Charlton, 990 F.3d 14, 20 (1st Cir. 2021)).

Doe argues that the Individual Defendants are not entitled to qualified immunity because the right of university students to engage in "offensive" expression on a public university campus has been "well-established in this [c]ircuit for over half a century."  In response, defendants argue that even if Doe could show a constitutional violation -- as we conclude he has -- he cannot carry his burden under the "clearly established" prong because he did not identify controlling authority or a consensus of persuasive authority that would have put the Individual Defendants on notice that disciplining Doe for his speech violated his First Amendment rights.

We agree with defendants.  Prior to this case, as the
district court accurately noted, there was an "absence of First
Circuit precedent" addressing the particular circumstances at
issue here.  Doe, 2024 WL 1521758, at *9.  Nor has Doe identified
sufficiently analogous case law that put it "beyond debate" whether
a university can discipline a student for offensive speech that
did not materially disrupt the educational environment or any
student's academics.[17]  Ciarametaro, 87 F.4th at 88.  Furthermore,

_____

[17]  As the district court explained, the cases Doe relies on
to argue that the Individual Defendants' conduct was clearly
established as illegal are factually distinguishable from the
present case.  See Papish v. Bd. of Curators of Univ. of Mo., 410
U.S. 667, 667-70 (1973) (holding that university violated
student's First Amendment rights by expelling student for
distributing newspaper with a political cartoon the university
viewed as explicit and offensive); Gay Students Org. of Univ. of
N.H. v. Bonner, 509 F.2d 652, 654, 662 (1st Cir. 1974) (holding
that First Amendment protected right of student organization to
hold social activities on university's campus); L.M., 103 F.4th at
868 (finding that "demean[ing]" speech by middle school student
that targeted certain classmates' personal characteristics could
be restricted); Doe v. Hopkinton Pub. Schs., 490 F. Supp. 3d 448,
467-68 (D. Mass. 2020) (holding that bullying in the high school
environment was not protected by First Amendment); Flores v.
Bennett, No. 22-16762, 2023 WL 4946605, at *1-2 (9th Cir. Aug. 3,
2023) (finding that high school's "flyer policy" was likely
facially overbroad insofar as it prohibited "inappropriate or
offense [sic] language or themes"); Saxe, 240 F.3d at 212, 215-18
(holding that school district's anti-harassment policy was
unconstitutionally overbroad because, in part, it purported to
prohibit offensive or unwelcome speech); Nuxoll, 523 F.3d at 674
(holding that high-school student was likely to prevail on his
claim that his school would violate his First Amendment rights by
preventing him from wearing a shirt bearing the slogan "Be Happy,
Not Gay"); Thonen v. Jenkins, 491 F.2d 722, 723-24 (4th Cir. 1973)
(holding that First Amendment prohibited university from
disciplining students for using single expletive in a letter
published in a school newspaper).

we are aware of no such cases.  Consequently, we cannot conclude
that every reasonable official would have known disciplining Doe
was illegal.  Indeed, our analysis on the First Amendment question
underscores the lack of on-point precedent, making it evident that
Doe's rights, at the time in question, were not clearly
established.  This is a close case, in which Doe prevails only in
the context of rather constricted arguments by defendants.  We
therefore agree with the district court that the Individual
Defendants are entitled to qualified immunity as to Doe's request
for monetary damages.  In so holding, we note that this does not
bar Doe's claims for prospective injunctive relief against the
Individual Defendants in their official capacities.

### V. Conclusion

        For the foregoing reasons, the judgment of the district
court is **<u>reversed</u>** as to the merits of Doe's First Amendment claim
but **<u>affirmed</u>** as to the Individual Defendants' entitlement to
qualified immunity.